UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CINDY GAMRAT,

       Plaintiff,

v.

KEITH ALLARD, in his individual capacity;
BENJAMIN GRAHAM, in his individual
capacity; JOSHUA CLINE, in his individual
capacity; JOSEPH GAMRAT; MICHIGAN
HOUSE OF REPRESENTATIVES; KEVIN G.
COTTER, in his individual capacity; TIM L.
BOWLIN, in his individual capacity; BROCK
SWARTZLE, in his individual capacity; NORM
SAARI, in his individual capacity; EDWARD
McBROOM, in his individual capacity;
HASSAN BEYDOUN, in his individual
capacity; DAVID HORR; and VINCENT
KRELL,

       Defendants.

Case No. 1:16-cv-1094

HON. GORDON J. QUIST

**FIRST AMENDED COMPLAINT
AND JURY DEMAND**

---

Tyler E. Osburn (P77829)
Schenk Boncher & Rypma
Attorneys for Plaintiff Cindy Gamrat
601 Three Mile Road NW
Grand Rapids, MI 49544
616-647-8277

Gary Gordon (P26290)
Jason T. Hanselman (P61813)
Dykema Gossett PLLC
Attorneys for Defendants Michigan House of
Representatives, McBroom, and Bowlin
Capitol View
201 Townsend St., Ste. 900
Lansing, MI 48933
(517) 374-9100

---

THERE ARE NO OTHER PENDING AND UNRESOLVED CIVIL ACTIONS
ARISING OUT OF THE TRANSACTIONS OR OCCURRENCE ALLEGED IN
THIS COMPLAINT.

**FIRST AMENDED COMPLAINT AND JURY DEMAND**

NOW COMES plaintiff Cindy Gamrat, by and through her attorneys, Schenk Boncher &

Rypma, and for her complaint against defendants Keith Allard; Benjamin Graham; Joshua Cline;

1

Joseph Gamrat; Michigan House of Representatives; Kevin G. Cotter; Tim L. Bowlin; Brock Swartzle; Norm Saari; Edward McBroom; Hassan Beydoun; David Horr; and Vincent Krell, states as follows:

### Jurisdiction and Venue

1.    Gamrat resides in this judicial district.

2.    This is a claim brought under 42 U.S.C. § 1983, 18 U.S.C. § 2511, and applicable state law.

3.    The United States District Court for the Western District of Michigan has original jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

4.    The United States District Court for the Western District of Michigan has supplemental jurisdiction over the attendant state law claims under 28 U.S.C. § 1367.

5.    Venue is proper in the United States District Court for the Western District of Michigan under 28 U.S.C. § 1391(b).

### Parties

6.    Plaintiff Cindy Gamrat ("Gamrat") is an individual residing in Allegan County, Michigan.

7.    Gamrat was the duly elected State Representative for the 80th District and a member of the Michigan House of Representatives until the House voted to expel her from office on September 11, 2015.

8.    Upon information and belief, Defendant Keith Allard ("Allard") is a resident of Kent County, Michigan.  Allard was a staff member for the 80th District office until the House terminated his employment on July 6, 2015, for poor performance and workplace issues.

9.    Upon information and belief, Defendant Benjamin Graham ("Graham") is a resident of Genesee County, Michigan. Graham was a staff member for the 82nd District office until the House terminated his employment on July 6, 2015, for poor performance and workplace issues.

10.   Upon information and belief, Defendant Joshua Cline ("Cline") is a resident of Lapeer County, Michigan. Cline was a staff member for the 82nd District office until he resigned from his position on or about April 14, 2015.

11.   Defendant Joseph Gamrat ("Joe Gamrat") is an individual residing in Allegan County, Michigan. He was at all relevant times Gamrat's husband.

12.   Defendant Michigan House of Representatives (the "House") is one of two chambers of the legislative body of the State of Michigan created by the Michigan Constitution. The House conducts its business in Lansing, Michigan.

13.   Upon information and belief, Defendant Kevin Cotter ("Cotter") is a resident of Isabella County, Michigan, and was the elected State Representative for the 99th District and a member of the House. He was also elected by the House as Speaker of the Michigan House of Representatives.

14.   Upon information and belief, Defendant Tim L. Bowlin ("Bowlin") is a resident of Ingham County, Michigan, and was the appointed Business Director/CFO for the House.

15.   Upon information and belief, Defendant Brock Swartzle ("Swartzle") is a resident of Ingham County, Michigan, and was the appointed Chief of Staff/General Counsel to Cotter.

16.     Upon information and belief, Defendant Norm Saari ("Saari") is a resident of Ingham County, Michigan, and was the appointed Chief of Staff to Cotter.

17.     Upon information and belief, Defendant Edward McBroom ("McBroom") is a resident of Vulcan, Michigan, and was the elected State Representative for the 108th District and a member of the House. McBroom was the chairperson of the House Select Committee to examine the qualifications of Gamrat.

18.     Upon information and belief, Hassan Beydoun ("Beydoun") is a resident of Ingham County, Michigan, and was the appointed Majority Legal Counsel to the House.

19.     Upon information and belief, Defendant David Horr ("Horr") is a resident of Fort Gratiot, Michigan.

20.     Upon information and belief, Defendant Vincent Krell ("Krell") is a resident of Portage, Michigan.

21.     Gamrat reserves the right to name additional defendants as they become known through discovery.

**Factual Allegations**

22.     The preceding paragraphs are incorporated herein by reference.

23.     In 2014, Gamrat served as an elected Precinct Delegate and Republican Presidential Elector for the 6th Congressional District's Electoral College. As the founder of the Plainwell Patriots and Michigan 4 Conservative Senate, Gamrat was considered a strong grassroots leader in Michigan, organizing many large statewide conferences while advocating for lower taxes, less spending, and transparency in government.

24.     Gamrat and Todd Courser ("Courser") ran for the offices of State Representative in the 80th and 82nd Districts, respectively.

25. It was well-known that during their campaigns, Gamrat and Courser strongly opposed Proposal 15-1, which was a proposal to fund Michigan roads through, among other things, increases in taxes.

26. During her campaign, Gamrat promised her constituents that, if elected, she would vote conservatively, submit specific legislation, and communicate with them regarding the activities of the legislature.

27. On August 5, 2014, Gamrat won the election primary for the State Representative seat for the 80th District with 41% of the vote.

28. During the general election campaign for Michigan State Representative in the fall of 2014, Allard volunteered and served on Gamrat's political campaign after losing his own campaign for State Representative.

29. During the election campaign for Michigan State Representatives and beyond, Graham was a paid political consultant and served on both Gamrat's and Courser's political campaigns.

30. During the election campaign for Michigan State Representatives and beyond, Cline was a paid political consultant and served on both Gamrat's and Courser's political campaigns.

31. In or around October 2014, Cline recommended to Gamrat and Courser to consider a "joint staffing arrangement," referencing other legislative offices using this arrangement, which would overlap duties of staff, decrease overhead costs, save taxpayer dollars, and allow the staff to be compensated at a higher rate.

32.    On October 15, 2014, Allard requested that he be permitted to serve as both the political campaign liaison for Gamrat and Courser and also as the "District Office Chief of Staff" for both Gamrat and Courser.

33.    On October 15, 2014, Allard sent an email to Gamrat, Courser, Graham, and Cline laying out what he felt would be the appropriate political and official duties and expectations of the staff under a joint staffing arrangement.

34.    Allard, Graham, and Cline assured Gamrat and Courser that they wanted to assist politically as well as work as staff for the House officially, and that they would not overlap political and official work during State time or on State property.

35.    On November 4, 2014, Gamrat won the general election for the State Representative seat for the 80th District with 63% of the vote.  Courser also won the general election to serve as State Representative for the 82nd District.

36.    Allard, Graham, and Cline were officially employed by the House on or about January 2, 2015.

37.    Cotter assigned Allard to Gamrat's office, which was located on the 10th floor on the north side of the House Anderson Building.

38.    Cotter assigned Graham and Cline to Courser's office, which was located across the street from Gamrat's office on the 11th floor on the south side of the House Anderson Building.

39.    Gamrat and Courser agreed to try the joint staffing arrangement suggested and advocated by Cline, but at no time did Gamrat and Courser ever share an office.  Allard, Graham, and Cline—as well as other staff—took turns working out of both Gamrat's and Courser's separate offices.

40.  Gamrat served on five Appropriations committees which met weekly in the Capitol. Gamrat had 100% attendance on her committees.

41.  Having experienced abuse and threats in her marriage, Gamrat feared for her personal safety and security.

42.  Gamrat directed the staff to forward all communications they received from family members directly to her. This direction was motivated by Gamrat's concern for her own personal protection and also to separate her personal life from her official work.

43.  On January 15, 2015—Gamrat's first day after being sworn into office—Cotter directed Gamrat and the other Republican State Representatives to sign a "Caucus Pledge" that required her to pledge her votes on important issues to caucus (i.e. Cotter) instead of voting based on the desires of the constituents in her district.

44.  Cotter instructed the State Representatives that this Caucus Pledge and its contents were to remain confidential.

45.  Gamrat felt that Cotter's actions—along with the Pledge itself—were unethical, and she refused to sign the Pledge. Later that day, Gamrat was called to a private meeting with Cotter and Swartzle where Cotter demanded that she sign the Pledge as a requirement of membership in his Republican Caucus.

46.  Upon information and belief, it was around this time that Cotter, Saari, and Swartzle began meeting with Allard, Graham, and Cline in order to direct them to gather information against Gamrat. (See Allegations contained in Complaint and Jury Demand in *Allard and Graham v. Michigan House of Representatives*, case no. 1:15-cv-01259 in the Western District of Michigan, including Paras. 20 and 33, attached as **Exhibit 1**;

Saari MSP Interview at pp. 10, 18, 25; attached as **Exhibit 2**; April 28, 2015, Text between Allard and Gamrat's son, attached as **Exhibit 3**.)

47. Upon information and belief, Allard, Graham, and Cline began to issue reports to Saari and Swartzle about Gamrat after the meeting in January 2015 between Cotter and Gamrat. (*Id.*; See also Jessica Jeurink Documents in HBO Report.[1])

48. Upon information and belief, these reports were part of an ongoing effort to assemble allegations to be used to injure and erode Gamrat's credibility and effectiveness as a State Representative.

49. For example, in an effort to damage Gamrat's first introduced bill—a bill that she had promised to her constituents—Cotter violated House Rule 41(4) by taking the rare step of withholding the bill's reading while directing the co-sponsors to remove their names from her bill. (Preliminary Exam Transcript Vol. II dated May 26, 2016, at pp. 305-309; 319-322; attached as **Exhibit 4**.)

50. As House staff serving in Gamrat's office, Allard, Graham, and Cline began communicating with Joe Gamrat without Gamrat's knowledge and against Gamrat's express directions to her staff. (See Attached Text Messages and Emails between Allard, Graham, Cline, and Joe Gamrat, attached as **Exhibit 5**.)

51. Upon information and belief, Joe Gamrat had been secretly conducting surveillance of Gamrat in her car, her home, her bedroom, and her campaign headquarters by placing secret wiretapping and surveillance devices in these locations.

---

[1] The HBO Report is over 800 pages long, and due to its length it is not attached as an exhibit to this Amended Complaint. However, a copy of the HBO Report can be found online at https://www.scribd.com/document/279727022/Michigan-House-report-on-investigation-into-Reps-Todd-Courser-and-Cindy-Gamrat.

52. Upon information and belief, Joe Gamrat, Krell, and Horr had been secretly conducting wiretapping in Gamrat's state office, hotel rooms, her car, and her purse by placing secret wiretapping devices in these locations during 2015.

53. Joe Gamrat, Krell, and Horr were also secretly monitoring Gamrat's phone calls and voicemails, as well as downloading her inbound and outbound emails and texts.

54. Joe Gamrat then began to forward this information both directly and anonymously to people who knew Gamrat, including her friends, her pastor, and her colleagues in the House.

55. Upon information and belief, Joe Gamrat began providing updates to Cotter and Saari both directly and indirectly through Allard, Graham, Cline, and others. (See Text Messages between Allard and Joe Gamrat, **Ex. 5.**)

56. On or around February 11, 2015, Joe Gamrat told Allard, Graham, and Cline that he believed Gamrat and Courser were having an affair.

57. At the same time, Allard, Graham, and Cline were also obtaining information through wiretapping and eavesdropping devices, as described in detail below in Count V.

58. Because Gamrat trusted Allard, Graham, and Cline as employees working in her office and because of their professional relationship, Gamrat provided them with her private passwords for her personal and official email accounts.

59. In the winter of 2015, at the beginning of their first term of office, it came to the attention of Gamrat and Courser that extensive surveillance was being conducted on them at many places, including the Radisson Hotel in Lansing.

60.  Gamrat was told by Radisson staff that her personal information, including reservations information, room number, and payment information were automatically sent to an email address attached to her account that Gamrat had not provided or authorized.  Gamrat would later discover that this email address was in the possession of Joe Gamrat.

61.  On April 14, 2015, Cline quit his position without warning.

62.  On April 15, 2015, Cotter physically removed Gamrat from the Republican Caucus, alleging she broke the "Caucus Pledge" confidentiality agreement through a Facebook post she made communicating to her constituents about the House Budget.

63.  Cotter's actions sent a strong message to the other State Representatives about the consequences of breaking the Caucus Pledge.  Cotter never allowed Gamrat to return to caucus, inflicting damage to her in her official capacity as State Representative.

64.  During this time, Graham and Allard had gained access to Gamrat's cellular phone, text messages, emails, and calendars as staff members of the House.  Allard and Graham distributed information obtained through this access to others outside the office without her permission.  (Texts between Joe Gamrat and Allard and Graham, **Ex. 5**.)

65.  Graham and Allard were illegally and secretly recording conversations involving Gamrat, as described in detail below in Count V.

66.  In some cases, Graham and Allard were admittedly not part of the recorded conversations.

67.  Upon information and belief, Graham and Allard were recording the conversations while in their official capacity and as agents of the House and on behalf of its member

Defendants. (See Statement by Allard that he and Graham "work for the Speaker." Evidence page 12 of HBO Report.)

68.   On a number of occasions, Allard commented to Gamrat and Courser and other staff that Gamrat's office was "bugged."

69.   Anne Hill, another staff member who was hired by Gamrat, would later comment that she wondered if Allard and Graham had "either been in the process of planting or removing additional surveillance items." (Anne Hill Statement in HBO Report, attached as **Exhibit 6**.)

70.   Allard also directed Graham to record conversations with Gamrat and Courser.

71.   Upon information and belief, although no longer a House employee, Cline continued to be copied on emails and had password access to Gamrat's email accounts. (See June 20, 2015, Email from Graham to Allard and Cline, attached as **Exhibit 7**.)

72.   Allard, Graham, and Cline kept their communications with Joe Gamrat hidden from Gamrat.

73.   During this time, Gamrat and Courser began receiving what would become a series of anonymous extortion texts demanding that Gamrat and Courser resign from office. These texts included personal and confidential information such as live call conversations, texts, information from private emails, and locations of Gamrat and Courser and their families.

74.   The Michigan State Police ("MSP") Report regarding the extortion found Joe Gamrat and Horr to be behind the extortion texts.[2]

---

[2] The MSP Report is almost 400 pages long, and due to its length it is not attached as an exhibit to this Amended Complaint. However, a copy of the MSP Report can be found online at http://media.mlive.com/lansing-news/other/Police-Report-on-Extortion-Texts-in-Courser-Gamrat-Scandal_Redacted.pdf.

75.   The MSP Report also found hundreds of communications between Joe Gamrat, Allard, Graham, and Cline before, during, and after the extortion texts were taking place.

76.   Due to many performance issues with Allard, Graham, and Cline, Gamrat and Courser requested that new staff be hired for their respective offices as early as March 2015. The work issues included skipping work without permission, not informing Gamrat of constituent calls and emails, using foul language in the office, leaving the office in disarray, numerous scheduling errors, and failing to follow through on administrative assignments.

77.   As Chief of Staff, Allard drew inappropriate pictures during staff meetings and also texted inappropriate comments about Gamrat to her minor son, Joey.

78.   In response to this request, Cotter finally hired and assigned Anne Hill to Gamrat's office and Karen Couture to Courser's office in June 2015.

79.   Allard and Graham subsequently met with Hill in an attempt to intimidate her into quitting her position.

80.   Gamrat and Courser met with Hill to discuss the improper meeting.  During this meeting, many concerns about the work performance of Allard and Graham surfaced and were conveyed to Gamrat and Courser by Hill.

81.   Hill shared that she felt Allard and Graham were not only incompetent, but that they were intentionally causing harm and disruption in the office.

82.   Gamrat and Courser decided that it was time to bring in the House Business Office to address these matters with Allard and Graham.

83.   On July 6, 2015, Gamrat approached Bowlin regarding the issues.  Bowlin terminated the employment of Allard and Graham on the same day.

84. Upon information and belief, on July 6, 2015—just hours after their termination—Allard and Graham again met with Bowlin, Saari, and Swartzle and again reported information and made unfounded accusations of misuse of taxpayer dollars against Gamrat. (Allegations contained in Complaint and Jury Demand in *Allard and Graham v. Michigan House of Representatives*, Para. 47, **Ex. 1**.)

85. On July 7, 2015, Allard texted Joe Gamrat, "I want to scare the living shit out of them," to which Joe Gamrat responded, "Nice. I have no idea how to do that but that's all right." (July 7, 2015 Text from Allard to Joe Gamrat, attached as **Exhibit 8**.)

86. Allard and Graham relayed these unfounded accusations and misinformation to the Detroit News prior to August 7, 2015, which is the date on which the Detroit News broke the story.

87. Within hours of the article breaking, Cotter—having seemingly already been prepared—requested and directed Bowlin to "investigate" and prepare a report on alleged misconduct by Gamrat and Courser.

88. Under Cotter's direction, Bowlin did an investigation into the alleged misuse of taxpayer resources.

89. As an example of how insufficient and suspect the investigation really was, Bowlin later stated during an interview with the MSP that he asked other members during the investigation just how low they wanted the bar to be set for the expulsion of Gamrat and that "they set it the way they wanted to set it." (Bowlin MSP Interview at pp. 6-7, attached as **Exhibit 9**.)

90.   Beydoun would later state in his interview with the MSP that Allard was "the most manipulative, deceitful person involved in all of this" and described him as "the mastermind." (Beydoun MSP Interview at pp. 21, 25; attached as **Exhibit 10**.)

91.   Cotter only gave Bowlin two weeks to investigate, in spite of the fact that Bowlin requested more time for the investigation.

92.   Upon information and belief, as part of the investigation, Bowlin conducted a series of interviews with several key players but never recorded the interviews, instead simply asking two staff members to take notes.

93.   On August 17, 2015, Gamrat met with Bowlin, Beydoun, and two other House staff for her interview for the report.

94.   In the meeting, Bowlin informed Gamrat that he was simply taking statements at that time, that she was not under oath, and that the statements would not be released to the public.

95.   Bowlin told Andrew Abood, Gamrat's attorney during the interview, that he could not record the interviews, instead assuring Gamrat and Abood that the two House staff were present to take notes. From those notes, Bowlin stated that he would prepare "statements."

96.   Bowlin refused to initially give Gamrat a copy of her alleged statement.

97.   When Gamrat was able to see a copy of her "statement" produced by Bowlin and the House, she identified a number of errors and omissions from the statement.

98.   Gamrat's corrections were not included in the final copy of the statements or in the HBO Report.

99. On August 19, 2015, under Cotter's direction and before the conclusion of Bowlin's investigation, the House passed House Resolution 129 ("H.R. 129") to form a Select Committee by a voice vote.

100. On August 31, 2015, Cotter, Bowlin, Swartzle, Saari, and Beydoun published a report called the "Report on the Investigation of Alleged Misconduct by Representative Todd Courser and Representative Cindy Gamrat" (the "HBO Report").

101. The HBO Report was based almost entirely on the unsworn testimony of Allard and Graham.

102. The HBO Report was rebroadcast and published many times by several different news outlets from August 2015 through December 2015.

103. The HBO Report included false statements made as fact that were taken directly from the unsworn allegations of Allard and Graham.

104. On September 1, 2015, The House Select Committee—formed by H.R. 129 to examine the qualifications of Gamrat and Courser—met to adopt the rules of the committee.

105. Upon information and belief, all committee members were handpicked or approved by Cotter, who also determined that the committee would be made up of four Republicans but only two Democrats, ensuring his control of the majority of votes and, subsequently, the outcome.

106. McBroom was the chairperson of the committee. The members of the committee were as follows: McBroom, Verheulen, Heise, Lafontaine, and Democrats Chirkin and Liberati.

107.   Upon information and belief, the rules adopted by the committee did not allow for Gamrat to call, question, or cross examine witnesses.

108.   Leading up to the committee hearings on September 4 and 7, 2015, Gamrat met with Beydoun, legal counsel for the House and, consequently, also legal counsel for Gamrat.

109.   During this meeting, Beydoun advised Gamrat to sign and prepare a statement admitting to all of the alleged wrongdoing in exchange for censure.

110.   Beydoun stated that he believed that censure was more appropriate for Gamrat than expulsion.

111.   Gamrat refused to sign Beydoun's prepared statement because the statement stated that all facts and findings set forth in the entire HBO Report were accurate.

112.   However, Gamrat and Beydoun worked jointly on a statement that would be read to the House committee.

113.   Although Gamrat refused to admit the entire HBO Report because of its falsehoods and inaccuracies, she did read the co-authored joint statement to the House committee.

114.   Beydoun assured Gamrat multiple times that censure was in play and appropriate. Beydoun stated that "we can control the Republican votes," refreshing Gamrat's memory of the Caucus Pledge agreement all Republicans had signed.

115.   Gamrat also met with Beydoun, McBroom, and her criminal attorney at Beydoun's office on the night before Gamrat was to present to the select committee.  At that meeting, McBroom went so far as to lay out the terms for Gamrat's censure.

116.   Although the Select Committee was carried out to give the appearance of a fair hearing, the Republican committee members had all previously signed the Caucus Pledge to stand with Cotter.

117.  By the time the committee hearings began on Tuesday, September 8, 2015, Gamrat had
only been allowed a quick review of the hundreds of pages of documents and audio, and
had been denied the opportunity to have a copy of any of the evidence in the HBO
Report—evidence that was the foundational evidence of the special committee hearings.

118.  When the Democrat Representatives requested to question Allard and Graham during
the Committee, they were told by McBroom that Allard and Graham refused to testify.
This was not true.

119.  Democrats Chirkin and Liberati put forward House Resolution 137 ("H.R. 137") to
subpoena Allard and Graham to allow the veracity of their allegations to be questioned
under oath.  McBroom and the Republican members all voted against this resolution.

120.  The credibility of Allard and Graham, as accusers, was not allowed to be questioned or
countered by Gamrat, Courser, or any of the committee members.  This was in spite of
the fact that McBroom would later admit that Allard and Graham had "precious little"
credibility.  (Allegations contained in Complaint and Jury Demand in *Allard and
Graham v. Michigan House of Representatives*, Para. 72, **Ex. 1**; Fox 2 News Article
dated December 8, 2015, attached as **Exhibit 11**.)

121.  The HBO Report was based primarily upon the accusations alone of Allard and
Graham.  These statements were not taken under oath.  However, they were accepted as
sworn evidence in the HBO Report and also in the Committee hearings.

122.  During the committee hearings, evidence and testimony from Anne Hill and Karen
Couture that corroborated Gamrat's testimony and discredited Allard and Graham
was not presented by McBroom, Beydoun, Cotter, Swartzle, or the House.

123.   Upon information and belief, many Democrat Representatives—including Chirkin, Liberati, and Singh—questioned the process, lack of witnesses, lack of subpoenas, lack of due process, and lack of any substantial evidence on the record.

124.   The Minutes of the House Select Committee to Examine the Qualifications of Representatives Cindy Gamrat and Todd Courser contain admitted omissions.

125.   On or around 10:30 a.m. on Wednesday, September 10, 2015, McBroom placed before the special committee House Resolution 141 ("H.R. 141") to expel Gamrat.

126.   A roll call of H.R. 141 was taken. Voting YEAH were McBroom, Heise, Verheulen, and Lafontaine. Voting NAY were none. Voting PASS were Representatives Chirkun and Liberati.

127.   Although Beydoun agreed that the committee would recommend censure for Gamrat during his prior meetings with her, the committee instead recommended expulsion.

128.   McBroom refused to allow a resolution for censure of Gamrat before the Select Committee for consideration.

129.   Upon information and belief, Cotter had directed Beydoun to obtain the censure statement from Gamrat.

130.   Session for the House of Representatives convened on Thursday, September 10, 2015—about an hour after the Select Committee recommended expulsion and adjourned.

131.   It had only been about 48 hours since the evidence was released to the full body of the House, which was responsible for voting on the expulsion of Gamrat.

132.   At or around 4:00 a.m. on September 11, 2015—after the representatives had been forced to remain in chambers for several hours without being able to leave for any reason—Gamrat was expelled from the House.

133. Gamrat had never missed a committee, never missed a vote, sponsored 21 pieces of legislation, and co-sponsored dozens more. In just 8 short months, Gamrat had worked hard and followed through on the votes and legislation she had promised her constituents when running for office.

134. Shortly after Gamrat was expelled and Courser was forced out, the House Road Package was passed, superseding the decision of the Michigan Electorate on Proposal 15-1.

135. While in office, Gamrat and Courser had been successful at preventing the tax and fee increases in the package from passing. With them out, however, the composition of the House was changed, and one of the bills in the House Road Package passed by a vote of 54-53 in the House—narrowly passing by just one vote.

136. Had Gamrat and Courser still been in office, the legislation would not have passed.

137. On or about February 26, 2016, criminal charges were filed against Gamrat.

138. These charges were baseless and ultimately dismissed at the preliminary exam after it was determined that there was no probable cause to charge Gamrat with any crime.

139. On or about October 7, 2015, Allard and Graham filed a lawsuit in Ingham County against Gamrat and Courser (the "State Case").

140. After a hearing on December 7, 2016, the presiding judge granted Allard and Graham's motion to dismiss the State Case with prejudice.

141. Gamrat's life has been ruined—personally, financially, and professionally—as a result of Defendants' actions as described in this Amended Complaint.

## Count I: Violation of Procedural Due Process under State and Federal Constitutions – 42 U.S.C. § 1983

142. The preceding paragraphs are incorporated herein by reference.

143. This count applies to the following Defendants: Cotter, Bowlin, Swartzle, Saari, McBroom, and Beydoun.

144. The Defendants named in the preceding paragraph deprived Gamrat of her constitutionally protected interest in continued state employment absent an adequate pre-termination or post-termination hearing, under color of law, in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

145. The Defendants named above deprived Gamrat of her constitutionally protected interest in continued state employment absent an adequate pre-termination or post-termination hearing, under color of law, in violation of the Due Process Clause of Article I, § 17 of the Michigan Constitution, which states that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to **fair and just treatment in the course of legislative and executive investigations and hearings** shall not be infringed." (Emphasis added.)

146. The named Defendants above were at all relevant times duly elected or appointed members or agents of the House.

147. Gamrat was employed by the House as a duly elected state representative and, at all relevant times, met the constitutional requirements to hold the position as an elected representative—she was a citizen of the United States, at least 21 years of age, an elector of the district she represented, had not been convicted of subversion, and had not been convicted of a felony involving a breach of public trust in the preceding 20 years. Mich. Const. art. IV, § 7.

148. Therefore, Gamrat enjoyed a constitutionally protected interest in continued employment for her elected term under the law of the State of Michigan so long as she met these qualifications.

149. On or about September 11, 2015, acting under color of law and pursuant to their authority as representatives, the named Defendants caused Gamrat to be expelled from the House.

150. Before depriving Gamrat of her constitutionally protected interest in continued employment, Defendants did not give Gamrat adequate notice, conduct an adequate pre-termination hearing, or otherwise afford Gamrat a full and fair opportunity to respond to the allegations against her or to confront and cross-examine the witnesses upon whose testimony the HBO Report was prepared.

151. Gamrat was not given adequate notice, an opportunity to conduct an independent investigation, time and access to review the facts that would be put forward, subpoena powers, rules to allow for cross examination, and rules that allowed her to adequately defend herself. Rather, these Defendants intentionally refused Gamrat every opportunity for due process, equal protection, or a fair hearing.

152. Gamrat was not afforded the same procedure afforded to past legislators facing censure or expulsion.

153. In fact, several other past members of the State Congress have committed felonies and other misconduct and never faced censure or expulsion.

154. This case is distinguishable from *Burks v. Perk*, 470 F.2d 163 (6th Cir. 1972), and the cases cited therein and in subsequent cases because Gamrat was duly elected to her

position by the voters in her district and at all times undeniably met the qualifications to serve according to the Michigan Constitution.

155.  In fact, case law from other jurisdictions supports the position that Gamrat had a constitutional right to hold office so long as she was elected and qualified. *See Flinn v. Gordon*, 775 F.2d 1551, 1554 (11th Cir. 1985) (reasoning that there was a distinction between a legislator being removed from office during the term to which he was elected and being voted out of office in a subsequent election, stating that the legislator "certainly had a constitutional right to run for office **and to hold office once elected**") (Emphasis added).

156.  Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law in arbitrarily expelling Gamrat—who had not even yet been charged with a crime at the time of her expulsion.

157.  Defendants also injured Gamrat's reputation by making the false and defamatory statements described in this Amended Complaint, which defamatory statements were publicized across the world which, in part, led to her expulsion.

158.  As a direct and proximate result of Defendants' actions, Gamrat has suffered, and will continue to suffer, substantial damages.

THEREFORE, Gamrat requests that this Court enter judgment against Defendants for the following relief:

A.  A declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that Defendants' actions in depriving Gamrat of her constitutionally-protected interest in continued employment absent a fair and impartial pre-termination hearing were unlawful and violative of her rights under the Due Process Clause of the Fourteenth Amendment and the Michigan Constitution.

B.  An award to Gamrat sufficient to compensate her for back pay or damages for lost earnings in the amount she would have earned as a State Representative, with interest, from the date she was expelled through the end of her term.

C.   An award to Gamrat of compensatory damages sufficient to compensate her for her mental anguish and emotional distress, embarrassment and humiliation, and damage to her professional reputation as a result of Defendants' actions.

D.   An award to Gamrat of punitive damages against Defendants as a result of the reckless indifference with which they violated Gamrat's right to due process of law.

E.   An award to Gamrat of the costs and disbursements of this action, including reasonable attorney fees pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988(b).

F.   An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Count II: Breach of Contract

159.   The preceding paragraphs are incorporated herein by reference.

160.   This count applies to the following Defendants: Cotter, Bowlin, Swartzle, McBroom, and Beydoun.

161.   The Defendants named above entered into an enforceable contract with Gamrat wherein they promised her censure in exchange for her presentation of a joint statement regarding the HBO Report and her apology to the House.

162.   The contract was supported by adequate consideration.

163.   Gamrat performed her obligations under the contract.

164.   The Defendants breached the contract through their actions described above by not even considering censure during the Select Committee meetings and ultimately expelling Gamrat from the House in violation of her due process rights.

165.   As a result of Defendants' breach, Gamrat has suffered extensive damages.

THEREFORE, Gamrat requests that this Court enter judgment against Defendants for the following relief:

23

A.   An award to Gamrat sufficient to compensate her for back pay or damages for lost earnings in the amount she would have earned as a State Representative, with interest, from the date she was expelled through the end of her term.

B.   An award to Gamrat of the costs and disbursements of this action, including reasonable attorney fees.

C.   An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Count III: Promissory Estoppel (Alternative Count to Breach of Contract Claim)

166.   The preceding paragraphs are incorporated herein by reference.

167.   This count applies to the following Defendants: Cotter, Bowlin, Swartzle, McBroom, and Beydoun.

168.   Gamrat met with Beydoun—an agent of Cotter and the House—and was assured that she would only be censured if she accepted the results of the HBO Report and read a joint statement in the committee hearing.

169.   Relying on these assurances, Gamrat appeared at the committee hearing and gave a statement and answered questions.

170.   Cotter and the House did not censure Gamrat as promised, but instead proposed a resolution for her expulsion.

171.   The agreement between the parties was clear and definite in nature.

172.   Defendants' promise was unequivocal and was specifically made to induce Gamrat to admit the contents of the HBO Report.

173.   In reliance on Defendants' promise—and to her detriment—Gamrat performed her obligations under the agreement between the parties.

174.   To avoid injustice, this Court should either enforce the agreement between the parties or grant damages to Gamrat for Defendants' breach of the agreement.

24

175.   As a direct and proximate cause of the violations described in this Amended Complaint, Gamrat has suffered extensive damages.

THEREFORE, Gamrat requests that this Court enter judgment against Defendants for the following relief:

A.   An award to Gamrat sufficient to compensate her for back pay or damages for lost earnings in the amount she would have earned as a State Representative, with interest, from the date she was expelled through the end of her term.

B.   An award to Gamrat of the costs and disbursements of this action, including reasonable attorney fees.

C.   An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Count IV: Malicious Prosecution/Abuse of Process

176.   The preceding paragraphs are incorporated herein by reference.

177.   This count applies to the following Defendants: Cotter, Bowlin, Swartzle, Saari, McBroom, Beydoun, Allard, Graham, and Cline.

178.   The Defendants named above instituted and initiated allegations of criminal activity against Gamrat without probable cause and with malice.

179.   Upon information and belief, Defendants instituted the investigation for the principal purpose of further harassing and denigrating Gamrat.

180.   MCL 600.2907 provides for civil and criminal liability for every person who, for vexation, trouble, or with malice, causes another to be arrested, attached, or in any way proceeded against by any process of civil or criminal action without that person's consent.

181.   Defendants abused the criminal investigatory process by using it for their ulterior motives and purposes to cause vexation, trouble, embarrassment, damage to Gamrat's

professional reputation and damage to her community reputation. Such use of the process was not legitimate, regular, or legal.

182. Upon information and belief, Defendants knew or should have known that the criminal allegations against Gamrat were unfounded.

183. In their respective interviews with the MSP, Cotter admitted that they did not have any direct evidence of illegality before doing the investigation, and Bowlin admitted that he did not see anything criminal in his investigation. (Cotter MSP Interview at p. 14, attached as **Exhibit 12**; Bowlin MSP Interview at p. 28, **Ex. 9**.)

184. Saari stated during his interview with the MSP that there were "never any illegalities" that he knew about regarding Gamrat. (Saari MSP Interview at p. 17, **Ex. 2**.)

185. The charges against Gamrat were dismissed at the preliminary exam after the judge determined that there was not enough probable cause to even charge Gamrat with any crime.

186. As a direct result of Defendants' malice in making allegations that initiated the criminal investigation, Gamrat has suffered extensive damages.

THEREFORE, Gamrat requests that this Court enter judgment against Defendants for the following relief:

A. An award to Gamrat sufficient to compensate her for back pay or damages for lost earnings in the amount she would have earned as a State Representative, with interest, from the date she was expelled through the end of her term.

B. An award to Gamrat of compensatory damages sufficient to compensate her for her mental anguish and emotional distress, embarrassment and humiliation, and damage to her professional reputation as a result of Defendants' actions.

C. An award to Gamrat of punitive damages against Defendants as a result of the reckless indifference with which they violated Gamrat's rights.

D. An award to Gamrat of the costs and disbursements of this action, including reasonable attorney fees.

E.   An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Count V: Violation of Federal Wiretapping Act and Michigan's Eavesdropping Statute

187.  The preceding paragraphs are incorporated herein by reference.

188.  This count applies to all Defendants, except McBroom and the House.

189.  Throughout the aforementioned time frame, Defendants had been illegally spying on and following Gamrat.

190.  Upon information and belief, the House-member Defendants were working with or directing Joe Gamrat, Krell, Horr, Allard, Graham, and Cline to conduct surveillance on Gamrat.  (See Allegations contained in Complaint and Jury Demand in *Allard and Graham v. Michigan House of Representatives*, Paras. 20 and 33, **Ex. 1**; Saari MSD Interview at pp. 10,18, 25; **Ex. 2**; April 28, 2015 Text, **Ex. 3**.)

191.  Among other things, and as described at length in this Amended Complaint, Defendants either 1) unlawfully placed listening devices, tracking devices, and engaged in other inappropriate and illegal surveillance activities; or 2) directed others to take such actions.

192.  Krell and Joe Gamrat even joked amongst themselves that they should form the Krell Gamrat Bureau of Investigation.  (February 12, 2015, Text between Krell and Joe Gamrat, attached as **Exhibit 13**.)

193.  Upon information and belief, Defendants supplied Gamrat's information to third parties.

194.  Defendants violated MCL 750.540 when they willfully and maliciously tapped or otherwise made an unauthorized connection to an electronic medium of communication of Gamrat.

195.   Defendants violated MCL 750.539c when they willfully used a device—or directed others to use a device—to eavesdrop upon the conversations of Gamrat without the consent of all parties to the conversation.

196.   Defendants violated MCL 750.539d when they installed listening devices in a private place without the consent of Gamrat—who was entitled to privacy—in order to observe, record, transmit, or eavesdrop upon the sounds and events in that place.

197.   Defendants further violated MCL 750.539d when they distributed and disseminated or transmitted for access a recording they knew to be obtained in violation of such section.

198.   Defendants violated MCL 750.539e when they used or divulged information they knew or reasonably should have known was obtained in violation of MCL 750.539b, 539c, or 539d.

199.   Defendants violated 18 U.S.C. § 2511 when they intentionally intercepted, endeavored to intercept, or procured other people to intercept or endeavor to intercept, wire, oral, and electronic communication of Gamrat.

200.   Defendants further violated 18 U.S.C. § 2511 when they intentionally used, endeavored to use, or procured other people to use or endeavor to use an electronic, mechanical, or other device to intercept oral communications of Gamrat.

201.   Defendants further violated 18 U.S.C. § 2511 when they intentionally used, disclosed or endeavored to disclose to other people the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communications in violation of 18 U.S.C. § 2511.

202.  At all relevant times, the Defendants acted maliciously, recklessly, intentionally, or by reason of gross negligence or violation of the law.

203.  As a direct and proximate cause of the violations described in this Complaint, Gamrat suffered extensive damages.

THEREFORE, Gamrat requests that this Court enter judgment against Defendants for the following relief:

A.  An award to Gamrat sufficient to compensate her for back pay or damages for lost earnings in the amount she would have earned as a State Representative, with interest, from the date she was expelled through the end of her term.

B.  An award to Gamrat of compensatory damages sufficient to compensate her for her mental anguish and emotional distress, embarrassment and humiliation, and damage to her professional reputation as a result of Defendants' actions.

C.  An award to Gamrat of punitive damages against Defendants as a result of the reckless indifference with which they violated Gamrat's rights.

D.  An award to Gamrat of the costs and disbursements of this action, including reasonable attorney fees.

E.  An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Count VI: Civil Stalking under MCL 600.2954

204.  The preceding paragraphs are incorporated herein by reference.

205.  This Count applies to all Defendants, except McBroom and the House.

206.  Upon information and belief, Cotter, Bowlin, Swartzle, Saari, and Beydoun directed the stalking activities described in this Amended Complaint that were undertaken by Allard, Graham, Cline, Joe Gamrat, Krell, and Horr.

207.  Defendants' actions as described above were prohibited by MCL 750.411h and constituted stalking as defined by Michigan law.

208.  Specifically, Defendants' actions were willful and directed toward Gamrat.

29

209. Defendants' course of conduct involved repeated and continuous harassment directed toward Gamrat—including, among other things, coordinating surveillance, following Gamrat, reporting her whereabouts, and sending extortion texts—that caused her emotional distress and mental anguish.

210. Defendants' repeated and continuous harassment of Gamrat would cause a reasonable person to feel terrorized, threatened, frightened, intimidated, harassed, and molested.

211. Defendants' conduct has actually made Gamrat feel terrorized, threatened, frightened, intimidated, harassed, and molested.

212. Gamrat was the targeted victim of Defendants' continued harassment.

213. Gamrat did not consent to any of the actions described above.

214. As a direct and proximate result of Defendants' stalking, Gamrat has suffered mental anguish, physical and emotional distress, humiliation, embarrassment, and the loss of her employment.

THEREFORE, Gamrat requests that this Court enter judgment against Defendants for the following relief:

A. An award to Gamrat sufficient to compensate her for back pay or damages for lost earnings in the amount she would have earned as a State Representative, with interest, from the date she was expelled through the end of her term.

B. An award to Gamrat of compensatory damages sufficient to compensate her for her mental anguish and emotional distress, embarrassment and humiliation, and damage to her professional reputation as a result of Defendants' actions.

C. An award to Gamrat of punitive damages against Defendants as a result of the reckless indifference with which they violated Gamrat's rights.

D. An award to Gamrat of the costs and disbursements of this action under MCL 600.2954, including reasonable attorney fees.

E. An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Count VII: Defamation

215.   The preceding paragraphs are incorporated herein by reference.

216.   This Count applies to the following Defendants: Cotter, Bowlin, Swartzle, Saari, McBroom, Beydoun, Allard, Graham, and Cline.

217.   Many of the accusations contained in the HBO Report and H.R. 141 were false, including, but not limited to, the accusations that 1) Gamrat committed a crime; 2) Gamrat misrepresented herself on several occasions during her testimony to the Business Office; 3) Gamrat misused her office, staff, and other state resources to cover up an affair and for her own political advantage; 4) Gamrat had "knowing involvement" in the plan to send the notorious "false flag" email; 5) Gamrat forced her staff to forge her signatures on bills; and 6) Gamrat required her staff to facilitate an affair and lie about her whereabouts.  The rest of the allegations in the HBO Report and H.R. 141 are incorporated by reference into this Count.

218.   Cotter, Bowlin, Swartzle, Saari, McBroom, and Beydoun recklessly reported false and misleading statements regarding Gamrat as if they were fact.

219.   Defendants published the remarks to third parties with either knowledge of the falsity of the statements or in reckless disregard of their truth or falsity.

220.   The publications were not privileged.

221.   The publication of these remarks has resulted in damage to Gamrat's reputation in the community and economic losses.

222.   Defendants' accusations were defamation per se.

THEREFORE, Gamrat requests that this Court enter judgment against Defendants for the following relief:

A.    An award to Gamrat sufficient to compensate her for back pay or damages for lost earnings in the amount she would have earned as a State Representative, with interest, from the date she was expelled through the end of her term.

B.    An award to Gamrat of compensatory damages sufficient to compensate her for her mental anguish and emotional distress, embarrassment and humiliation, and damage to her professional reputation as a result of Defendants' actions.

C.    An award to Gamrat of punitive damages against Defendants as a result of the reckless indifference with which they violated Gamrat's rights.

D.    An award to Gamrat of the costs and disbursements of this action, including reasonable attorney fees.

E.    An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Count VIII: Fraud

223.   The preceding paragraphs are incorporated herein by reference.

224.   This Count applies to the following Defendants: Cotter, Bowlin, Swartzle, McBroom, and Beydoun.

225.   Beydoun—acting as an agent of the House and its member Defendants—made material misrepresentations to Gamrat in assuring her that her interests would be protected and that she would only be censured.  This meeting took place on Friday, September 4, 2015, from about 4:00 p.m. until 7:30 p.m. in Beydoun's office in the Capitol Building.

226.   Beydoun's representations to Gamrat included, but were not limited to 1) telling Gamrat that the evidence did not support expulsion and that the House believed censure was more appropriate; 2) stating that he could control the Republican votes for censure; 3) falsely telling Gamrat that her conduct violated House Rule 74 in an attempt to obtain an admission from Gamrat that she misused taxpayer resources; and 4) continuously telling Gamrat that her signature on the censure agreement would allow her to keep her seat and that she could clear up the details after she kept her seat.

227. These representations and assurances were false because Beydoun never intended to take any affirmative steps to protect Gamrat's interests. Instead, Beydoun was taking steps to protect the interests of the House and its member Defendants.

228. Defendants intended that the representations and assurances made to Gamrat would be relied upon to prevent Gamrat from adequately protecting her interests.

229. Gamrat did, in fact, rely upon the representations and assurances by cooperating with the House in its investigation and entrusting Beydoun with information that should have been protected by the attorney-client privilege.

230. As a result of her reliance upon these representations, Gamrat was ultimately expelled from office in violation of her due process rights.

231. As a direct and proximate result of the actions described in this Amended Complaint, Gamrat has suffered extensive damages.

THEREFORE, Gamrat requests that this Court enter judgment against Defendants for the following relief:

A. An award to Gamrat sufficient to compensate her for back pay or damages for lost earnings in the amount she would have earned as a State Representative, with interest, from the date she was expelled through the end of her term.

B. An award to Gamrat of compensatory damages sufficient to compensate her for her mental anguish and emotional distress, embarrassment and humiliation, and damage to her professional reputation as a result of Defendants' actions.

C. An award to Gamrat of the costs and disbursements of this action, including reasonable attorney fees.

D. An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Count IX: Indemnification

232. The preceding paragraphs are incorporated herein by reference.

233.    This Count applies to Cotter and the House.

234.    MCL 691.1408(1) states the following, in relevant part:

Whenever a claim is made or a civil action is commenced against an officer, employee, or volunteer of a governmental agency for injuries to persons or property caused by negligence of the officer, employee, or volunteer while in the course of employment with or actions on behalf of the governmental agency and while acting within the scope of his or her authority, the governmental agency may pay for, engage, or furnish the services of an attorney to advise the officer, employee, or volunteer as to the claim and to appear for and represent the officer, employee, or volunteer in the action.

235.    MCL 691.1408(2) states the following, in relevant part:

When a criminal action is commenced against an officer or employee of a governmental agency based upon the conduct of the officer or employee in the course of employment, if the employee or officer had a reasonable basis for believing that he or she was acting within the scope of his or her authority at the time of the alleged conduct, the governmental agency may pay for, engage, or furnish the services of an attorney to advise the officer or employee as to the action, and to appear for and represent the officer or employee in the action.

236.    Although the language of MCL 691.1408 is discretionary, a governmental agency cannot refuse to indemnify an employee for an unconstitutional reason. *See Warda v. City Council*, 696 N.W.2d 671 (Mich. 2005) ("Even a discretionary action of a governmental agency must still comport with the constitutions of this state and the United States . . . The decisions of a governmental agency . . . influenced by corruption might implicate the due process guarantees of these same constitutions.")

237.    The House is a governmental agency and arm of the state.

238.    Gamrat was sued by Defendants Allard and Graham in the Ingham County Circuit Court regarding claims derived from Gamrat's acts as a State Representative.

239.    Gamrat was also criminally charged for actions stemming from her employment as a State Representative.

240.    Because the facts and circumstances regarding the civil lawsuit brought against Gamrat and the criminal charges against her stemmed from her actions as a member of the

34

House, Cotter and the House had the right under MCL 691.1408 to indemnify Gamrat for her attorney fees and costs incurred in defending those actions and provide her with a defense.

241. It is the general practice of the House to indemnify State Representatives accused of similar misconduct, and it has done so in the past.

242. Cotter and the House never offered to indemnify Gamrat in the above-mentioned actions, despite her specific and repeated requests for indemnification.

243. Upon information and belief, the House has refused to indemnify Gamrat for an unconstitutional reason—that reason being the intentional and malicious violation of her procedural due process rights by its member Defendants.

244. As a direct and proximate cause of the violations described above, Gamrat has suffered extensive damages.

THEREFORE, Gamrat requests that this Court enter judgment against the House for the following relief:

    A.    An award to Gamrat of all of her attorney fees incurred in defending all of the civil and criminal actions instituted against her based on allegations regarding her conduct as a State Representative.

    B.    An award to Gamrat of the costs and disbursements of this action, including reasonable attorney fees.

    C.    An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Count X: Civil Conspiracy

245. The preceding paragraphs are incorporated herein by reference.

246. This Count applies to all Defendants, except the House.

247. Defendants illegally, maliciously, and wrongfully conspired with one another with the intent to and for the illegal purpose of committing the tortious actions described above.

248. At all relevant times, Defendants engaged in the concerted activities described in the preceding paragraphs by express or implied agreement.

249. As a direct and proximate result of Defendants' concerted activities, Gamrat has suffered extensive damages.

250. Due to the concert of action among Defendants, each is liable to Gamrat for her injuries and damages even if there was no directed relation to the aforementioned activities conducted by any one particular person, party, or agent thereof.

251. Defendants are jointly and severally liable to Gamrat for all of her injuries and damages.

THEREFORE, Gamrat requests that this Court enter judgment against Defendants for the following relief:

A. An award to Gamrat sufficient to compensate her for back pay or damages for lost earnings in the amount she would have earned as a State Representative, with interest, from the date she was expelled through the end of her term.

B. An award to Gamrat of compensatory damages sufficient to compensate her for her mental anguish and emotional distress, embarrassment and humiliation, and damage to her professional reputation as a result of Defendants' actions.

C. An award to Gamrat of the costs and disbursements of this action, including reasonable attorney fees.

D. An award to Gamrat of such other and additional legal or equitable relief to which she may be entitled.

## Jury Demand

Plaintiff Cindy Gamrat, by and through her attorneys, Schenk Boncher & Rypma, demands a jury trial in this action.

Respectfully Submitted,

SCHENK, BONCHER & RYPMA

Dated: April 6, 2017        By:    /s/ Tyler E. Osburn
                                   Tyler E. Osburn (P77829)
                                   Attorney for Plaintiff Cindy Gamrat
                                   601 Three Mile Road NW
                                   Grand Rapids, MI 49544
                                   (616) 647-8277

**Verification Page to Follow**

## Verification

STATE OF MICHIGAN        )
                         ) ss
COUNTY OF Kent           )

I, Cindy Gamrat, being first duly sworn, deposes and states that I am the Plaintiff in the above-captioned lawsuit, that I am familiar with the facts at issue in this case, that I have read the foregoing Amended Complaint, and that, to the best of my knowledge, information and belief, the contents thereof are true and correct..

_____
Cindy Gamrat

Subscribed and sworn to me this _4th_ day of April, 2017.

Jean M Thomsen
Jean M. Thomsen, Notary Public
Kent County, State of Michigan
My commission expires: 3/30/2022

38