UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CINDY GAMRAT,

       Plaintiff,

v.

       Case No. 1:16-cv-1094

KEITH ALLARD; in his individual capacity;
BENJAMIN GRAHAM; in his individual capacity;
JOSHUA CLINE; in his individual capacity;
JOSEPH GAMRAT; MICHIGAN HOUSE OF
REPRESENTATIVES; KEVIN G. COTTER, in
his is individual capacity; TIM L. BOWLIN, in his
individual capacity; BROCK SWARTZLE in his
individual capacity; NORM SAARI, in his
individual capacity; EDWARD McBROOM, in his
individual capacity; HASSAN BEYDOUN, in his
individual capacity; DAVID HORR; and
VINCENT KRELL,

       Defendants.

HON. GORDON J. QUIST

**EXHIBIT 3, PART A**

---

Tyler E. Osburn (P77829)
Schenk Boncher & Rypma
Attorneys for Plaintiff Cindy Gamrat
601 Three Mile Road NW
Grand Rapids, MI 49544
616-647-8277

Cameron Evans (P47276)
Evans Law Group, P.C.
Attorney for Defendant Norm Saari
950 W. University Drive, Suite 102
Rochester, MI 48307
(248) 468-1485

Gary Gordon (P26290)
Jason T. Hanselman (P61813)
Dykema Gossett PLLC
Attorneys for Defendants Michigan House of
Representatives, McBroom, Bowlin, Cotter,
Swartzle, and Beydoun
Capitol View
201 Townsend St., Ste. 900
Lansing, MI 48933
(517) 374-9100

H. Rhett Pinsky (P18920)
Sarah Riley Howard (P58531)
Pinsky, Smith, Fayette & Kennedy, LLP
Attorneys for Defendants Keith Allard and Benjamin
Graham
146 Monroe Center St NW, Suite 805
Grand Rapids, MI 49503
(616) 451-8496

---

SCHENK, BONCHER & RYPMA
Attorneys for Plaintiff

Dated: February 23, 2018     By:   /s/ Tyler E. Osburn
                                Tyler E. Osburn (P77829)



UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CINDY GAMRAT,

       Plaintiff,

v.

KEITH ALLARD; in his individual capacity;
BENJAMIN GRAHAM; in his individual capacity;
JOSHUA CLINE; in his individual capacity;
JOSEPH GAMRAT; MICHIGAN HOUSE OF
REPRESENTATIVES; KEVIN G. COTTER, in
his is individual capacity; TIM L. BOWLIN, in his
individual capacity; BROCK SWARTZLE in his
individual capacity; NORM SAARI, in his
individual capacity; EDWARD McBROOM, in his
individual capacity; HASSAN BEYDOUN, in his
individual capacity; DAVID HORR; and
VINCENT KRELL,

       Defendants.

Case No. 1:16-cv-1094

HON. GORDON J. QUIST

**Plaintiff's Supplemental Brief with**
**Newly-Acquired Evidence in Support**
**of Her Responses to Defendants'**
**Motions to Dismiss**

---

Tyler E. Osburn (P77829)
Schenk Boncher & Rypma
Attorneys for Defendant Cindy Gamrat
601 Three Mile Road NW
Grand Rapids, MI 49544
616-647-8277

Cameron Evans (P47276)
Evans Law Group, P.C.
Attorney for Defendant Norm Saari
950 W. University Drive, Suite 102
Rochester, MI 48307
(248) 468-1485

Gary Gordon (P26290)
Jason T. Hanselman (P61813)
Dykema Gossett PLLC
Attorneys for Defendants Michigan House of
Representatives, McBroom, Bowlin, Cotter,
Swartzle, and Beydoun
Capitol View
201 Townsend St., Ste. 900
Lansing, MI 48933
(517) 374-9100

H. Rhett Pinsky (P18920)
Sarah Riley Howard (P58531)
Pinsky, Smith, Fayette & Kennedy, LLP
Attorneys for Defendants Keith Allard and
Benjamin Graham
146 Monroe Center St NW, Suite 805
Grand Rapids, MI 49503
(616) 451-8496

## Introduction

Plaintiff Cindy Gamrat submits this supplemental brief and attachments for this Court's review before the hearing on Defendants' Motions to Dismiss because new information has recently come to light that supports Gamrat's allegations in this case and her responses to the aforementioned motions. For the reasons set forth more fully below and in the attached documents, Gamrat respectfully requests that this Court consider this newly-acquired evidence and deny Defendants' Motions to Dismiss.

## Law and Argument

As a result of the acts and occurrences described in Gamrat's complaint, criminal charges were filed against Gamrat and former representative Todd Courser. Although Gamrat's criminal charges were ultimately found to be baseless and without probable cause, the Attorney General has persisted in criminally prosecuting Courser. It came to Gamrat's attention toward the end of 2017 that Courser and his attorney had finally been able to procure and analyze the computers and electronic devices that had been seized by the House without a warrant and, eventually, by the Michigan State Police as part of the HBO investigation. Gamrat and her counsel also learned at that time that expert reports had been prepared based on the forensic analyses of the computers and other devices that showed, among other things, that all of the devices and their electronic data had been tampered with after August 7, 2015. This information is vitally important because the HBO Report shows that Defendants Cotter, Swartzle, and Bowlin ordered a "litigation hold" on all electronic data on Friday, August 7, 2015. (HBO Report at p. 623, attached as **Exhibit 1**.) On August 8 and 9, 2015, the House locked Gamrat's office and seized the laptops and other electronic devices of Gamrat, Courser, and their staff members. (*Id.*; Swartzle Interview, attached as **Exhibit 2**.) And on September 11, 2015, the MSP allegedly took custody of the

2

computers, according to the police report. That means that between August 8 and September 11, the House and its members—including House Defendants—were in sole control of the computers and electronic devices.

The criminal case against Courser has been brought in two different jurisdictions, with one case currently pending in the Ingham County Circuit Court and one case in the Lapeer County Circuit Court. The information described above regarding the destruction and modification of electronic data that took place, until recently, had been filed as part of a sealed court record in Ingham County. Therefore, neither Gamrat nor her counsel had the means to access the contents of the documents or the means by which to present the documents to this Court.

On January 22, 2018, Courser filed the attached brief and supporting documents in the Lapeer County Circuit Court. (Brief and attachments, attached as **Exhibit 3**.)[1] The judge in Lapeer County has refused to seal the file, so the information was first made public on the date of the filing. As this Court can see, the brief contains a detailed description of the activities of the House and also includes reports prepared by Adam Kelly—the forensics expert hired by Courser—that show the extent of the tampering and the dates on which it occurred.[2] For

---

[1] Although this brief was filed on Courser's behalf in his criminal case—and therefore is focused primarily on the destruction of evidence on his devices—the reports and documents attached to the brief show that Gamrat's devices were tampered with and files were deleted or modified after they were in the sole custody of the House and House Defendants. It should also be noted that Exhibits 16, 31, 32, 33, 34, and 35 are the only Exhibits to the brief filed by Courser that are attached for this Court's review. While the interview transcripts are compelling and are relevant to Gamrat's claims, due to the sheer number of pages attached to Courser's brief Gamrat did not want to overburden this Court. The other attachments are public record and also available to this Court upon request.

[2] For instance, the report shows, among other things, that Courser's computers were connected to a House server and modified in late September 2015—_after_ the computers were admittedly in the custody of the Michigan State Police.

instance, the evidence with regard to Gamrat and her devices revealed, among other things, that the following occurred with the computers while they were in the control of the House:

- Files were accessed, modified, deleted, and written over on devices used by Gamrat and Defendants Allard, Graham, and Cline;

- The Lync messaging program used by House members and staffers to communicate amongst themselves was deleted, along with all of the existing messages;

- A file destruction program called Kaspersky was run on every computer, completely destroying files; and

- Two of Gamrat's computers were locked with BitLocker, which would have had to have been installed by the House or someone with an administrative password. Gamrat has no idea what BitLocker is, what it does, or how to activate it on a computer. The BitLocker requires a key to unlock, but the House has not provided a key to unlock it.

In light of the information above, Gamrat hired her own expert, Neil Broom, to perform a forensic analysis of the computers that were assigned to her. (First Broom Expert Report, attached as **Exhibit 4**.)[3]  In Broom's first expert report, he explained the following regarding the one computer assigned to Gamrat that has not been locked by the House:

- The computer "was not preserved and alterations were allowed to alter and destroy evidence on the computer hard drive on 08/10/15, after the evidence had been seized by the House Business Office on 08/08/15";

---

[3] The First Broom Expert Report attached to this brief does not contain the exhibits thereto, which are extensive.  A full copy of the report plus exhibits has been attached as Exhibit 1 to the Brief in Support of Plaintiff's Motion for Leave to file Supplemental Brief with Newly-Acquired Evidence.

- When the computer was awakened on August 10, 2015, after having entered "Sleep Mode" on July 29, 2015, the user account was switched from Gamrat's user account to an Administrator account;

- The computer was plugged into a network Ethernet cable on August 10, 2015, which resulted in evidence being altered;

- The computer was allowed to run updates, which overwrote a substantial amount of information on the hard drive; and

- As a result of the activities on August 10, 2015, over 12,200 files on the computer were either added or modified—which accounted for 12.6 GB of altered data.

Further, Broom prepared a second report regarding the two computers that were assigned to Gamrat but on which the BitLocker had been activated.  (Second Broom Expert Report, attached as **Exhibit 5**.)  In this report, Broom explained the following:

- The computers will need to be reimaged after the BitLockers are removed;

- If any one of several actions occurred that caused BitLocker to go into "Recovery Mode", then "the Administrator of the Domain must provide the Recovery Password from the Active Directory Domain Server."  Without the password, the evidence is unrecoverable and will have been destroyed;

- "No forensics tool is capable of unencrypting forensics images that were created of a computer running Windows 8 with BitLocker activated";

- "To turn on, turn off, or change configurations of BitLocker on operating system and fixed data drives, membership in the local Administrators group is required"; and

5

- A standard user—such as Gamrat—could not turn on or modify BitLocker on these computers;

Again, this information regarding the massive alteration of evidence is important for two primary reasons. First, a large part of Defendants' motions and briefs were designed to convince this Court that Gamrat's claims—including her claims of wiretapping and conspiracy between the parties—had no merit and that they were simply the musings of a disgruntled former lawmaker, thus warranting dismissal. This proof that electronic data on Gamrat's computers and devices was modified and destroyed while in the custody of the House certainly belies Defendants' motions and directly supports Gamrat's claims that House Defendants and other Defendants conspired to commit the tortious acts described in her complaint. It also does not strain credulity to think that the information on the computers with the BitLockers activated would be just as damning to House Defendants in this case as the evidence already produced and analyzed.

Second, this proof of evidence tampering and destruction even after a "hold" was implemented on all electronic data arguably entitles Gamrat to summary judgment in this case, but at the very least entitles her to an adverse inference jury instruction and the presumption that what was contained in the deleted files was unfavorable to the House Defendants. Specifically, Fed. R. Civ. P. 37(e) states the following:

> **(e) Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> > **(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> >
> > **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
> >
> > > **(A)** presume that the lost information was unfavorable to the party;

(**B**) instruct the jury that it may or must presume the information was unfavorable to the party; or

(**C**) dismiss the action or enter a default judgment.

The Sixth Circuit has also stated the following with regard to the spoliation of evidence:

> As our sister circuits have recognized, a proper spoliation sanction should serve both fairness and punitive functions. Because failures to produce relevant evidence fall "along a continuum of fault -- ranging from innocence through the degrees of negligence to intentionality," the severity of a sanction may, depending on the circumstances of the case, correspond to the party's fault. Thus, a district court could impose many different kinds of sanctions for spoliated evidence, <u>including dismissing a case, granting summary judgment, or instructing a jury that it may infer a fact based on lost or destroyed evidence.</u>

*Adkins v. Wolever*, 554 F.3d 650, 652-653 (6th Cir. 2009) (internal citations omitted) (emphasis added).

In this case, the House Defendants—as admitted by Swartzle, Cotter, and Bowlin—had a duty to preserve the electronic data after the "hold" was placed on August 7, 2015. The newly-acquired evidence contained in the attached brief and attached documents, as well as the expert reports prepared by Broom, shows that there was a monumental amount of files modified and deleted after this "hold" was in place and after the devices were in the sole possession of the House. It is very clear that the loss of the deleted and modified files—which included, among other things, a messaging system containing communications among House members and their staff members—is extremely prejudicial to Gamrat's case. Further, Broom opined with regard to the one computer he was able to analyze that based on his analysis and experience, "either an intentional act or at a minimum, gross negligence occurred to allow the electronic evidence to be altered in this fashion." Courts must take care not to hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed [or unavailable] evidence, because doing so would subvert the purposes of the adverse inference, and would allow parties

7

who have destroyed evidence to profit from that destruction. *Flagg v. City of Detroit*, 2011 U.S. Dist. LEXIS 116963, 2011 WL 4634249, Docket No. 05-74253 (E.D. Mich. 2011), citing *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002).

The fact of the matter is that the evidence attached to this brief shows that the House and House Defendants have completely locked the hard drive information on two of Gamrat's computers—quite possibly destroying the electronic data on those hard drives as a result—and, at the very least, allowed someone to access and destroy Gamrat's electronic data on another device. At best this was gross negligence. At worst, House Defendants directed the access and destruction of relevant evidence. In either situation, spoliation sanctions may apply in this case and more details are necessary. This should be reason enough to deny Defendants' Motions to Dismiss.

## Conclusion

At this stage, it is imperative that Gamrat be allowed to continue working with Broom to gain access to the computers that have been locked by the BitLocker placed by the House. At that time, Gamrat expects that her expert reports—along with the expert reports and information contained in Courser's brief—will be sufficient to form the basis for her own motion for summary judgment against the House Defendants based on the willful and intentional destruction of electronic data relevant to her claims. However, at this time and for the foregoing reasons, Gamrat respectfully requests that this Court consider this newly-acquired evidence, deny Defendants' Motions to Dismiss, and grant her any other relief that this Court deems fair and proper.

Respectfully Submitted,

SCHENK, BONCHER & RYPMA

Dated: February 22, 2018          By:    /s/ Tyler E. Osburn
                                         Tyler E. Osburn (P77829)
                                         Attorney for Plaintiff
                                         601 Three Mile Road NW
                                         Grand Rapids, MI 49544
                                         (616) 647-8277

s:\clients\gamrat - bauer\usdc 16-1094\supplemental brief.docx

9

**1**

**Friday, August 7, 2015**

Directed by Speaker Cotter to conduct an investigation into the allegations made against Representative Courser and Representative Gamrat.

Reviewing allegations.

Put on hold all electronic data of the House/Members/Staff.


**Saturday, August 8, 2015**

Locked offices of Reps. Courser and Gamrat.

Removed laptop from Rep. Gamrat's office.

Could not locate laptop assigned to Rep. Courser.

Rep. Gamrat called me on my cell and asked what the process would be for the investigation. Informed her that the process was not finalized but I would be interviewing her and others. Asked if she should get a lawyer -- informed her that I always believe it is best to have someone on your side who can assist and represent you. Informed her that I would be conducting an interview with her early next week. Did not speak about the allegations. Told her the best way to help herself is to tell the truth.


**Sunday, August 9, 2015**

Starting writing process outline for the investigation and questions to be asked.

Compiled list of people to interview and contact numbers.


**Monday, August 10, 2015**

Met with Rep. Gamrat's employee, Anne Marie Hill, and informed her that she would be reporting to the Business Office directly until further notice. Also, informed her that she was on the list of persons to be interviewed and we would schedule that later in the week. She was informed not to remove or delete any files. She said she understood and thought she would be questioned by what she had been reading.

2

Detective Britvec:    Sure.

Brock Swartzle: Um, so August seventh, um I'm general counsel and once the story broke and we saw kind of the seriousness of it because we, we had an inkling. Uh our Press Agent um, you know talks to reporters and we get a courtesy heads up, "Hey there's gonna be something in the media that's gonna be pretty crappy." Um but we didn't have, we, we just thought it was gonna be about a um, an affair. Frankly, in my mind, I'm like "I don't care."

Detective Britvec:    Mm-hmm (affirmative)-

David Dwyre:   Right.

Brock Swartzle: You know, I'm [00:06:00] not doing bad checks with people.

Detective Britvec:    Right.

Brock Swartzle: Um, so we didn't really have an inkling of the scope of what it was going to be. So Friday morning, I'm on the way to the airport, first time I read the Detroit news article, the first time I listen to the audio. I'm like "holy shit."

Detective Britvec:    It's really-

Brock Swartzle: So this is something that's going to be an issue. So I, uh, all weekend I was working with, um, Tim Bowlin and Hassan who I think you're going to be talking with today, um, about "what do [00:06:30] we do?" So we get, we put in what I would- I was in private practice and litigation, what I would call litigation hold. So we had been saving emails, um, a couple weeks before because of something. I had heard which concerned me. So we were saving all house emails, you know. No longer could an office push delete and it would delete it, so that was no longer an option.

So the question was, "what do we do now?" And so I [00:07:00] was talking to him about "Okay, close down their office, have somebody from our business office. Go down, take their hard files, take their computers. We reached out to Todd and Cindy and basically said "Listen, you know, if you have any, uh work files, or copied work files, or, you know, anything else work related uh 'records'" I think we called them, "bring them in to us." Do not destroy them, I'm ordering, or I'm instructing [00:07:30] you not to delete anything.

David Dwyre:   (coughs)

Brock Swartzle: So it was kind of a weekend of that. Of hey, let's just lock everything down so that we have it. Uh, Monday we met with the Speaker, you know he called for a business office investigation so, um, talked with Tim kind of, what would be the scope of that, what would he be looking, who were the ... He actually came up with a list of people that he wanted to talk to. Um, it was then, and [00:08:00] I knew before hand that I would probably be involved, um so I assigned two lawyers to Tim in our office and Hassan

Beydoun and Shannon (name), but Shannon didn't do a whole lot, it was mostly Hassan. And I just told Tim, "Use them as your lawyers. They're at your disposal."

The reason why I knew that I was, likely going to be interviewed by Tim was that, uh, back in May I think the day after, [00:08:30] uh Todd Courser and Ben Graham had that discussion that was recorded, Ben Graham asked to talk with Norm [00:08:38] and I. And we had that discussion and based on that discussion, I just knew, uh, that probably I shouldn't be the one directing the investigation.

Detective Britvec:     So, you and Norm actually did meet up with him the next day

Brock Swartzle: I think it was the next day. It was then or the day after.

Detective Britvec:     He's saying it was so I, that is immaterial, What was [00:09:00] your position there?

Brock Swartzle: General Counsel.

Detective Britvec:     You were General Counsel also back then.

Brock Swartzle: Yep. And Norm was Chief of Staff at the time.

Detective Britvec:     So you guys were separate and they've combined the two and you cover both now?

Brock Swartzle: Yeah, I mean,

Detective Britvec:     Just so I get an idea

Brock Swartzle: This is more of the vanity on my part. At some point I'm going to leave here and go back into private practice. Being General Counsel is more important to me than being Chief of Staff.

Detective Britvec:     Right.

Brock Swartzle: So I wanted to keep the title. I'm still the Nominal Lead Lawyer, but Hassan ... [00:09:30] when I took Chief of Staff, I made him the Majority Legal Counsel. But he is the primary lawyer for the Republicans now.

David Dwyre:     Okay. When Hassan was sitting in here during the interview. Um, he was House, he was House Legal Counsel during that, during those interviews. Would you be able to say that?

Brock Swartzle: Oh yeah. He [00:9:56] was.

Detective Britvec:     Okay go ahead, so you met with Ben, you knew, you knew that you'd probably called



STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF LAPEER

PEOPLE OF THE STATE OF MICHIGAN

      Plaintiff,

v.

TODD COURSER

      Defendant

Case No. 17-013022-FH

HON. NICK O. HOLOWKA

| | |
|---|---|
| GREGORY TOWNSEND (P35857)<br>DENISE M. HART (P45127)<br>MICHIGAN ATTORNEY GENERAL<br>3030 West Grand Blvd<br>Detroit, MI 48202<br>(313) 456-0285 | MATTHEW S. DePERNO (P52622)<br>DePERNO LAW OFFICE, PLLC<br>Attorney for Defendant Todd Courser<br>951 W. Milham Avenue, PO Box 1595<br>Portage, MI 49081<br>(269) 321-5064 |

**DEFENDANT'S MOTION and BRIEF TO DISMISS BASED ON DESTRUCTION OF EVIDENCE, HIDING EVIDENCE, and MISHANDLING EVIDENCE**

# TABLE OF CONTENTS

Page

A.  FACTS AND PROCEDURAL TIMELINE ...............................................................1

    1.  Introduction.................................................................................................1

    2.  Why this matters ........................................................................................1

    3.  Procedural history; Defendant's motions to compel ...................................5

    4.  Procedural history; The government's collective responses .......................5

    5.  The 4 Buckets of Evidence; The Shell Game .............................................6

    6.  The prosecution had possession and control via the House.........................9

    7.  Procedural history; Defendant's motion to dismiss, dated August 5, 2017 ............9

B.  EARLY INVOLVEMENT BY MICHIGAN STATE POLICE; INTERVIEWS ....................................10

    1.  MSP Interviews ..........................................................................................10

    2.  Hassan Beydoun Interview .........................................................................10

    3.  Brock Swartzle Interview ...........................................................................12

    4.  Tim Bowlin Interview .................................................................................13

    5.  Norm Saari Interview..................................................................................14

    6.  Kevin Cotter Interview ...............................................................................15

    7.  Todd Courser Interview ..............................................................................17

C.  EARLY INVOLVEMENT BY MICHIGAN HOUSE OF REPRESENTATIVES ...................................17

    1.  The "litigation hold". Items in possession of the House of Representatives. House of Representatives "litigation hold"; House seizes all data..........................................................................................................17

D.  INVOLVEMENT OF MICHIGAN STATE POLICE OFFICERS. ....................................................19

    1.  Chief Sergeant Dixon..................................................................................19

    2.  Trooper Troy Johnston................................................................................19

    3.  Sergeant Jeremy Brewer .............................................................................19

    4.  Det. David Dwyre (#____ ) ........................................................................21

    5.  F/Lt. Brody Boucher (#123), MSP Capitol Post.........................................21

    6.  D/Sgt. Kraig Britvev (#107) .......................................................................22

    7.  D/Sgt. Jeffery Yonker (#363) .....................................................................22

    8.  DFA Colleen J. Auer (#1355)......................................................................23

i

E.   EVIDENCE NOT TURNED OVER. ........................................................................24

    1.    List of evidence still not turned over ..............................................24

    2.    Exculpatory and impeachment evidence ........................................24

    3.    Police Report and Failure to Produce Forensic Reports ................26

    4.    Reports were prepared .....................................................................26

    5.    All downloads and other digital information has not been provided....................27

    6.    Evidence has been deleted and destroyed ......................................28

F.   DEFENSE EXPERT WITNESSES........................................................................30

    1.    Larry Dalman ...................................................................................30

    2.    Adam Kelly ......................................................................................32

    3.    J. Stott Matthews .............................................................................35

G.   MORE EVIDENCE DESTRUCTION OF EVIDENCE ...........................................36

    1.    While in possession of the House; MCL 750.483a.........................36

    2.    While in possession of the MSP; MCL 750.483a...........................36

    3.    More evidence of manipulation and destruction of evidence on computer #0003...................................................................................37

    4.    Even more evidence of manipulation and destruction of evidence on computer #0003 ...........................................................................39

    5.    More evidence of manipulation and destruction of evidence on computer #0005...................................................................................40

    6.    Lync Messaging ...............................................................................41

    7.    Backups Made..................................................................................42

    8.    External USB Connections ..............................................................42

    9.    Android Emulator ............................................................................44

    10.    Surveillance Software .....................................................................45

    11.    Someone accessed item #0010 on September 1 and September 11, 2015.............46

    12.    Bit-Locker .......................................................................................47

    13.    Where is the warrant? ......................................................................47

    14.    Mindy May........................................................................................47

    15.    Recording from August 17, 2015 of Ben Graham ..........................48

    16.    Denise Hart and Gregory Townsend said they would dismiss (or quit) if defense showed evidence was destroyed ..........................48

DEPERNO LAW OFFICE, PLLC • 951 W. MILHAM AVENUE • PO BOX 1595 • PORTAGE, MI 49081
(269) 321-5064 (PHONE) • (269) 353-2726 (FAX)

H.   LEGAL ARGUMENT ...........................................................................................48

  1.   Constitutional Due Process ............................................................................48

  2.   The House of Representatives had a duty to preserve the evidence ....................50

  3.   Mr. Courser has an absolute right dismissal with prejudice ..................................52

       a.   Vindicating constitutional rights....................................................53

       b.   Preserving judicial integrity ............................................................53

       c.   Deterring future illegal conduct ....................................................54

       d.   Prosecutorial misconduct................................................................54

       e.   Actions in this case ..........................................................................54

       f.   Failure to accept responsibility ....................................................58

       g.   The government's conduct has prejudiced the defense............................59

       h.   The facts in this case are egregious................................................59

I.   SUMMARY; CONCLUSION; RELIEF REQUESTED ....................................................60

  1.   Summary ..........................................................................................................60

  2.   This case should be dismissed with prejudice ......................................................62

  3.   In the alternative to dismissal, we need an evidentiary hearing ...........................62

iii

DEPERNO LAW OFFICE, PLLC ● 951 W. MILHAM AVENUE ● PO BOX 1595 ● PORTAGE, MI 49081
(269) 321-5064 (PHONE) ● (269) 353-2726 (FAX)

Defendant TODD COURSER, by and through his attorney, DePERNO LAW OFFICE, PLLC, brings this motion to dismiss based on destruction of evidence, hiding evidence, and mishandling of evidence.

## A.  FACTS AND PROCEDURAL TIMELINE

### 1.  Introduction

This motion to dismiss comes to you after the Michigan House of Representatives (the "House"), Attorney General ("AG" or "prosecution"), and Michigan State Police ("MSP") intentionally destroyed relevant, exculpatory, and impeachment evidence in a very systematic way that demonstrates coordination of an enterprise. The AG has repeatedly stated that evidence was not in its control and that no evidence was destroyed. This motion will demonstrate these statements are false. Now three defense forensic experts have stated in reports and in affidavits that the destruction occurred and that the government is not telling the truth. While in the possession of the House and MSP, computer evidence was destroyed and "bleached" using a destructive computer software package that prevents later retrieval. This process was done to "clean" the computers before they were forensically imaged and turned over to the defense. Evidence on these computers was relevant, exculpatory, and impeachment evidence. This was done to deny the defense access to information that both exonerates him and cover-up various surveillance, extortion, and wiretapping. What follows is a collective representation of over 2 years of investigation into the government's mishandling and intentional destruction of evidence.

### 2.  Why this matters

- The Michigan House of Representatives (the "House") and Michigan State Police ("MSP") seized computers from Mr. Courser.

- Exculpatory and impeachment evidence existed on the computers and electronics seized by the House and MSP.

- Between August 6, 2015 and September 28, 2015, while in the possession of both the House and MSP, items were deleted, overwritten, tampered with, manipulated, destroyed, and then "bleached" so that they can never be recovered.

- The Attorney General ("AG" or "prosecutors") is responsible for the evidence while it is in the custody of the House and MSP. The AG has argued (incorrectly) that it is not responsible for evidence while it is in the possession of the House. We all know that is false.

  ➢ The House is a governmental agency. The House, by its members and employees, including but not limited to, Kevin Cotter (Speaker of the House), Brock Swartzle (Special Counsel to all House members)[1], and Tim Bowlin (director of the House Business Office) directed the MSP to seize computer and other things of Todd Courser and Cindy Gamrat, without a warrant and without any authority to tell the MSP what to do.

  ➢ The House (through these same people and others) as a governmental agency, is the complaining witness in this criminal case. These people demanded that the MSP investigate and pursue criminal charges.

  ➢ The House (through these same people and others) ran its own investigation into Todd Courser and Cindy Gamrat.

  ➢ The MSP ran a concurrent criminal investigation but allowed the House to maintain or "hold onto" the computers and electronic evidence until the House was ready to turn it over to the MSP.

  ➢ Case law is clear, the AG is responsible for all governmental agencies (not just the police) who are running investigations.

  ➢ The MSP, perhaps not understanding this rule or ignoring it, directly told the House to not turn certain evidence over to the MSP. This was done so that the MSP and AG could later tell the defense and the Court that they were not in possession or control of certain evidence. In this way, the MSP and the AG abrogated their duties and responsibilities.

  ➢ During the time after the House (with help of the MSP) seized computers and other things, and while it remained in the possession of the House, certain key House employees gained access to the seized computers and deleted items and then "bleached" those items so that they could never be retrieved.

  ➢ Only then did the MSP collect those computers and electronics from the House.

---

[1] And let's not forget, attorney to Todd Courser while Mr. Courser was a member of the House.

2

> ➢ But then, while in the possession of the MSP and the forensic crime lab, at least two of those computers were "bleached" again before the MSP created a forensic image.

- Todd Courser is charged with misconduct related to a statement he made to Benjamin Graham.

- We now know that surveillance software and an Android emulator were installed on Mr. Courser's computers.[2] This software allowed people to monitor and record conversations. We know that Anne Hill stated that Keith Allard and Ben Graham told her that the office "was bugged." Exhibit 1.

- We know that between August 6, 2015 and September 1, 2015, administrators from the House accessed the various computers and removed files, overwrote files, and "bleached" the computers with a destructive program called Kaspersky[3].

- We know that MSP collected computers and electronics from the House on September 1, 2015 but waited until September 11, 2015 to turn those computers over to the MSP forensic law.

- We know that between September 1, 2015 and September 11, 2015, while in possession of the MSP, those computers were modified again and items were deleted.

- We know that on September 11, 2015, those computers and electronics were delivered to the MSP forensic crime law.

- We know that September 25, 2015 (while in the possession of the MSP), an administrator from the House again accessed at least two of the computers (those assigned to Mr. Courser, being items #0003 and #0005) and again removed files, overwrote files, and "bleached" the computers again.

- During this same time, we know that the program for Lync messaging was removed on every computer, which deleted every email.

- During this same time, we know that the surveillance software and the Android emulator were removed, which would include any audio and video files.

- We know that the House demanded these charges be filed. The House is the complaining witness. The House, with the help of the Capitol Police, seized these

---

[2] This is a crime pursuant to MCL 750.539 *et seq* and MCL 750.540 *et seq*, but the AG and MSP have refused to investigate.

[3] Kaspersky is the Russian version of "BleachBit". It is a program used to search and delete files and then shred and write over the files on the computer, commonly referred to as "bleaching" the computer. The defense has now hired an expert who says he can retrieve fragments of these files if still on the computer. He will also try to decrypt the BitLocker.

3

computers (without a warrant) and then searched the computers, deleted files and programs, and then bleached the computers.

- We know that after September 11, 2015, Kaspersky was again run on computer #0003 and seven (7) different external hard drive devices were attached to this machine while in police custody.

- We know that of the 12 known audio recordings made by Ben Graham, only 4 have been produced to the defense.

- We know that during a period of approximately 10 weeks from March 2015 to May 2015, all activity on Mr. Courser's computer has been wiped clean. There are no internet searches, no emails, and no use of any programs.

- We know that the MSP failed or refused to seize Ben Graham's phone (the Android mobile phone that made some of the recordings) but instead returned the phone to Ben Graham without logging the phone as evidence and without collecting the data from that phone.

- We know that the Capitol Police (a division of the MSP) were involved in this case as early as August 6, 2017 when they seized or attempted to seize computers used by Mr. Courser.

- This is concrete evidence that someone with an administrative log-in and access tampered with and destroyed evidence on these computers while in the possession of the House and MSP, [4]

- This brief details how evidence was tampered with between August 6, 2017 and September 25, 2017 (while in the custody of MSP).

It is the defense position that these actions are so egregious that this case must be dismissed. If this Court seeks to continue this case, then the government must be required to turn over all evidence listed in the defense proposed subpoena and the government and prosecution witnesses (regarding these computers) must submit to an evidentiary hearing on the issues listed above and presented herein in painstaking detail.

---

[4] This is a crime pursuant to MCL 750.483a *et seq*, but the AG and MSP have refused to investigate. Tampering with evidence is sometimes referred to as "obstructing justice" or "obstruction of justice".

4

3.      **Procedural history; Defendant's motions to compel**

Mr. Courser has stated that he served discovery demands on the government in Ingham County. Exhibit 2. He served discovery demands on the government in this case. Exhibit 3. Mr. Courser has served three letters asking for the government to fully respond to discovery. Exhibits 4, 5, 6. Between Ingham and Lapeer County, Defendant has now filed seven (7) motions to compel or dismiss based on *Brady* violations and destroyed evidence. Defendant has filed multiple supplemental briefs and have attached hundreds of pages of evidence to verify these claims. The information listed in Exhibit 6 has still not been produced. Defendant demands a subpoena to issue to the House, MSP, others others to require production of this information.

4.      **Procedural history; The government's collective responses.**

The government have always responded ion the same manner by stating the following:

➢      There were no separate investigations; there was only one investigation.

➢      They have "turned over everything." See *People's Reply to Motion for Discovery*, at 2 (11/07/2016) ("Everything within the People's control has been shared.")

➢      "There is no hidden information in the constructive possession the Attorney General." *Id.*

➢      "Any information held pursuant to a litigation hold instituted by the House of Representatives is not in the control of the Attorney General." *Id.* at 3.

➢      "All interviews conducted by the Michigan State Police and Attorney General's investigative team in this matter have been provided to defense counsel." *Id.*

➢      "Deny that the Attorney General 'refuses to turn over communications and information that are likely to impeach government witnesses; rather, the People have an open-door discovery policy and have fully complied with Michigan's discovery rules and constitutional due-process requirements. . . . The People have not withheld any exculpatory or impeachment material within their control or law enforcement's control." *Id.*, at 3-4.

➢      "While defendant Courser posits that 'various government actors in this case' have 'documents and things' the pertinent ones for the discovery requested here are the Michigan State Police and the Department of Attorney General, who were

5

requested by the House of Representatives to investigate defendant Courser's actions." *Id* at 6.[5]

➢   "Recapitulating, the People have turned over everything within their control as a result of the joint Michigan State Police and Attorney General investigation, specifically requested by the House of Representatives, into defendant Courser." *Id.* at 6.

Each of these statements have been proven to be false. Everything has not been turned over. Government has hidden information. They have either actively destroyed information or allowed it to be destroyed by looking the other way. All interviews have not been turned over. For instance, the August 8, 2015 interview of Ben Graham has not been turned over. See Exhibit 7, the latest request on December 21, 2017. The government failed to even respond to this email. The information destroyed, while in the possession of the government was clearly impeaching and exculpatory evidence.

5.     **The 4 Buckets of Evidence; The Shell Game.**

We can all see the game played here. Again, the prosecutors claim that they have turned over everything in their "control". The prosecutors try to argue that "control" is only the prosecutor's control. It is not. It is the control of any governmental agency conducting an investigation into the defendant. The prosecutors clearly acknowledge that the House and MSP were conducting investigations. The prosecutors ignore case law that defines "possession" and "control". Possession is not simply documents and things in its office. The term "possession" refers to documents within the prosecutors' access, possession, custody, or control; even if those documents are unknown to the prosecution. *People v Chenault*, 495 Mich 142; 845 NW2d 731 (2014). *Harris v Lafler*, 553 F3d 1028 (6th Cir. 2009). A defendant's constitutional rights to due

---

[5] The AG acknowledges "that Michigan State Police Detective/Sergeant Jeremy Brewer is the officer in charge of the joint criminal investigation and that Detective/Sergeant Kraig Britvec was the officer in charge of criminal investigation his [sic] extortion report in Lapeer Couny." *Id.* at 5.

DePerno Law Office, PLLC ● 951 W. Milham Ave. ● PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (Phone) ● (269) 321-5164 (Fax)

process are violated when the prosecution withholds material evidence in its possession. *Brady v United States*, 373 US 83; 82 S.Ct 1194 (1963); *Giglio v United State*, 405 US 150; 92 S.Ct 763 (1972). The Michigan Supreme Court extended the prosecutor's obligation to evidence which may not be in his possession physically, but within his control such as that which is in the possession or control of law enforcement. *People v Chenault*, 495 Mich 142; 845 NW2d 731 (2014). *Chenault* also stands for the position that evidence is subject to *Brady* when it is for impeachment purposes, citing to *Harris v Lafler*, 553 F3d 1028 (2009).

In *Harris* the 6th Circuit Court of Appeals made clear that material and exculpatory information includes impeachment material. Further, the prosecution is required to turn over everything it has. Where doubt exists as to the usefulness of the evidence, the prosecution must resolve such doubts in favor of full disclosure. *United States v Van Brandy*, 726 F.2d 548, 552 (9th Cir. 1984) (citing *United States v Goldberg*, 582 F.2d 483, 489 (9th Cir. 1978). The prosecutor's knowledge does not define the limits of constitutional liability. *Brady* imposes a duty on prosecutors to learn of material exculpatory and impeachment evidence in the possession of other agencies as well. *Brady* suppression occurs when the government fails to turn over even evidence that is known only other government agencies. *Youngblood v West Virginia*, 547 US 867 (citing *Kyles v Whitley*, 514 US 419, 438 (1995) ("[T]he individual prosecutor has a duty to lean of any favorable evidence known to the others acting on the government's behalf in the case, including the police.")). "The prosecutor will be deemed to have knowledge of and access to anything in the possession, custody, or control of any federal agency participating in the same investigation of the defendant." *United States v Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989).

In this case, as we have detailed throughout this brief, the House (which is a government agency) demanded that the AG conduct an investigation into Mr. Courser. The AG did that, with

DePerno Law Office, PLLC • 951 W. Milham Ave. • PO Box 1595 • Portage, MI 49081
(269) 321-5064 (Phone) • (269) 321-5164 (Fax)

the help of the MSP. The House ran a concurrent investigation using the MSP. The House

gathered and seized computers, electronics, and other things, using the MSP. At times, the MSP

specifically told the House "don't give us the information." The defense has always argued in this

case that the prosecutors have played a very elaborate "shell game". The prosecutors did this by

creating separate buckets.

- **Bucket #1** is simply anything the prosecutors are willing to turn over to the defense. Very little goes in this bucket.

- **Bucket #2** is the extortion investigation. The prosecutors created this bucket so that it could claim the information is not relevant even though it is run by the same police officers involving the exact same facts and circumstance.

- **Bucket #3** is other information they have allowed witnesses to keep; knowing that the defense had no access to it. For instance, the government allowed Ben Graham to keep his phone; the very same phone he used to record conversations with Todd Courser.

- **Bucket #4** is the House investigation. Everything of importance went into this bucket, including the "litigation hold" and "millions of documents".

When it came time to turn over evidence to the defense, only Bucket #1 was turned over. The

prosecutors claimed Bucket #2 was not relevant. They then claimed they didn't have control over

the information in Buckets #3 and #4. The falsity and absurdity of this strategy is summed up in

*United States v Blanco*, 392 F.3d 382 (9th Cir. 2004).

> "Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Carriger v Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (en banc). "A prosecutor's duty under *Brady* necessarily requires the cooperation of other government agents who might possess *Brady* material. In *United States v. Zuno-Arce,* 44 F.3d 1420 (9th Cir. 1995) (as amended), we explained why "it is the government's, not just the prosecutor's, conduct which may give rise to a *Brady* violation." *Id.* at 1427.
>
>> "[E]xculpatory evidence cannot be kept out of the hands of the defense just because the prosecutor does not have it, where an investigating agency does. That would undermine *Brady* by allowing the investigating agency to prevent production by keeping a report of the prosecutor's hands until the agency decided the prosecutor ought to have it, and by

8

allowing the prosecutor to tell the investigators not to give him certain information on material unless he asks for them.

*Id.; see also United States v. Monroe,* 943 F.2d 1007, 1011 n. 2 (9th Cir. 1991) (stating that "the prosecution must disclose any [*Brady*] information within the possession or control of law enforcement personnel") (quoting *United States v. Hsieh Hui Mei Chen,* 754 F.2d 817, 824 (9th Cir. 1985)).

*Blanco,* at 388-89. This is exactly what happened in this case. The prosecutors allowed the House to run a separate investigation using the MSP. Then the AG refused to gather that information. Instead, the AG permitted the House and MSP to destroy exculpatory and impeachment materials. This conduct, strategy, and conspiracy to convict Mr. Courser warrants that this case be dismissed.

### 6.   The prosecution had possession and control via the House.

All information from the House has been in the possession of the AG since the House passed HR 141 and 145 on September 17, 2015 which directed that all information be turned over to the MSP. Exhibit 8. By House Resolutions No. 141 and 145, the House turned over to the AG and MSP its entire evidentiary record. The AG and MSP have already reviewed this information. In order to protect that evidentiary record from discovery – presumably because it contains exculpatory and impeachment evidence – the AG and MSP return it to the House and then claimed they no longer had "control" of the evidence.

### 7.   Procedural history; Defendant's motion to dismiss, dated August 5, 2017

After discovering that information had been destroyed by the House, AG, and MSP, Mr. Courser filed a motion in Lapeer County to dismiss based on destruction of evidence. Judge Barnard never ruled on this motion and it remains outstanding. It is attached, without exhibits, as Exhibit 9.

9

### B.   EARLY INVOLVEMENT BY MICHIGAN STATE POLICE; INTERVIEWS

**1.   MSP Interviews.**

The MSP conducted an interview with various House members in October and November 2015. The importance of these interviews cannot be understated. These interviews reveal that (a) the MSP was involved from at least August 6, 2017 when Kevin Cotter directed the police to seized items from Mr. Courser; (b) the MSP knew no crimes were committed; and (c) the MSP told the House members to not give certain material to the MSP. It is clear from these interviews that the MSP was aware of its *Brady* obligations but thought it could be circumvented by not taking possession.

**2.   Hassan Beydoun Interview.**

The MSP conducted an interview with Hassan Beydoun on October 29, 2015. The transcript is attached as Exhibit 10. During that interview, Mr. Beydoun makes statements that described documents that have not been produced.

> ➢   He prepared notes of all meetings with Todd Courer. *Beydown Transcript*, p. 3-4. He acknowledges that he shared his notes with the police. "And I have those with me if there are any specific questions on, on there." p. 5. He also states that he compiled the Home Business Office ("HBO") report, so his notes were the basis for the report. *These have never been turned over to the defense.*

> ➢   He acknowledges other recordings, "so at the very least there was about a hour and a half of recorded conversation, clearly personal nature." p. 11. *These have never been turned over to the defense.*

> ➢   Sgt. Brewer states, "And so, that's why, and we've been given, um, I don't even want to say some direction, um, but we've got a few different areas to where there are maybe some hints of criminal activity." p. 12. *The MSP acknowledge possession of these items, which have never been turned over to the defense.*

> ➢   He specifically states that Ben Graham was not paid for the meeting with Mr. Courser in his office in Lapeer and that it was off state time. p. 13-14. Det/Sgt. Brewer states, "Yeah, at night, in Lapeer, at his law office, it's off state time, it's off state records." p. 13.

10

➢ He discusses multiple recorded interviews. *Beydown Transcript*, p. 15. He also discusses multiple recordings made by Ben Graham. *"Multiple" recordings have not been turned over. For instance, the MSP interview with Ben Graham dated August 18, 2015 have never been turned over to the defense.*

➢ He agrees there is no criminal activity. "Any one of these instances that are covered, uh, in a series of events, on its own it really doesn't rise to the level of a problem." p. 16.

➢ He discusses that they put a litigation hold "on the electronics." p. 18. *The items in this litigation hold have never been turned over to the defense.*

➢ He discusses a memo that was prepared that documents the items in the litigation hold that can be compared to the forensic download. p. 18. *This memo and comparison have never been turned over to the defense.*

➢ He acknowledges that emails exist regarding the litigation hold. Brewer asks about the litigation hold, "Would that have been like a memo type thing? Or a phone call?" Beydoun answers, "It, it could have been an email" p. 19.

➢ He discusses the "final interview docket". p. 20.

➢ He acknowledges that Keith Allard is not trustworthy. "Um, Keith on the other hand is probably the most manipulative, deceitful person involved in all of this. Uh, he, I mean, he everything he does is calculated, um, and it was, I think it was very apparent when we were, even interviewing him.  Um, that he rehearsed ahead of time and knew what he was doing, uh, said things with a purpose. Uh, he's just that kind of person." p. 22.

➢ They agree that Keith Allard directed Ben Graham to tape the meeting at Mr. Courer's office. Det. Johnson says, "Um, the recordings, was it your understanding that Ben was working under Keith's direction?" Beydoun says, "I wouldn't be surprised at all." p. 22.

➢ Perhaps the most damning statement in this interview is when Sgt. Brewer states: **"If [the Attorney General] don't charge, then the attorney general's gonna be a bunch of, you know, weak minded, whatever, wer're goint to be bad investigator's, you know, it's, it's just one of those things that, there's a no-win." p. 30.**

➢ And then, "Keith's a very deceitful person." p. 30.

DEPERNO LAW OFFICE, PLLC ● 951 W. MILHAM AVE. ● PO BOX 1595 ● PORTAGE, MI 49081
(269) 321-5064 (PHONE) ● (269) 321-5164 (FAX)

3.      **Brock Swartzle Interview.**

The MSP conducted an interview with Brock Swartzle on October 29, 2015. The transcript is attached as <u>Exhibit 11</u>. During that interview, Mr. Swartzle makes statements that reveal that documents have not been produced:

➢  He acknowledges the litigation hold. "We put in what I would – I was in private practice and litigation, what I would call litigation hold. So we had been saving emails, um, a couple weeks before because of something I had heard which concerned me. So we were saving all house emails, you know. No longer could an office push delete and it would delete it, so that was no longer an option." p. 5.

➢  He then acknowledges that the House seized everything in the office. "And so I was talking to him about 'Okay, close down their office, have somebody from our business office. Go down, take their hard files, take their computers." p. 5.

➢  He also acknowledges that his job was to get Mr. Courser expelled. "But in my mind, and what I try to build my case to get them expelled, it wasn't to build a criminal case against Todd and Cindy . . . ."

➢  He discusses the "contemporaneous emails and reports" that have never been produced. p. 6.

➢  He states that he relied on emails and "recordings" during the investigation. p. 7.

➢  The investigator Britec states. "And I'm a firm believer that we've spent enough on these assholes, to be honest with you. And I include Allard and Cline and Graham as the assholes. They were all horrible. Horrible people. Every freaking one of them, horrible people." p. 17.

➢  Brock Swartzle then states he will deny the truth: "If they agree, then fine, we're good. If they don't agree and they file their complaint tomorrow, that's going to be a public document and they're going to say that, primarily Norm, um, but they're going to say, they're going to want me in there, that they told us all this stuff beforehand and that, you know, we dropped the ball on their whistleblower claim. And we need to come out somehow publicly to defend ourselves. Basically saying 'Oh shit, they never told Norm this kind of stuff before. Um . . . and I, I'm not, we don't have to say anything about the extortion issue at all.'" p. 18.

➢  Britvec then confesses to the number of texts messages he has uncovered. "Joe Gamrat, Josh Cline, and Keith Allard have so many texts in between each other that indicate that they were part of this...Just the totality of it saying they knew they were providing Joe with the information"...."But I've got like 255 contacts between the two of them (Joe and Keith) from the time the texting started to the

12

time it ended." p. 19. *These text messages have never been turned over to the defense.*

➢ Throughout the interview he references multiple recordings made by Allard and Graham. See eg. p. 20. *Yet, multiple recordings have never been disclosed.*

➢ Perhaps most importantly, Britvec acknowledges that the tape recording was a "set up." Referring to Ben Graham, "Now there's that, I also think, it just looking at it, I've been coming more and more, I really don't like the guy, I think he's sneaky. But I believe that he was probably talked into doing these recordings by Josh Cline because, the second that, and I'm not positive that he didn't know about the texting. Because the second that Courser contacts him to 'Get over here, I need your help' He calls Josh Cline and he tells me that. And him and Josh Cline decide together that this should, this should probably be taped. Well, that sounds like a setup to me." p. 20.

4.  **Tim Bowlin Interview.**

The MSP conducted an interview with Tim Bowlin on October 29, 2015. The transcript is attached as <u>Exhibit 12</u>. During that interview, Mr. Bowlin makes statements that reveal that documents have not been produced:

➢ He states that he made "sure that electronic data was secure." p. 6. He further stats that he had access to all computers in the office and "access to the files." p. 6.

➢ He states that he asked the House members "how low do you want that bar to be for members behavior to be set. It wasn't in the constitution as to the felonious behavior but where do toy want that bar to be? And they set it the way they wanted it set." p. 7.

➢ He states that there isn't "anything criminal in nature". p. 25.

➢ He acknowledges that Allard, Graham, and Cline were doing things off hours on their own time. "Um and, and who they told and specifically what they told. But on top of it I think they were doing stuff on their own, of their own, on their own actions. And that they were doing stuff that they shouldn't be doing [00:31:00] as employees. And on top of that, I mean listen to audiotape five, hugely insubordinate in my mind. So uh, there were a lot of reasons I would have fired them that had nothing to do with them whistle blowing." p. 14. See also page 28, "On their own time."

➢ He states that when people go to Bibgy coffee, his people "know where you're going". p. 15. *Yet, these records have been turned over.*

➢ He states that he saw Norm Saari's text messages on his phone and they revealed that there were meetings with Cotter's office and Allard, Graham, and Cline.

13

These text messages have not been turned over. p. 16. *Yet, these messages have been turned over.*

➢ On page 22, he admits that he had the computers. Bowlin and Swarzle collected all the computers and information. They collected information from lots of people's emails having to do with Mr. Courser. They also collected emails, between Cotter, Saari, Swartzle, Bowlin, Allard, Graham, and Cline. Bowlin admits that he saw communication between Allard, Graham, Cline, and Saari on Saari's phone. *These have not bene turned over.*

➢ Perhaps the most damning statement in this interview is when Tim Bolwin states: **"And again, and I'll say this in this room only is that I honestly, this was put together in two weeks. And I don't want to diminish it but . . . So it was limited in what it could do in two weeks . . . . Because everyone was wanting it yesterday. I really thought that the committee process would be different in that um, there would have been they had subpoena power and you know whether they would use it or not that was up to them."** p. 31-32

➢ Then Det. Dwyre (AG) states, "I'm going to give you my card. Um don't email me though because I prefer not to get emailed on this investigation." p. 32. *Clearly he wanted no trace of how he conducted this investigation.*

**5.   Norm Saari Interview.**

The MSP conducted an interview with Norm Saari on November 4, 2015. The transcript is attached as Exhibit 13. During that interview, Mr. Saari makes statements that reveal that documents have not been produced:

➢ He acknowledges that the House was watching Mr. Courser. On page 9 he states, ". . . this is the cut to the chase here, we never had a smoking gun. You know, we, (laughs) never honestly, there just, you know, when, when, when Ben and, had the taped conversation, Ben told us anecdotally about, he had met with Todd. But, but again that's not a, it wasn't on state property, it wasn't on state time, it wasn't state resources. You know, hey, he's your boss. I mean, you, if there's something that you really have evidence that was in violation of state time, state property, state material, I could probably take it that next step, but you and your boss having a disagreement, I'm sorry but you're an at-will employee, and it's, life's tough out there. I mean it is. I've been in the streets before. I understand life's tough out there."

➢ He acknowledges that the email was a setup. p. 8.

➢ When asked about anything illegal happening, he states, "never happened." p. 17.

14

> He also agrees that the meeting between Mr. Courser and Ben Graham was not on state time. "And then, eventually, um, Ben said, you know, this all happened but, again, what I believe was Saturday night, in his Lapeer office. Sorry but I got you from 9 to 5 in your Lansing office. I don't have you Saturday night when you're doing other activities so, you know as strange and unusual and everything else that it was, um, again, it was, his word, and . . . not on state time." p. 19.

> Det. Johnson then says, "I'm telling you that unless there's something that I'm missing. Um, there's not a whole lot criminal here." p. 25.

## 6.    Kevin Cotter Interview.

The MSP conducted an interview with Kevin Cotter on November 4, 2015. The transcript is attached as Exhibit 14. During that interview, Mr. Cotter makes statements that reveal that documents have not been produced. He also states that he directed the MSP to seize evidence (without a warrant):

> Det. Brewer admits that "we still have a lot of evidence and, uh, technical information, computers and phones and things like, that we're looking at." p. 5. *All of this information has not been turned over. In fact, much of it has been deleted and scrubbed.*

> Kevin Cotter admits that they have no evidence of illegality. p. 14.

> Kevin Cotter references "the evidence" multiple times through the interview.

> He also states that nothing illegal happened. Det. Brewer asked, "involved a, a breaking of the law at that point, it was more of a, a lot of house rules and policies were broken but, didn't raise to that level at that point?" Cotter says, "yes". p. 15.

> When referring to the email Mr. Courser sent, Swartzle says, "in my opinion, I didn't make a big deal about it in my written testaments, because I just didn't see it rising to the level of criminality" p. 26.

> Det. Johnson asked Kevin Cotter if Mr. Courser "tried to hide or conceal" any information. Kevin Cotter responded, "Nothing comes to mind. Um, I just think of one ... The situation when, right after the investigation started, one of the very early things Tim Bowlin did was to go to their offices for the purpose of retaining all information, their emails, computers, other things. And I think, when that occurred, the revelation is that all computers were available with the exception of Todd's laptop. And so when we then learned of that, we were able to direct Chief Sergeant Dickson to actually go to look here in an effort to retain that, uh, to retrieve that coherently." p. 29.

15

➢ Det. Johnson then acknowledges the police have the computers. "Uh, we have a lot of the computers, and the technical side of things we're looking into to see if that's been done from that end of it." p. 30. *This motion proves that information was deleted while in the possession of the MSP.*

➢ Det. Brewer then agrees that the meeting that took place at Mr. Courer's office was not on state time. "The umbrella of misconduct, it's gonna just depend on how or once we're complete and everything is put together, even though he was off campus, um, in his own law office and he didn't ask Ben to do this on state time." p. 30.

➢ Cotter then acknowledges that there were additional recordings created in state offices. "Can I ask you a question, just out of curiosity? But I'm thinking about some of the recordings created in state offices, and so they're, based on some of this [inaudible] that were discussing . . . Is that misconduct?" p. 31. *These additional recordings made in the state offices have never been turned over.*

➢ Sgt. Brewer then agrees that they have additional recordings and that the AG's office isn't "completely" headhunting on this investigation. "We, we brought those things up, um, and they've been discussed. . . . We're not going to be completely headhunting here and just trying to find anything because these people are so disliked (laughs). You know what I mean? . . . . [A]nd that got brought up as far as all that surrounds these recordings. And I think they were just like, "Let's just wait and see till everything's put together. You guys have a lot of interviews to do." p. 31.

➢ What is interesting about that exchange is that Cotter is worried that "the other recordings" might be released. *These "other" recordings have never been produced.*

➢ Then Det. Britvec gives Cotter and Swartzle a "heads-up" about inside investigative information so that they could use that information in the civil lawsuit. "Hey, I just want to make sure you guys were aware there's this report, and Keith Allard might be named as the extortionist, one of the extortionists. That, being said, I'm telling you this, because I want you guys, you know, as a taxpayer, to be careful what you're going to settle." p. 34.

➢ Near the end of the interview, Kevin Cotter is essentially begging the police to bring criminal charges; yet Det. Brewer states that this investigation "is a waste of time." p. 36.

➢ Cotter also asks Det. Brewer for any internal reports. Brewer says, "I mean, I wouldn't even have an issue trying to just get you guys a copy of it. You know what I mean?" p. 35.

➢ Swartzle then lays out his strategy if there is a lawsuit filed. "If they do end up filing, um, not from a legal perspective but from a PR perspective, we have to respond in some way. We basically have to say oh, they're a bunch of liars, you

16

know . . . . Keith's at the heart of the extortion for God's sake, but if we have to kind of wait a couple of weeks, we can do that. I mean, we're good at it." p. 36.

7.    **Todd Courser Interview.**

We also know that on August 17, 2015, Mr. Bowlin and the MSP conducted an interview of Mr. Courser; yet no *Miranda* warnings were given. We now know that the MSP and Capital Police were conducting a criminal investigation at the time of this interview and the MSP were involved as early as August 7, 2015.

C.    EARLY INVOLVEMENT BY MICHIGAN HOUSE OF REPRESENTATIVES

1.    **The "litigation hold". Items in possession of the House of Representatives. House of Representatives "litigation hold"; House seizes all data.**

On August 6, 2015, Chad Livengood published a story about Todd Courser and Cindy Gamrat in *The Detroit News*. That same day, the Michigan House of Representatives instituted a "litigation hold" and seized all computers and electronics. This is confirmed through a report prepared by Brock A. Swartzle (general counsel) and Tim Bowlin (business director). See except *Exhibit 15. Select Committee to Examine the Qualifications of Representatives Cindy Gamrat and Todd Courser*, pages 1-3.

> "Hours after Chad Livengood of the *Detroit News* broke the story about the extramarital affair between Rep. Courser ad Rep. Gamrat, Speaker of the House Kevin Cotter ordered an internal investigation by the House Business Office. As General Counsel for the House, Brock Swartzle implemented what is commonly referred to as a "litigation hold" on all potentially relevant materials. This consisted of multiple steps, including but not limited to (1) preserving all House network drives, emails, calendars, and other Outlook-related matters; (2) seizing all hardcopy documents from the offices of Rep. Courser and Rep. Gamrat; and (4) instructing Republican and Democrat senior staff to review all of their files for any records potentially relevant to the investigation. The House Business Office implemented this order, and the litigation hold remains in place today."

Ex. 10, p. 2-3. This litigation hold is confirmed in *Exhibit 16*. This is a chronology of event from the HBO report prepared by Brock Swartzle and Tim Bowlin detailing steps taken in the

17

"investigation". See entry for Friday, August 7, 2015: "put on hold all electronic data of the House/Members/Staff". This litigation hold is also confirmed above in the Police Tapes listed above. No warrant was issued for this seizure, even though the MSP was directed by Kevin Cotter to seize the computers.

That same evening, the House through the Capital Police, a division of the MSP seized the laptops of Mr. Courser, Ms. Gamrat and staff members, and seized other document. This is confirmed through the statements of Kevin Cotter (Ex. 16) and the report prepared by Brock Swartzle and Tim Bowlin (Ex. 10).

Nevertheless, the AG has refused to produce documents by either (a) segregating documents and things into separate files and then claiming certain files are not relevant or (b) claiming they are not in control of the documents, even though everything in the possession of the House has already been turned over to the MSP. On November 29, 2016, the AG stated that the House has produced "millions of documents". Exhibit 17. In that email Attorney Hart states that (1) "there are millions of documents contained in the litigation hold since July 2015" and (2) "hundreds of thousands to review with regard to your client." The AG would only know there are hundreds of thousands related to Mr. Courser if he has already reviewed the millions of documents. It is important to understand the process and it is worth repeating. The prosecutors reviewed the items in the litigation hold but intentionally did not "take possession" in order to keep it from the defense.

The House Business Office implemented this order, and the litigation hold remains in place today. This information was passed from the House Business Office to the MSP and the AG to Allard, Graham, and Cline. This evidence is vital both for impeachment of witnesses and as exculpatory evidence for both the upcoming preliminary hearing and for the upcoming trial.

DePerno Law Office, PLLC • 951 W. Milham Ave. • PO Box 1595 • Portage, MI 49081
(269) 321-5064 (Phone) • (269) 321-5164 (Fax)

### D.   INVOLVEMENT OF MICHIGAN STATE POLICE OFFICERS

**1.   Chief Sergeant Dixon**

Chief Sergeant Dixon is employed by the MSP and assigned to the Capitol Post. He is the officer that supervised the seizure of all computers, electronics, and other things at the House. Also, on August 7, 2017, without a warrant and at the direction of Speaker Kevin Cotter, Chief Dixon travelled to Lapeer County to Mr. Courser's home and law office and attempted to seize computers. This is quite remarkable. The police are part of the executive branch. The legislative branch makes the laws. The judicial branch interprets the laws. The executive branch enforces the laws. If the government wants to seize someone's property, it asks the judicial branch to issue a warrant. That didn't happen here. In this case, the legislative branch directed the executive branch to seize Mr. Courser's property. They circumvented the judicial branch. Chief Dixon had no problem following the direction of the legislative branch, circumventing the judicial branch, and using his executive branch power to violate Mr. Courser's constitutional rights.

**2.   Trooper Troy Johnston**

Trooper Johnston interviewed Hassan Beydoun, Norm Saari, and Kevin Cotter.

- During the Norm Saari interview he stated, "I'm telling you that unless there's something that I'm missing. Um, there's not a whole lot criminal here."

- During the Kevin Cotter interview he acknowledges the police have the computers. "Uh, we have a lot of the computers, and the technical side of things we're looking into to see if that's been done from that end of it."

Yet while computers were in possession of the MSP, filed were deleted and the computers were bleacher.

**3.   Sergeant Jeremy Brewer**

Sgt. Brewer interviewed Hassan Beydoun, Norm Saari, and Kevin Cotter.

DePERNO LAW OFFICE, PLLC • 951 W. MILHAM AVE. • PO BOX 1595 • PORTAGE, MI 49081
(269) 321-5064 (PHONE) • (269) 321-5164 (FAX)

- During the Hassan Beydoun interview he stated, "And so, that's why, and we've been given, um, I don't even want to say some direction, um, but we've got a few different areas to where there are maybe some hints of criminal activity."

- During the Hassan Beydoun interview he stated, "Yeah, at night, in Lapeer, at his law office, it's off state time, it's off state records."

- During the Hassan Beydoun interview he specifically acknowledges that charges must be brought. **"If [the Attorney General] don't charge, then the attorney general's gonna be a bunch of, you know, weak minded, whatever, we're going to be bad investigator's, you know, it's, it's just one of those things that, there's a no-win."**

- During the Kevin Cotter interview he admits "we still have a lot of evidence and, uh, technical information, computers and phones and things like, that we're looking at."

- During the Kevin Cotter interview he also that took place at Mr. Courser's office was not on state time. "The umbrella of misconduct, it's gonna just depend on how or once we're complete and everything is put together, even though he was off campus, um, in his own law office and he didn't ask Ben to do this on state time."

- During the Kevin Cotter interview claims that the AG's office isn't "completely" headhunting. "We, we brought those things up, um, and they've been discussed. . . . We're not going to be completely headhunting here and just trying to find anything because these people are so disliked (laughs). You know what I mean? . . . . [A]nd that got brought up as far as all that surrounds these recordings. And I think they were just like, "Let's just wait and see till everything's put together. You guys have a lot of interviews to do.""

- During the Kevin Cotter interview Det. Brewer acknowledge that this investigation "is a waste of time."

- At the end of the Kevin Cotter interview Det. Brewer states that he can get Kevin Cotter a report before it is released. "I mean, I wouldn't even have an issue trying to just get you guys a copy of it. You know what I mean?"

The MSP acknowledge possession of these items, which have never been turned over to the defense. He acknowledges there is nothing criminal; yet the charges have moved forward in Lapeer where an essential element is that Ben Graham was working on state time. He

20

acknowledges receipt of evidence; yet all of this information has not been turned over. In fact, much of it has been deleted and scrubbed while in the possession of the MSP.

4. **Det. David Dwyre (# )**

Det Dwyre interviewed Tom Bowlin.

- During the Tim Bowlin interview he stated, "I'm going to give you my card. Um don't email me though because I prefer not to get emailed on this investigation."

- During the swear-to-hearing, Det. Dwyre testified under oath (in order to get Mr. Courser charged with a crime) that the MSP had audio recordings. Either he was lying (because these recordings have not been turned over) or they were destroyed while in possession of the MSP (because these recordings have not been turned over).

Clearly he wanted no trace of how he conducted this investigation. He clearly intended not to take control of evidence in possession of the House.

5. **F/Lt. Brody Boucher (#123), MSP Capitol Post**

Brody Boucher is the officer who retrieved the computers and electronics from the House on September 1, 2015. See MSP report 010-0000715-15 (DB) attached as <u>Exhibit 18</u>. In this report, Officer Broucher acknowledges that "The House Business Office investigation was reported to provide evidence that both representatives misused public funds." Yet he never obtained this evidence. He allowed the House to keep the evidence. He further acknowledges that HR 145 "request[ed] that the Michigan State Police and Michigan Attorney General's Office investigate the alleged criminal misconduct by former Representatives COURSER and GAMRAT." Again, he never retrieved the "millions of documents" from the House. He does state that he went to the House on "TUE, SEP 01, 2015 at 0400". He states that "[o]n this date" he contacted Tim Bowlin and "requested" that information be turned over. He didn't get a warrant. He also "requested" that electronics be turned over to the MSP. He "made arrangements to meet LISA CURTIS, his administrative assistant, to take possession of the requested items."

21

Remember, Sgt. Dixon was already involved with seizing computers on August 7, 2015. But on September 1, 2015, they are in possession of the Lisa Curtis at the House Business Office. Then at 12:30 pm. Officer Boucher met with Lisa Curtis and Greg Bensinger. They turned over items 1-6. Then they went to Cindy Gamrat's office and took more computers. Then they went to Mr. Courser's office and took more things. Then he logged these items into evidence at the Capitol Security Section. Then Colleen Auer, the MSP forensic technician prepared a report on September 15, 2015, but does not state when she received the evidence. See report Exhibit 19.

6.    **D/Sgt. Kraig Britvec (#107)**

Det. Britvec interviewed Brock Swartzle and Tim Bowlin.

- During the Brock Swartzle interview when discussing the extortion, he stated, "Joe Gamrat, Josh Cline, and Keith Allard have so many texts in between each other that indicate that they were part of this...Just the totality of it saying they knew they were providing Joe with the information. . . . But I've got like 255 contacts between the two of them (Joe and Keith) from the time the texting started to the time it ended."

- During the Brock Swartzle interview, he acknowledged that the meeting with Benjamin Graham in Lapeer was a "set up." Referring to Ben Graham, "Now there's that, I also think, it just looking at it, I've been coming more and more, I really don't like the guy, I think he's sneaky. But I believe that he was probably talked into doing these recordings by Josh Cline because, the second that, and I'm not positive that he didn't know about the texting. Because the second that Courser contacts him to 'Get over here, I need your help' He calls Josh Cline and he tells me that. And him and Josh Cline decide together that this should, this should probably be taped. Well, that sounds like a setup to me."

- During the Kevin Cotter interview, he gave Kevin Cotter a "heads up" about the investigation so that they could use that information in the civil lawsuit. "Hey, I just want to make sure you guys were aware there's this report, and Keith Allard might be named as the extortionist, one of the extortionists. That, being said, I'm telling you this, because I want you guys, you know, as a taxpayer, to be careful what you're going to settle."

These text messages have never been turned over to the defense.

7.    **D/Sgt. Jeffery Yonker (#363)**

Det. Yonkers aided Det. Britvec in every step taken by Det. Britvec.

22

8.    **DFA Colleen J. Auer (#1355)**

Colleen Auer's initial report states that she received a "home computer" and created a forensic image. Her supervisor signed off on this report. However, after two years, she has now changed her report. Now she claims there was no "home computer"; but only after being caught by the defense for not turning over this item. For two years, the defense has been arguing "we don't have this item" and the prosecution has continuously stated "we gave it to him." Now, the MSP and prosecutors have conveniently changed their story, stating it was a typo. However, the prosecutors have produced no affidavit to this support this point. Instead, we are left with an unsworn, hearsay amended police report. Based on this significant contradiction alone the Court should have and still should complete an evidentiary hearing so the defense and the Court itself can test the veracity of this new enlightened – yet unsworn – testimony.

Ms. Auer claimed this problem was a "typo". This is very unlikely. Do we really believe that Ms. Auer was trying to type "Unredacted House Business Report" but actually typed "home computer". That is not "a typo". That is a ridiculously important and major error in documenting evidence and the chain of custody. The truth is that it doesn't make sense. These police reports are littered with inconsistencies on the evidence seized and chain of custody.

Ms. Auer has been unable to establish a chain of custody for any of the computer or electronics in her possession. On December 13, 2017, Ms. Auer stated that the computers were seized with a warrant, which she claimed would establish the chain of custody. The prosecutor confirmed there was a warrant and stated "the warrant was turned over to the defense." But then Ms. Auer couldn't find the warrant. The prosecutors couldn't find the warrant. Then on December 20, 2017, the prosecutors had Colleen Auer "amend" her initial report in order to establish the chain of custody. They continue to ignore this missing warrant.

23

Ms. Auer claims that she ran forensic images on September 17, 2015. But interestingly, two of the computers were not imaged until October 8, 2015. Even more interesting, these two computers were "bleached" on September 28, 2015. We have to ask why was there a delay for these two computers and who permitted access to these two computers on September 28, 2015. Who scrubbed them? Ms. Auer has refused testify under oath or sign an affidavit about any of her work or statements.

On December 13, 2015, Ms. Auer also claimed that she obtained a Bitlocker code from the House but it didn't work on the computers. Now she has changed her story again and claims that she never did this. Her continuous changes to her stories are not credible.

On August 29, 2017, the prosecution produced an email from Colleen Auer which states: "MSP CCU Did Not Produce the forensic reports for CCU-2235-2017 items: 0002, 0004, 0005, 0007, 0008, 0009, and 0011 for comparison of hash values." This statement confirms the defense position and Larry Dalman's affidavit that there is no way to authenticate the date on items 0002, 0004, 0005, 0007, 0008, 0009, and 0011. This remains true today.

### D.    EVIDENCE NOT TURNED OVER

**1.    List of evidence still not turned over.**

Ex. 6 lists 33 categories of information not turned over by the AG, House, or MSP.

**2.    Exculpatory and impeachment evidence.**

In this case, the government claims that Mr. Courser committed misconduct in office when he asked an alleged state employee (Ben Graham) to send a false email. There is evidence that House employees provided others, including Joe Gamrat, with Mr. Courser's passwords. Exhibit 20. Yet at the preliminary hearing in Ingham County, Ben Graham testified that he didn't disclose the password. Exhibit 21. This testimony was false. There is also evidence that employees of the House were bugging the offices of Mr. Courser and Cindy Gamrat. Anne Hill

24

specifically stated that she was told the offices were bugged. <u>Exhibit 22</u>. Keith Allard also confirmed that there were at least three other recordings being passed around. <u>Exhibit 23</u>. Yet the AG has not turned over any of the forensic recordings on any of the computers. The prosecutors have only turned over 4 "copies" of critical recordings that have been altered. The prosecutors have not turned over at least 8 other recordings. There should be very little doubt that these recordings, and the other information requested, is favorable to the defense. If even one of these recordings contain evidence conversation showing that Ben Graham or Keith Allard perjured themselves during the preliminary exam, that would be impeachment evidence. Further, the MSP has already declared that Allard, Graham, and Cline are liars. For instance:

> "You're f'ing liars." – Tim Bowlin as to Keith Allard and Benjamin Graham, *MSP Interview Tape*, 46:40.

> "It's clear that they tailor their testimony to what they thing the law is or isn't. I think he's one of those." – Hassan Beydoun as to Keith Allard and Benjamin Graham, *MSP Interview Tape*, 44:20.

> "I think Keith Allard is a piece of crap." Brock Swartzle as to Keith Allard, *MSP Interview Tape*, 41:48.

There can be no doubt that the government has suppressed impeachment evidence as to Allard, Graham, and Cline. This evidence is material to the defense and it must be turned over immediately. The defense has already filed documents with this court showing that the AG has hidden evidence (a) deleted calls from the call log produced, (b) refusing and failing to produce the telephone and "texting" phone of David Horr, (c) refusing and failing to produce videos that were on Joe Gamrat's telephone, and (d) refusing and failing to produce emails. Also, the key piece of evidence is Benjamin Graham's cell phone. The government never took possession of it. Instead, it remains in the possession of Ben Graham and his attorney.

25

3.    **Police Report and Failure to Produce Forensic Reports.**

The defense has filed the attached police report with the court several times. See Ex. 19. This police report is dated September 16, 2015, supplemented December 22, 2015. This police report shows that that on December 22, 2015, the government conducted forensic examinations on multiple computers. As a result, they produced an "IEF Report" and an "ACCESS DATA – FTK Report". The government has refused to produce this information, claiming it didn't really do reports. These forensic reports are important because they will detail the evidence examined by the MSP, present conclusions regarding the evidence, and will be damaging to the credibility of the prosecution's witnesses and the prosecutors themselves.

On June 7, 2017, the prosecution stated the following:

> "The People deny the allegations as untrue. The People further state that there was no relevant information in any of the examinations performed by the Computer Crimes Unit of the Michigan State Police therefore, no report(s) were prepared. However, all downloads and other digital information has been provided to defendant's forensic expert witness."

Not only does this statement fly in the face of the prosecutor's duty to turn over evidence to the defense, but it is also false. The police reports specifically identify "reports". The prosecution cannot credibly claim there are no reports.

4.    **Reports were prepared.**

We know the statement "no report(s) were prepared" is demonstrably false for the following reasons:

(a)    The police report states that forensic reports were produced. It is unbelievable – it is remarkable – it is knowingly false – and it amounts to contempt of court for the prosecution to state that "no report(s) were prepared."

(b)    The police report states: *"See Forensic Report disc, "IEF Report" for further details"*.

(c)    The police report states: *"See Forensic Report disc, "ACCESS DATA – FTK Report" for further details"*.

26

(d) The police report identifies two forensic reports. They exit.

(e) The idea that the prosecution can say "no report(s) were prepared" when there were, in fact, two reports prepared is absurd. The court cannot excuse this behavior and the court cannot allow this case to continue when evidence has clearly been destroyed.

## 5. All downloads and other digital information has not been provided.

We know the statement "all downloads and other digital information has been provided to defendant's forensic expert witness" is demonstrably false for the following reasons:

(a) On July 17, 2015, Keith Allard sent an email to Ben Graham that included 13 recordings. Exhibit 24. These are "m4a" audio files.

(b) On August 7, 2015, Chad Livengood (Detroit News) sent an email to Keith Allard stating that he was editing "voice003.m4a". Exhibit 25.

(c) On August 28, 2015, Keith Allard sent two emails to Chad Livengood (Detroit News) that included 2 recordings. These are "m4a" audio files, labeled "voice004.m4a" and "voice005.m4a". Exhibit 26.

(d) This means that there at least 16 audio files. We assume there was also a "voice001.m4a" and "voice002.m4a". We don't know if there was a "voice006.m4a" and beyond.

(e) Colleen Auer's police report (Ex. 19) references "Prop 001 – Desc: 1 TRANSCEND 32GB THUMB DRIVE WITH AUDIO RECORDING".

(f) At a preliminary examination, Ben Graham testified that he turned over the "tapes" to the House Business Office "in late August". This refers to August 2015. Exhibit 27. *Preliminary Examination*, 155:5-8 (05/25/2016).

(g) House Resolution 141 states that all information in the possession of the House was turned over to the MSP. Ex. 8.

(h) The email from Denise Hart on November 29, 2016 states that the House has "millions of documents contained in the litigation hold since July of 2015, and hundreds of thousands to review with regard to [Mr. Courser]." Ex. 9.

(i) At a preliminary hearing, Ben Graham also testified that his attorney gave the tapes to the MSP. See Ex. 5, 155:13-14.

(j) Another email from Chad Livengood to Keith Allard, dated August 28, 2015, confirms that audio tapes were made "in the House Office Building". In this email, Chad Livengood states that he is mostly interested in the audio tapes that Kevin Cotter (then Speaker of the House) was using as evidence of wasting

27

taxpayer resources; i.e., those taped conversations "in the House Office Building about their personal lives". <u>Exhibit 28</u>.

(k)    The police report (Ex 19), lists 11 property items. A screen-shot of the date produced by the prosecution to Larry Dalman shows these 11 items identified in separate folders. <u>Exhibit 29</u>. However, folder 1 is empty. <u>Exhibit 30</u>. (l)

## 6.   <u>Evidence has been deleted and destroyed</u>.

The above demonstrates that evidence has been destroyed, hidden, and altered. The prosecution has never produced the forensic reports. They were not produced to Larry Dalman. And we have to ask why the prosecution refuses to produce these reports. The reason is because the reports will show there is no case. There was no crime. The recordings will exonerate Mr. Courser. The prosecution has never produced certain audio files which Ben Graham has acknowledged exist and which were provided to the government. These audio tapes were given to the MSP by Ben Graham and the House. The prosecution has never produced certain audio files. The data now shows that the folder labeled "transcend drive" is empty.

In every response filed by the prosecution, they have declared that they "have given the defense everything." Yet at each nearly every hearing on the motions to compel, the prosecution has arrived at the hearing and "produced" additional information. Of course, this begs the question of why additional information was produced if the prosecution has already turned over everything. But the reality is that this additional information was produced in order to deflect from the real issue of obstruction and destruction of evidence.

For instance, on March 1, 2017, at another scheduled hearing to compel production in Ingham County, the prosecution appeared with several computer discs. This made their prior statement that they "gave him all the disks that we have" false. These discs were alleged to have computer information. But instead, they were nothing more than "hot links" that routed to dead ends because the prosecution failed to produce the external hard drive of evidence that tracks

28

with the discs. In other words, the government loads all computer evidence onto a hard drive. Then they set up "hot links" or a "front door" into that evidence through a browser page. Clicking on the "hot link" takes the user to the data on the hard drive. But the information on the disc is just a link. Nothing more. In this case, the prosecution knowlingly failed and refused to produce the actual data or external hard drive; meaning the "hot links" were dead ends and useless. But the goal of "producing" the discs was accomplished because there was an "appearance" that the prosecution was producing something, which satisfied the Court. In fact, the prosecution produced nothing. This behavior continues today.

The prosecution has also refused to produce any information on the computers labelled "0002" and "0004" because these computers now have a "BitLock" installed. This "BitLock" was not on the computers when they were seized; but now that they are in the possession of the government, they have acquired a "BitLock" which prevents the prosecution from turning over the data. Of course, we all know that Microsoft will give any law enforcement agency the code to unlock the "BitLock". The government simply needs to contact Microsoft and provide the computer serial number. But the prosecution has refused to request the unlock code.

The information contained in these missing, hidden, and destroyed file is essential because this case is about a recorded conversation between Mr. Courser and Ben Graham. Other recorded conversations recorded are critical. These computers and audio files contain the conversations. The conversations are exculpatory, relevant, essential, and will have impeachment evidence. Without the audio, we cannot determine the truth of the conversations, extent of wiretapping, and trustworthiness of the prosecution witnesses. We already know that the government considers Ben Graham, Keith Allard, and Joshua Cline "liars" and we know some of them lied at the preliminary examination; yet the prosecutors still put them on the stand. Further,

29

without the emails, texts, and other documents contained in the litigation hold we cannot examine the witnesses about the wiretapping, extortion, and being directed by House members. We already know that the MSP has acknowledged that Mr. Courser was set up by Ben Graham and Keith Allard. The emails, texts, and other documents are exculpatory, relevant, essential, and will have impeachment evidence.

## F.    DEFENSE EXPERT WITNESSES

1.    __Larry Dalman.__

Larry Dalman's has signed an affidavit. Exhibit 31. In his affidavit he states the following:

➢ A police report was prepared on September 16, 2015 (supplemented December 22, 2015). It referenced 10 computers and forensic reports titled "IEF Report" and an "ACCESS DATA – FTK Report". *Affidavit* ¶9.

➢ After 20 months (Sept. 2015 through May 2017), the Attorney General finally produced some information, but that was only after the Attorney General delayed from April 19, 2017 to May 12, 2017. *Affidavit* ¶¶3-7.

➢ "The purpose of an FTK Report is to confirm the nature, character, and quantity of the data on the device **at the time of the original download (when the device is taken into custody.**" *Affidavit* ¶10.

  • The FTK Report is created in order to ensure the integrity of the data.

➢ "The FTK Report contains a specific MD5 hash used to authenticate the data as of the date of the original download." *Affidavit* ¶10.

  • Keep in mind that the MD5 hash is a code specific to each download and imbedded in the FTK Report. It authenticates the data "as of the date of the original download" and is used to ensure that data has not been changed front the original download until it is produced to the defense.

➢ "Without the FTK Report, we cannot confirm that data has not been changed since the device was taken into custody. *Id.*

➢ "As to each identified computer listed above, the MSP CCU provided forensic reports for only computers 003, 006, and 010." *Affidavit* ¶10.

➢ "There are NO forensic reports for computers 002, 004, 005, 007, 008, 009, 011. In fact, the folders labeled "Access Data – FTK Report" are empty. This means

30

that there is no original report containing the MD5 hash for 7 computers." *Affidavit* ¶10.

- • This means that Larry Dalman cannot authentic the data on 7 of the computers. It is unbelievable that the Attorney General has mishandled evidence to this degree.

➢ "Instead of providing the original FTK Report (which contains the original MD5 hash), the MSP provided text files that contain an MD5 hash value as of the date of the download provided to me." *Affidavit,* ¶12.

- • This is in reference to the three MD5 hash numbers that the Attorney General provided. This is remarkable. This means that the MSP/Attorney General "faked" the MD5 hash for computers 003, 006, and 010.

➢ "In the computer forensic examination process, a hash value is used to ensure that the examined copy has not been altered. Under accepted protocols, an image is made of the original. The image is used during the forensic examination to preserve the integrity of the original. The original evidence is not used for the analysis. A hash value is taken of the imaged copy before any examination. If the values are the same, then the copy is treated the same as the original. If the values are different, then the integrity of the copy is called into question. The hash values (original hard drive, imaged hard drive) must match." *Affidavit,* ¶13.

- • The MSP/Attorney General stripped the MD5 hash from the FTK Report and created separate "WordPad" files. These WordPad files could have been manipulated at any time. For instance, if the data in the FTK Reports has been manipulated, then the MD5 hash given to Larry Dalman would not match the MD5 hash from the original download. In order to match the MD5 hash, the Attorney General could strip out the MD5 on the FTK Report and create a WordPad file by simply typing the now-matching MD5 hash into the newly created file. There is no way for MSP/Attorney General to prove this didn't happen.

➢ "This means there is no way to compare whether the information downloaded to the external hard drive provided to me is a true copy of the original forensic download taken by the MSP CCU in 2015. This means that between then and now, data could have been changed, modified, or altered from its original download. The data provided to me could have been modified and manipulated between the time I requested the data (April 19, 2017) and the time the data was finally provided (May 15, 2017)." *Affidavit,* ¶15.

➢ "It is for these reasons that FTK Reports are prepared contemporaneous with the original download." *Affidavit,* ¶16.

31

➢ "Because the MSP CCU did not produce the forensic reports for computers 002, 004, 005, 007, 008, 009, 011, I can only obtain a hash value on what I received with nothing to compare it to." *Affidavit*, ¶17.

    • Larry Dalman cannot confirm the integrity of the data on ANY of the computers because (1) the MD5 hash on computers 003, 006, and 010 was detached from the FTK Report and (2) no FTK Report was produced for computers 002, 004, 005, 007, 008, 009, and 011.

➢ "I was not given access to audio file downloads. In fact, folders labeled "audio files" or "transcend thumb drive" are empty. A folder was created but there was no data. Possible reasons may be the data is no longer available or have been destroyed. The folders themselves and audio files identified in the police report confirm that those audio files once existed." *Affidavit*, ¶18.

    • Simply put, audio files are missing. Nobody creates folders for evidence that doesn't exists.

➢ "I also requested the MSP CCU produce all forensic images of all digital evidence. Because the MSP CCU previously placed audio files on a flash/thumb drive, it should have been included as a forensic image. It was not." *Affidavit*, ¶19.

    • Simply put, forensic images, digital evidence, and audio files are missing.

➢ "I can confirm through the data I received that 37,472 items were checked and categorized by the MSP CCU. The report shows this. The items selected may have included text messages, emails, and other files data files (such as audio or video). However, of these 37,472 items, only 1 MS Word document was exported into the report. This means there are 37,471 items that were bookmarked but not included." *Affidavit*, ¶20.

    • 37,471 items are missing.

➢ "Based on my review to date, I can make the following conclusions: (1) MSP CCU has not produced 7 forensic reports on 7 computers. Because 7 forensic reports were not provided, I cannot match the MD5 hash value of these 7 computers. (2) Audio files and a 32 GB transcend thumb drive containing audio files were not produced to me. Forensic images of these items have not been produced. (3) 37,472 items were checked and categorized but were not produced." *Affidavit*, ¶21.

## 2. <u>Adam Kelly</u>.

Adam Kelly of DataExam LLC conducted an initial review of the forensic images previously provided to Larry Dalman. Mr. Kelly signed an affidavit. <u>Exhibit 32</u>. He has produced two reports. <u>Exhibits 33 and 34</u>. Mr. Kelly confirmed the following:

DePerno Law Office, PLLC • 951 W. Milham Ave. • PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 321-5164 (fax)

(a)     Protocol

➢     MSP did not follow proper protocol when receiving the data. Rather than first conducting a forensic image, the MSP first conducted an examination of the data which resulted in destruction of evidence and integrity of the data.

(b)     Property Item 001

➢     Property item 0001, a computer was searched and imaged; but the image was never produced. See Exhibit 33, *Report and Production Review*, dated November 28, 2017.

(c)     Property Items 002 and 003

➢     Property item 0002 and 0003. We know the computers and other data were seized on August 8, 2015. Yet the forensic image of Item 002 was conducted on February 2, 2015, which is 6 months before it was actually seized. This means that the MSP manipulated the data when it took the forensic image. This means the integrity of the data is not intact. This means that if MSP can manipulated the date of a forensic download on one computer, it can manipulate the date on all computers. This is also contrary to Ms. Auer's statement that she imaged these drives on October 8, 2015.

➢     Property item 0003. It was seized on August 8, 2015, but the forensic image was conducted on February 2, 2015. It was also modified on August 19, 2015 and September 24-25, 2015, before it was imaged by MSP.

➢     "It should also be noted that folders within the forensic image of Item 0003 have a modified date of 8/19/2015 as shown below:" Ex. 33, p. 4.

➢     In Mr. Kelly's second report dated December 5, 2017, he shows that Item 003 has significant changes on August 19, 2015 and September 25, 2015. See Ex. 34, *Report and Production Review*, dated December 5, 2017.

➢     This tells us that Items 002 and 003 have significant evidentiary problems. They were seized on August 8, 2017 and then modified on August 19, 2015. Ms. Lemke claims to have taken a forensic image on October 8, 2015; which fails to capture the modified items. However, the actual forensic image states that is was captured on February 2, 2015, which occurred 6 months prior to its seizure; meaning that the date of the actual forensic image has been manipulated.

(d)     Property Item 005 (Todd Courser's laptop)

➢     Property item 0005, was seized on August 6, 2015.

33

       ➤     It was modified on August 7, 2015 and August 19, 2015.

       ➤     Also, Mr. Courser's login account "tcourser" is missing, even though 0005 was the laptop assigned to Mr. Courser.

(e)    <u>Property Item 006</u>

       ➤     Property item 0006 was seized on August 6, 2015.

       ➤     It was modified on August 10, 2015. Ex. 34, p. 3.

(f)    <u>Property Item 007</u>

       ➤     It was seized on August 6, 2015.

       ➤     It was modified on August 10, 2015. Ex. 34, p. 4.

       ➤     Mr. Kelly also states that the recycle bin was modified on August 10, 2015. Ex. 34, p. 4. In other words, someone deleted information on August 10, 2015.

(g)    <u>Property Item 008</u>

       ➤     Property item 0008, although seized on August 6, 2015

       ➤     It was modified on August 28, 2015, September 9, 2015, and September 10, 2015. Ex. 34, p. 4.

       ➤     The recycle bin was modified on August 19, 2015. Ex. 34, p. 4.

(h)    <u>Property Item 009</u>

       ➤     Property item 0009 was seized on August 6, 2015.

       ➤     It was modified on August 10, 2015, August 19, 2015, August 27, 2017, and September 10, 2015. Ex. 34, p. 5.

       ➤     The recycle bin was modified on August 19, 2015. Ex. 34, p. 5.

(i)    <u>Property Item 010</u>

       ➤     Property item 0010 was seized on August 6, 2015.

       ➤     It was modified on August 10, 2015, September 1, 2015, September 8, 2015, and September 11, 2015. Ex. 34, p. 5.

       ➤     The recycle bin was modified on this laptop on August 10, 2015. Ex. 34, p.6.

34

(h)    Property Item 011

&#9655;    Property item 0011 was seized on August 6, 2015.

&#9655;    It was modified on August 10, 2015. Ex. 34, p. 6.

&#9655;    The recycle bin was modified on August 10, 2015. Ex. 34, p.6.

(i)    Bitlocker. Items 002 and 004

&#9655;    Data on Items 002 and 004 have been protected with a Bitlocker. The House and the AG have refused to produce the Bitlocker key. The Bitlocker can only be added to these machines by someone with an administrative password.

&#9655;    On December 13, 2017, Colleen Auer acknowledged that she obtained Bitlocker keys from the House. She claimed the keys didn't work.

&#9655;    Now she has changed her story and stated that she didn't get any keys from the House.

3.    **J. Stott Matthews.**

Exhibit 35 is a report printed by Spectrum Computer Forensic & Risk Management, LLC. This report shows the following:

- On September 18, 2015 (while in the possession of the MSP) the surface pro laptop assigned to Todd Courser was accessed and 100 files (3,348,815 bytes) were added to the computer.

- On September 23, 2015 (while in the possession of the MSP) the surface pro laptop assigned to Todd Courser was accessed and 39 files (6,481,977 bytes) were added to the computer.

- On September 24, 2015 (while in the possession of the MSP) the surface pro laptop assigned to Todd Courser was accessed and 26 files (8,968,623 bytes) were added to the computer.

This report provides irrefutable evidence that there was significant activity while in possession of the MSP. Someone at MSP attached devices to Mr. Courser's computers (Property Items 0003 and 0005) and deleted files, overwrote files, and "bleached" these computers. Let's not overlook that while in the possession of the House, certain devices were attached to these computers.

35

Then, while in possession of the MSP, those exact same devices were attached to the same computers.

### G.   MORE EVIDENCE DESTRUCTION OF EVIDENCE

#### 1.   While in possession of the House; MCL 750.483a.

The reports produced and the information provided in this motion demonstrate massive damage to the computers while in possession of the House. Data was manipulated on August 8, 10, 19, 27, and 28 of 2015, For instance, while in possession of Cathy Hunter on August 19, 2015 and while subject to a litigation hold and while the government was interviewing witnesses, someone added 4,325 files totaling 4,513,919,998 bytes. See Ex. 18. This was a crime. See Exhibit 36.

> (5) A person shall not do any of the following:
>
>> (a) Knowingly and intentionally remove, alter, conceal, destroy, or otherwise tamper with evidence to be offered in a present or future official proceeding.

MCL 750.483a(5)(a). The penalty if "committed in a criminal case" is "imprisonment for not more than 10 years or a fine of not more than $20,000.00, or both." Ever instance on August 8, 10, 19, 27, and 28 of 2015 were crimes. Why isn't the AG's office investigation this? Instead, the government has argued that "nothing happened".

#### 2.   While in possession of the MSP; MCL 750.483a.

While in possession of MSP Colleen Auer on September 1, 8, 9, 10, 11, 19, 23, 24, and 25, 2015 and during an active criminal investigation, someone manipulated these computers and deleted evidence and bleached the data. For instance, on September 19-24, 2015, someone added 165 files totaling 18,799,415 bytes. See Ex. 35. Each of these instances of tampering were crimes. Again, see MCL 750.483a(5)(a). Why isn't the AG's office investigation this? Instead, the government has argued that nothing happened.

36

3.   **More evidence of manipulation and destruction of evidence on computer #0003.**

The defense has evidence that (while in MSP lock up) multiple external devices were attached to this laptop on September 23, 2015 and September 24, 2015. The police claim they did not make the forensic image until October 8, 2017 even though the date of the image is February 16, 2015. See Ex. 33.

a.   The defense asks this Court to require the House to disclose who had accessed and control of this computer on August 6, 2017 and after; and who used the House administrative log-in, password, and user ID to log in and alter this computer.

b.   The defense asks this Court to require the House to disclose these various listed thumb drives used on August 6, 2015 and after; and allow the defense to inspect and make copies of their contents and a copy of any backups made.

c.   The defense asks this Court to require the House to turn over the backups made by the House on August 19, 2015 and to turn over copies of the thumb drives used by the House both before and after such backups were made.

d.   The defense asks this Court to require that MSP now account for how MSP says this item was taken into custody on September 11, 2015 but why a forensic copy was delayed until October, 8, 2015. Yet in-between those dates it is clear that someone attached and used external devices on this machine. We ask the Court to require the House to disclose this person and what they did to this computer and require that the House turn over this external piece of hardware for inspection and that a copy of the contents of this piece of hardware be provided.

e.   The defense asks this Court to require the House to disclose who accessed this computer on September 24, 2015 using a House administrative password while this machine was in MSP custody.

f.   Below is a list of the external equipment used on this machine:

| | | |
|---|---|---|
| 9/23/2015 | Unknown | VID_1286&PID_204B (Serial # Unknown) |
| 9/18/2015 | Unknown | VID_045E&PID_07BE (Serial # 5&3a7b5b92&0) |
| 9/18/2015 | Unknown | VID_045E&PID_07BE&MI_00 (Serial # 6&3a1d2c5a&0) |
| 9/18/2015 | Unknown | VID_045E&PID_07BF (Serial # 5&3a7b5b92&0) |
| 9/18/2015 | Unknown | VID_045E&PID_07BF&MI_00 (Serial # 6&ad4a85&0) |
| 9/18/2015 | Unknown | VID_045E&PID_07DC (Serial # 033472243454) |
| 9/18/2015 | Unknown | ROOT_HUB30 (Serial # 4&2cadecc0&0) |

37

| | | |
|---|---|---|
| 8/19/2015 | Unknown | VID_0424&PID_7500 (Serial # 0000000ec0) |
| 8/19/2015 | Unknown | VID_045E&PID_07BE (Serial # 5&3a7b5b92&0) |
| 8/19/2015 | Unknown | VID_045E&PID_07BE&MI_00 (Serial # 6&3a1d2c5a&0) |
| 8/19/2015 | Unknown | VID_045E&PID_07BF (Serial # 5&3a7b5b92&0) |
| 8/19/2015 | Unknown | VID_045E&PID_07BF&MI_00 (Serial # 6&ad4a85&0) |
| 8/19/2015 | Unknown | VID_045E&PID_07DC (Serial # 033472243454) |
| 8/19/2015 | Unknown | VID_1286&PID_204B (Serial # Unknown) |
| 8/19/2015 | Unknown | ROOT_HUB30 (Serial # 4&2cadecc0&0) |

g.    Below is another profile on Property Item #0003.

| | | |
|---|---|---|
| 09/18/2015 | Unknown | VID_045E&PID_07BE (Serial # 5&3a7b5b92&0) |
| 09/18/2015 | Unknown | VID_045E&PID_07BE&MI_00 (Serial # 6&3a1d2c5a&0) |
| 09/18/2015 | Unknown | VID_045E&PID_07BF (Serial # 5&3a7b5b92&0) |
| 09/18/2015 | Unknown | VID_045E&PID_07BF&MI_00 (Serial # 6&ad4a85&0) |
| 09/18/2015 | Unknown | ROOT_HUB30 (Serial # 4&2cadecc0&0) |
| 09/23/2015 | Unknown | VID_1286&PID_204B (Serial # Unknown) |
| 09/23/2015 | Unknown | VID_045E&PID_07DC (Serial # 033472243454) |
| 09/23/2015 | Unknown | C:\Users\win81.SURFACE-56700\Downloads |
| 09/23/2015 | Unknown | VID_1286&PID_204B (Serial # Unknown) |
| 09/23/2015 | unknown | C:\Users\win81.SURFACE-56700\Desktop |
| 09/24/2015 | Unknown | C:\Program Files (x86)\Kaspersky Lab\Kaspersky Endpoint Security 10 for Windows SP1\avp.exe |

These entries show that someone accessed this computer on September 18, 23, and 24 of 2015. They attached multiple different USB devices (with serial numbers listed). They downloaded information to the computer. Then they wiped their activity and files with Kaspersky. Some of the serial numbers on these USB devices match serial numbers attached between August 6, 2015 and September 11, 2015. Other serial numbers are new (never connected before). So let's ask the obvious questions:

1.    While in the possession of the House, certain USB devices were connected to these computers.

2.    The People are trying to argue that these computers were not in the possession of the MSP until September 11, 2015.

3.    If that is true, how are the same devices (in the hands of the House), connected to the computer (in the hands of the MSP)? Does that make any sense? That means

38

that someone in MSP gave someone with a previously connected USB access to the computer while in the possession of the MSP; and that person connected the USB again; but now while in the possession of the MSP; and then "bleached" the hard drive.

4. Now the obvious question: Who did this? Who connected the USB? Who is the same person that connected the USB at the House and then at the MSP? Who allowed this to happen? Who "bleached" the hard drive?

5. Why did the MSP let this happen?

6. Even if we only care about access after September 11, 2015, there are literally dozens of very significant entries after September 11, 2015.

## 4. <u>Even more evidence of manipulation and destruction of evidence on computer #0003.</u>

Further, in two of the USB devices listed as having been used in the final scrub on September 23-24, 2015, it says "Microsoft life cam rear"; which is the audio/video software on the laptop. This program is voice activated. It was removed in the final scrub and written over. This package would have remnants of the deleted conversations. Why delete this when it was in a "litigation hold"? Why delete this when it was in the possession of the MSP? Why delete this *before* creating the forensic image? There are obvious answers.

And as we keep saying, all relevant data from March 2015 through May 2015 is all gone. Everything – search history, Google items, texts, chats – is purged. <u>Exhibit 37</u> shows "prefetch" files proving more activity on computer #0003 on August 19, 2015 (after it was allegedly returned to Tom Bowlin on August 17, 2015; although the defense disputes this). Of particular interest:

- *ssclient.exe* is a component of SafeConnect, a program that connects a user to an employer's network.[6] Therefore, someone connected to the House network.

- *runtimebroker.exe* is a Microsoft background program that runs when someone requests permission to access location or microphone.[7]

---

[6] https://www.file.net/process/ssclient.exe.html
[7] https://www.howtogeek.com/268240/what-is-runtime-broker-and-why-is-it-running-on-my-pc/

39

- *tiworker.exe* is part of the Windows operating system that runs when the user is installing, modifying, or removing a component on the computer.[8]

- *snippingtool.exe* is a stand-alone program that runs when the user executes the file. It allows the user to take screen-shot of images on the computer screen.[9]

- *acrodist.exe* is a process that starts when a user creates or prints a PDF document.[10]

These are just some examples of a long list of programs and processes that were activated on August 19, 2015 through September 24, 2015. We can also see that activity started at 8:38 a.m. on August 19, 2015 and ended at 9:51 a.m. on September 24, 2015.

5.  **More evidence of manipulation and destruction of evidence on computer #0005.**

Property item #0005 is an HP laptop used by Mr. Courser. The government's story regarding this property item has changed several times. On December 22, 2014, someone using the administrative user account and password added software to Mr. Courser's assigned laptop. This was before it was ever in the possession of Mr. Courser. This software turned this laptop into a listening device that could transmit audio and video recordings. Then in the dead of night on August 7, 2015, a person using the same administrative user log-in accessed this computer and removed these software programs. That same administrator then searched the laptop for audio and video files. Then, that same person deleted everything from the laptop. There is no longer a user account, no emails, no word documents, no excel spreadsheets, and no web searches at all under Mr. Courser's name. He no longer even has a user ID account on this computer.

a.  The defense asks the Court to require the House to disclose who installed the surveillance software on Mr. Courser's laptop on December 22, 2014 days before he was sworn into office; because this is the same person who accessed the computer on August 7, 2015.

---

[8] https://www.howtogeek.com/316122/what-is-windows-modules-installer-worker-and-why-is-it-running-on-my-pc/
[9] http://www.thewindowsclub.com/snipping-tool-capture-screenshots-windows-8-tips
[10] http://www.processlibrary.com/en/directory/files/acrodist/23505/

DEPERNO LAW OFFICE, PLLC • 951 W. MILHAM AVE. • PO BOX 1595 • PORTAGE, MI 49081
(269) 321-5064 (PHONE) • (269) 321-5164 (FAX)

b.   The defense asks the court to then require the House to disclose the name of the administrator who accessed the computer in the dead of night on August 6-7, 2015 and deleted these software programs; searched this computer specifically for the audio / video files; then deleted the user account, emails, word documents, spreadsheets, and web searches.

c.   The defense asks the Court to require the House to turn over the multitude of external equipment that was attached to this computer on August 6-7, 2015 and after; and any backups that were made.

d.   The defense asks the Court to require the House to turn over the backups made on August 19, 2015.

e.   The defense asks the Court to require that MSP disclose who had access to this machine between the time it was seized on September 11, 2015 and the time the forensic download was created.

f.   This machine was also accessed on August 23, 2015. The defense asks this Court to force the House to disclose who this person was.

g.   Below is a list of the external equipment used on this machine both between August 6, 2015 and September 11, 2015.

| | | |
|---|---|---|
| 8/19/2015 | VID_8087&PID_0024 |
| 8/19/2015 | VID_8087&PID_0024 |
| 8/19/2015 | ROOT_HUB20 |
| 8/19/2015 | ROOT_HUB20 |
| 8/19/2015 | ROOT_HUB30 |
| 8/6/2015 | Disk&Ven_SanDisk&Prod_Cruzer_U&Rev_1.27 |

6.   **Lync Messaging**

Property Item 0003: Lync Messaging deleted on August 19, 2015

Property Item 0005: Lync Messaging deleted on August 19, 2015

Property Item 0006: Lync Messaging deleted on August 19, 2015

Property Item 0007: Lync Messaging deleted on August 6, 2015

Property Item 0008: Lync Messaging deleted on August 6, 2015

Property Item 0009: Lync Messaging deleted on August 6, 2015

Property Item 0010: Lync Messaging deleted on August 10, 2015

Property Item 0011: Lync Messaging deleted on August 6, 2015

41

7.     **Backups Made**

    Property Item 0003:   User "mig13" made backup on August 19, 2015
                               User "migrate" made backup on August 19, 2015

    Property Item 0005:   User "mig13" made backup on August 19, 2015

    Property Item 0006:   User "mhradmin" made backup on August 10, 2015

    Property Item 0007:   User "mhradmin" made backup on August 10, 2015

    Property Item 0008:   User "mig" made backup on August 19, 2015

    Property Item 0009:   User "mhradmin" made backup on August 10, 2015
                               User "mig13" made backup on August 19, 2015

    Property Item 0010:   User "mhradmin" made backup on August 10, 2015

    Property Item 0010:   User "mhradmin" made backup on August 10, 2015

6.     **External USB Connections**

The most up-to-date USB connections are listed below. And we must keep in mind that when we refer to "USB connection" it can be any type of external unit connected to the target computer through a USB port. Most people think of this as a small "thumb drive"; but that is not the case. These are large external units that can transfer large amounts of data. These external units also contain separate executable programs that run from the external unit and affect the target computer.

Property Item 0003. Many significant connections were made to this computer after September 11, 2015. Most likely, the external device ran the external program called "Kaspersky" which is a "bleaching" program similar to "BleachBit", "Clean Master", and "System Ninja". These programs wipe a portion (or all) of a system clean and makes the data very difficult or impossible to recover. These programs overwrite data and make it very difficult to recover the files.

      09/23/2015   Unknown   VID_1286&PID_204B (Serial # Unknown)

DePerno Law Office, PLLC • 951 W. Milham Ave. • PO Box 1595 • Portage, MI 49081
(269) 321-5064 (Phone) • (269) 321-5164 (Fax)

| 09/18/2015 | Unknown | VID_045E&PID_07BE (Serial # 5&3a7b5b92&0) |
| 09/18/2015 | Unknown | VID_045E&PID_07BE&MI_00 (Serial # 6&3a1d2c5a&0) |
| 09/18/2015 | Unknown | VID_045E&PID_07BF (Serial # 5&3a7b5b92&0) |
| 09/18/2015 | Unknown | VID_045E&PID_07BF&MI_00 (Serial # 6&ad4a85&0) |
| 09/18/2015 | Unknown | VID_045E&PID_07DC (Serial # 03347224345A) |
| 09/18/2015 | Unknown | ROOT_HUB30 (Serial # 4&2cadecc0&0) |
| 08/19/2015 | Unknown | VID_0424&PID_7500 (Serial # 0000000ec0) |
| 08/19/2015 | Unknown | VID_045E&PID_07BE (Serial # 5&3a7b5b92&0) |
| 08/19/2015 | Unknown | VID_045E&PID_07BE&MI_00 (Serial # 6&3a1d2c5a&0) |
| 08/19/2015 | Unknown | VID_045E&PID_07BF (Serial # 5&3a7b5b92&0) |
| 08/19/2015 | Unknown | VID_045E&PID_07BF&MI_00 (Serial # 6&ad4a85&0) |
| 08/19/2015 | Unknown | VID_045E&PID_07DC (Serial # 03347224345A) |
| 08/19/2015 | Unknown | VID_1286&PID_204B (Serial # Unknown) |
| 08/19/2015 | Unknown | ROOT_HUB30 (Serial # 4&2cadecc0&0) |

## Property Item 0005:

| 08/19/2015 | VID_8087&PID_0024 |
| 08/19/2015 | VID_8087&PID_0024 |
| 08/19/2015 | ROOT_HUB20 |
| 08/19/2015 | ROOT_HUB20 |
| 08/19/2015 | ROOT_HUB30 |
| 08/06/2015 | Disk&Ven_SanDisk&Prod_Cruzer_U&Rev_1.27 |

## Property Item 0007

| 08/14/2015 | Unknown | VID_8087&PID_0024 (5&1b67116c&0) |
| 08/14/2015 | Unknown | VID_8087&PID_0024 (5&212aae9d&0) |
| 08/14/2015 | | ROOT_HUB20 (4&2e53545b&0) |
| 08/14/2015 | Unknown | ROOT_HUB20 (4&2ca37a10&0) |
| 08/14/2015 | Unknown | ROOT_HUB30 (4&22c7916f&0) |
| 12/16/2014 | Unknown | VID_8087&PID (0024 5&212aae9d&0) |
| 07/31/2015 | Unknown | ROOT_HUB20 (4&2ca37a10&0) |
| 07/31/2015 | Unknown | ROOT_HUB20 (4&2e53545b&0) |
| 07/31/2015 | Unknown | ROOT_HUB30 (4&22c7916f&0) |

## Property Item 0008

| 09/08/2015 | ahill | Disk&Ven_USB&Prod_Flash_Disk&Rev_1100 (FBG1105201206238) |
| 09/04/2015 | Unknown | VID_090C&PID_1000 (FBG1105201206238) |
| 08/20/2015 | Unknown | VID_03F0&PID_034A (6&1990268&0) |
| 08/20/2015 | Unknown | VID_03F0&PID_034A&MI_00 (7&2bc36af2&0) |
| 08/20/2015 | Unknown | VID_03F0&PID_034A&MI_01 (7&2bc36af2&0) |

43

| 08/20/2015 | Unknown | VID_0461&PID_4E35 (6&1990268&0) |
| 08/19/2015 | Unknown | VID_03F0&PID_034A (5&17bde8d1&0) |
| 08/19/2015 | Unknown | VID_03F0&PID_034A&MI_00 (6&17249f86&0) |
| 08/19/2015 | Unknown | VID_03F0&PID_034A&MI_01 (6&17249f86&0) |
| 08/19/2015 | Unknown | VID_0461&PID_4E35 (5&17bde8d1&0 ) |
| 08/19/2015 | Unknown | VID_8087&PID_0024 (5&9d195a3&0) |
| 08/19/2015 | Unknown | VID_8087&PID_0024 (5&9feb08a&0) |
| 08/19/2015 | Unknown | ROOT_HUB30 (4&7a756bc&0) |
| 08/19/2015 | Unknown | ROOT_HUB20 (4&24e2292f&0) |
| 08/19/2015 | Unknown | ROOT_HUB20 (4&29eea675&0) |
| 08/18/2015 | Unknown | Disk&Ven_SanDisk&Prod_Cruzer_Glide&Rev_1.26 (4C53200007071712334 ) |
| 08/14/2015 | ahill | Disk&Ven_Generic&Prod_Flash_Disk&Rev_8.07 (550DABD8) |
| 08/14/2015 | Unknown | VID_058F&PID_6387 (550DABD8 ) |

### Property Item 0009

| 08/19/2015 | Unknown | VID_03F0&PID_034A (6&27c7ce02&0) |
| 08/19/2015 | Unknown | VID_03F0&PID_034A&MI_00 (7&e089942&0) |
| 08/19/2015 | Unknown | VID_03F0&PID_034A&MI_01 (7&e089942&0) |
| 08/19/2015 | Unknown | VID_046D&PID_C077 (6&27c7ce02&0) |
| 08/19/2015 | Unknown | VID_8087&PID_0024 (5&9d195a3&0) |
| 08/19/2015 | Unknown | ROOT_HUB20 (4&24e2292f&0) |
| 08/19/2015 | Unknown | ROOT_HUB20 (4&29eea675&0) |
| 08/19/2015 | Unknown | ROOT_HUB30 (4&7a756bc&0) |
| 08/12/2015 | Unknown | Disk&Ven_SanDisk&Prod_Cruzer_Glide&Rev_1.26 (4C53200007071712334) |

## 9.  Android Emulator

Property Item 0003. An "administrator" installed an Android Emulator on this computer. An "emulator" allows a person to remotely access the sound and video of a laptop computer. At the time the emulator was removed, "Windows Sound Recorded" was also removed and "Zune Video" was removed. This emulator was remove on August 19, 2017. The person who removed the emulator also accessed the following:

- My Computer:C:\Program
  Files\WindowsApps\Microsoft.WindowsSoundRecorder_2013.1010.500.2928_neutral_~
  _8wekyb3d8bbwe\

44

- My Computer:C:\Program Files\WindowsApps\Microsoft.ZuneVideo_2014.1204.146.1745_neutral_~_8wekyb3d8bbwe\

- http://xfinitv.comcast.net/

- https://housenet.mihouse.mi.gov/VideoChannel/VideoChannels

- Android Emulator for PC

- Teamviewer software

- searching for .wav files as well

Again, the Android Emulator allows a person to convert their Android phone into a surveillance device. It took someone with an administrative password to install this software BEFORE the computer was assigned to Mr. Courser. It took someone with an administrative password to remove the program in August 2015. Then after removing the software, an administrator with an administrative user name and an administrative password tried to overwrite these sectors and then "bleach" the sectors.

## 10.   Surveillance Software

Exhibit 37 is a log for "Property Item 0003", the laptop assigned to Mr. Courser. This shows activity on August 19, 2015 and September 24, 2015. Exhibit 38 is another report for computer 0003 showing further activity. On these dates, (and perhaps most importantly on September 24, 2015 while in the possession of the MSP-CCU), someone ran a "Kasperky" as "avp.exe". See Exhibit 39. Kaspersky is a file removal program similar to BleachBit. It wipes out, or "covers the tracks" of a user. Kaspersky contains a utility called "File Shredder" which prevents the recovery of deleted files. In other words, someone accessed this computer and deleted files on September 24, 2015, then ran Kaspersky, wiping the files and the user's tracks. Just so we are clear – on September 24, 2015 while admittedly in the possession of the MSP-CCU unit, someone purged this hard drive BEFORE it was imaged. See Exhibit 40. See also

45

Exhibit 41 which shows that this program was run on every machine while in the possession of the House or MSP.

There is no way for the government to back away from this problem. We already have their admission that Property Item #0003 is a computer assigned to Todd Courser. We already have their admission that Property Item #0003 was collected by the MSP from the House on September 11, 2015.[11] We now have forensic evidence that someone attached a USB device on September 24, 2015 and ran a purging file removal program. So here it the process: while in the possession of the government an administrator accessed this computer; then they made their inquiries so they knew what files were on the computer; then they removed items, attached external USB devices, ran programs from those external devices on this original computer; then installed updates or "fake" backups over the top of the sectors; then while in the possession of the MSP, ran a purging program called Kaspersky. Clearly all of the updating and downloading was to write over portions of the hard drive so that it was unrecoverable. So much for the litigation hold and so much for the preservation of evidence by the House (which started the investigation and demanded that charges be brought) and the MSP when in their possession.

11.     **Someone accessed item #0010 on September 1 and September 11, 2015**

Exhibit 42 is the registry for Property Item #0010. This shows that the computer was connected to the internet on the morning of September 1, 2015 and September 11, 2015. This suggests that the computer connection was routed through "mihouse.mi.gov". Who used this computer the morning is was allegedly picked up by MSP?

---

[11] Notwithstanding the defense position that the computers were collected by the MSP from the House on September 1, 2015 and notwithstanding the defense position that the House is a government agency conducted a "public investigation" and was therefore under the same duty as the MSP to preserve evidence.

DePerno Law Office, PLLC • 951 W. Milham Ave. • PO Box 1595 • Portage, MI 49081
(269) 321-5064 (phone) • (269) 321-5164 (fax)

12.    **Bit-Locker**

On December 13, 2015, there was a meeting in Lansing at the Attorney General's office. In attendance were Matt DePerno and Adam Kelly (for the defense) and Denise Hart, Gregory Townsend, and Colleen Auer (for the People). During that meeting, Colleen Auer stated that there were 2 computers with a Bit-Locker installed (they are computers #0002 and 0004). She stated that she went to the House and asked for the key-code to unlock the Bit-Locker. She stated that the House gave her a code. She tried the code, but it didn't work. She said she asked for a different code but was told the House didn't have a different code. This means that the House has Bit-Locker codes. Now, she claims that the House doesn't use Bit-Locker. It if doesn't use the program, then it wouldn't have codes. The only reason anyone has Bit-Locker codes sitting around is because it uses the program. Her revised statement now contradicts her statement at the meeting on December 13, 2015.

13.    **Where is the warrant?**

Also at the meeting on December 13, 2015, the defense asked Ms. Auer about the chain of custody of these computers. She stated that the chain of custody started with the warrant from August 2015. Where is the warrant? Immediately the prosecutors stated that the warrant was given to me with the discovery (remember, every time I say I don't have something, I am met with the hostile response "we've turned everything over"). So is there a warrant or no warrant? It hasn't been produced with the People's memorandum. Do the People now claim there was no warrant?

14.    **Mindy May**

The information regarding Mindy May has still not been produced. Ex. 7.

47

15. **Recording from August 17, 2015 of Ben Graham**

The recording from August 17, 2015 of the interview of Ben Graham has still not been produced. Ex. 7.

16. **Denise Hart and Gregory Townsend said they would dismiss (or quit) if defense showed evidence was destroyed**

Also at the meeting on December 13, 2015, the prosecutors stated that they would dismiss this case and do the right thing, or resign, if the defense showed that evidence was destroyed. The defense has now shown this to be true.

### H.   LEGAL ARGUMENT

1. **Constitutional Due Process**

Due process guaranteed by the US Constitution, Amendment XIV requires that the prosecution not suppress evidence that is favorable to the defense. *Brady v Maryland*, 373 US 83 (1963); *People v Lester*, 232 Mich App 262; 591 NW2d 267 (1998). Under the Due Process Clause, the Supreme Court has developed "what might loosely be called the area of constitutional guaranteed access to evidence." *California v Trombetta*, 467 US 479, 485 (1984) (quoting *United States v Valenzuala-Bernal*, 458 US 858, 867 (1982). Under *Brady*, 373 US at 87, suppression of evidence violates a defendant's due process rights, irrespective of good faith or bad faith of the prosecution.

This case of misconduct is entirely about what Mr. Courser said to Ben Graham. We know that there were multiple recordings made in and outside of the House Business Office. We know that these recordings were once in the hands of the House and transferred to the MSP. The tapes were then reviewed. We know the recordings have been edited by Ben Graham and Chad Livengood. The recordings will show that Mr. Courser was telling the truth. Now the recordings are destroyed. Without question, these recordings are exculpatory. However, when the

48

prosecution suppresses or fails to disclose exculpatory evidence, the good or bad faith of the prosecution is irrelevant; a due process violation occurs whenever such evidence is withheld. *Brady*, 373 US at 83.

But what makes this case worse is that this evidence was destroyed in bad faith. There is no question that these tapes were destroyed in bad faith. Mr. Courser has issued a discovery request, additional letters, and filed multiple motions to compel this information. The government was well aware of the need to preserve the evidence and turn it over. The police reports show that the evidence existed and was handled by the House and turned over to the MSP. It was then examined. Forensic reports were prepared. The forensic reports no longer exist. The recordings no longer exist. This is the height of "bad faith". Every trace of the evidence has been destroyed. Ironically, the only evidence that the forensic reports and recordings existed are the police reports and emails that prove they did, in fact, exist. Notwithstanding that evidence, the prosecution continues to state that they don't exist. Even the lack of candor demonstrates bad faith.

We already know the prosecution is willing to engage in bad faith. For instance, in Ingham County, Denise Hart and Gregory Townsend were caught in a secret *ex parte* meeting with Judge William Collette. All three produced written statements to Chief Judge Lawless stating that they engaged in no private conversations. Then the defense produced affidavits regarding their conduct. Exhibits 43 and 44. Then Judge Collette removed himself from the case; but it was only after the affidavits were produced and after he initially denied the conversations. In a subsequent interview with *The Detroit News*, Judge Collette finally admitted to the private conversation with the prosecutors.

49

2.      <u>The House of Representatives had a duty to preserve the evidence</u>

The prosecutors pretend that the House (because it owned *some of* the electronic equipment and was Mr. Courser's employer) had the right to seize the electronic equipment because it was the employer, and to do so without a warrant. This is false. There is a vast distinction in the law between a "private sector investigation" and a "public sector investigation". This was an investigation started by the House. It was a "public sector investigation", meaning it was conducted by the government and involved public employees. As a result, the protections of the US Constitution applied, including the protections of the 4th, 6th, and 14th Amendments. In a "public sector investigation" a search warrant is required before seizing digital evidence because the government is involved in seizing the property. The Fourth Amendment to the US Constitution applies to government agencies conducting search and seizure. Let's not forget Judge Collette's initial comments on this investigation in Ingham County:

> THE COURT: So let me get this straight. Where did the investigation come out of that led to these charges?
>
> MS. HART: The Michigan State Police.
>
> THE COURT: All right. And Mr. Schuette?
>
> MS. HART: And Mr. Schuette, the house of --
>
> THE COURT: Who gets along really well with the house, of course.
>
> MS. HART: They asked us to do the investigation.
>
> THE COURT: But here is my question. Who asked you to do an investigation?
>
> MS. HART: The house of representatives.
>
> THE COURT: Okay. And now they are claiming that their staff members are immune from testifying?
>
> MS. HART: Yes.
>
> THE COURT: And that records they have are not subject to subpoena?

50

MS. HART: I suppose so. I don't know that anybody has subpoenaed records. They keep asking us for them.

THE COURT: Are you now going to go over and speak -- who is the new speaker? Do we know or haven't they voted yet?

THE DEFENDANT: Leonard. Tom Leonard.

THE COURT: Is somebody going to go talk to Mr. Leonard and explain that they have a right to assert whatever they want? And apparently, one of our other circuit judges agree they have immunity. Was it Canady?

MS. HART: Jamo.

THE COURT: Well, that figures. No. I'm kidding. He is a great guy. But it seems to me as follows, that if there is evidence that could assist the Defense in this case in the hands of the legislature, and they are choosing to not turn that over, it will tie my hands and this case will not go very far. That's the facts of life. I can't allow people who are actually the instigators of this entire event -- and they could come in here and yell at me, but I am term limited so I don't care, all right? But the fact is -- well, they couldn't beat me anyway. I couldn't be beat with a stick. It's true. Maybe they could now, I don't know. But the fact is, doesn't that kind of smack of kind of not being good? I mean, honestly sit there and say -- he knows me, don't you?

MR. TOWNSEND: I do, Judge.

THE COURT: And we've spent a lot of hours together on a lot of cases, and my first rule is always fairness. I may not like him at all, and this guy here I don't know about what he is writing here, but the fact is, they are entitled to a fair defense. And if they have things in their hands that could assist that Defense, this case will never go to trial in this Court. You will be in the court of appeals and then the Supreme Court. By the time it gets back I'll be retired. So I just want you to understand. So we are not going any farther, except I am going to rule on one thing today, but the rest of this case you got to go tell -- tell Leonard I want the stuff. And I don't want to - - and I'll subpoena it, and they are not going to honor it, and then I can't hold them in contempt. How would that look? Well, I could issue a contempt, and that wouldn't look very good, and then I'll just go to the press and tell them all about it.

*Transcript*, 27:22-31:3 (11/17/2016). At the very least, Judge Collette was right on this point. It would be substantially unfair to allow the complaining witness, the House of Representatives, to start an investigation and then not turn over evidence. But it is even worse in our case. Not only did the House demand and start the investigation, but the House then seized computers,

modified computers, and deleted evidence. The MSP allowed this to happen, or were at the very least complicit in this behavior, as discussed below, allowing some of the destruction to occur while in the possession of the MSP.

3. **Mr. Courser has an absolute right dismissal with prejudice**

A key component of our fair and just legal system is to be able to confront the defendant's accusers and to be able to have the evidence to defend one's self. Our 6th amendment protects the defendant from being unjustly prosecuted by those who have little to no evidence and who have ulterior motives for bringing or advancing the charges. The judge is required to act independently from the prosecution to ensure the defendant is afforded their right to a fair trial and that the Constitution isn't violated in pursuit of some narrative that isn't at all appropriately advanced in court.

This Court may dismiss an indictment with prejudice under two different theories: "[First, a court] may dismiss an indictment on the ground of outrageous government conduct if the conduct amounts to a due process violation. [Second, i]f the conduct does not rise to the level of a due process violation, the court may nonetheless dismiss under its supervisory powers." *United States v. Chapman*, 524 F.3d 1073, 1084 (9th Cir. 2008) (quoting *United States v. Barrera–Moreno*, 951 F.2d 1089, 1091 (9th Cir.1991).

Under the first theory, a district court may dismiss an indictment for outrageous government conduct that amounts to a due process violation. *Barrera-Moreno*, 951 F.2d at 1091. To violate a defendant's due process rights, a government must conduct itself in such a way that is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir.1991). Such conduct must be inherently wrong or amount to "the engineering and direction of the criminal enterprise from start to finish." *United*

52

*States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991). Such decisions are reviewed de novo on appeal. *Id.*

Under the second theory, a district court may exercise its supervisory power to dismiss an indictment to "implement a remedy for the violation of a recognized statutory or constitutional right; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury; and to deter future illegal conduct." *Chapman*, 524 F.3d at 1085 (quoting *U.S. v. Simpson*, 927 F.2d 1088, 1090 (9th Cir. 1991)).

   a.   **Vindicating constitutional rights.**

A court may dismiss an indictment to remedy a violation of the defendant's constitutional rights, such as the right to pre-trial discovery under *Brady* and *Giglio*. *See Chapman*, 524 F.3d at 1085 (rejecting prosecution's argument that *Brady* and *Giglio* violations cannot justify dismissing an indictment). Under *Brady v. Maryland*, a prosecutor violates the defendant's constitutional due process rights when it fails to disclose evidence that is material and favorable to the defendant. 373 U.S. at 83, 87 (1963). Under *Giglio v. United States*, favorable material includes evidence of government incentives or promises offered to a witness. 405 U.S. 150, 154–55. (1972). The prosecution's obligation to disclose extends to *Brady* material within the control of any federal agency participating in the investigation of the defendant, not just the police. *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989).

   b.   **Preserving judicial integrity.**

Another ground for dismissing an indictment is to preserve judicial integrity. *Simpson*, 927 F.2d at 1090 (9th Cir. 1991). Thus, due to a court's independent interest in fair and ethical criminal trials, courts have discretion to act in manners they deem appropriate to discipline

53

prosecutors. *United States v. Lopez*, 4 F.3d 1455, 1463–64 (9th Cir. 1993) (recognizing that "courts are empowered to deal with such threats to the integrity of the judicial process.").

    **c.**    **Deterring future illegal conduct.**

    Yet another ground for dismissing an indictment is to deter future illegal conduct. *Simpson*, 927 F.2d at 1090 (9th Cir. 1991). Dismissal pursuant to this ground is appropriate when a court has determined that the prosecution engaged in illegal conduct and wishes to deter future illegal conduct by dismissal. *United States v. Struckman*, 611 F.3d 560, 576–77 (9th Cir. 2010).

    **d.**    **Prosecutorial misconduct.**

    A court can dismiss an indictment when it finds the prosecutors have engaged in "reckless disregard" for the prosecution's constitutional obligations." *Chapman*, 524 F.3d at 1085–86. In *Chapman*, the Ninth Circuit upheld the district court's finding of flagrant misconduct based on the government's *Brady* and *Giglio* violations. *Id.* 1085. The court noted that it found it "particularly relevant" that the prosecution had received "several indications, both before and during trial, that there were problems with its discovery production" and yet continued to withhold discovery despite repeated complaints from the defense. *Id.* at 1085.

    **e.**    **Actions in this case.**

    In this case we have a request for investigation being advanced by the House. The MSP were involved from the start of that investigation. Rather than secure the electronic evidence, the MSP gave the devices to the accuser (the House). The House then intentionally and willfully acted to eliminate and destroy evidence and then "bleach" the computers. This Court should be disturbed by those actions because they are crimes. Let's not forget the number of crimes that have been stepped over in order to prosecute Mr. Courser. In what way would a court in any

54

other situation allow a witness to bring an accusation and then allow that same witness to systematically destroy the evidence?

There are numerous and specific instances where the prosecutors have suppressed *Brady* material, and have done so willfully. All of the material in question undermines the government's theory of prosecution or rebuts overt acts charged in the indictment.[12] Yet the government has continually stated it has no obligation to produce these materials, blaming the defense for their "paranoia" and continuously stating that they have turned over "everything". The scope, flagrancy, and harm caused by this conduct mandates dismissal.

Let's take a step back and think about how the House conducted this investigation. The correct course for any investigation in the House (including a criminal investigation) is thru the "Clerk's Office." The Clerk of the House, Gary Randall, fills a non-partisan position, elected by the full House from both parties. He is in charge of the Capitol Police (a branch of the MSP) and is the enforcer of the rules of the House. Neither the Speaker of the House nor his business director Tim Bowlin in the House Business Office, have the right to investigate the "breaking of rules" or of laws by a representative. Yet in this case, the prosecutors have argued that the Housed conducted this investigation through the House Business Office. In other words, the prosecutors claim that the police were not involved.

If that is true, then the Clerk abrogated his responsibility and simply turned over the right and responsibility to investigate to the Speaker's employee, a partisan employee (i.e. the House Business Office). But that scenario is contrary to Kevin Cotter's statement that Chief Dixon was sent to seize computers. If that is true, then Chief Dixon was involved through the Clerk's office.

---

[12] For instance, the MSP have continuously stated that Ben Graham was not on state time and they saw no evidence of a crime.

55

Certainly, Kevin Cotter cannot direct the police. Or did he? If he did, then that creates a whole set of constitutional issues.

Why? Because the House Business Office is not empowered as Sergeant-at-Arms under MCL 4.382(2). Again, that duty falls under the Clerk. The House Business Office is not even in the same chain-of-command. Only the Sergeant-at-Arms is empowered to enforce rules of the House, through the Clerk's office. The House Business Office answers to the Speaker of the House. The Sergeant-at-Arms answers to the Clerk. In this case, the government suggests that the Clerk (Gary Randall) somehow assigned his duties to the House Business Office, which then directed the police. The defense doesn't think that happened because the only way a referral can be made to law enforcement is through the Clerks' office. But if it did happen, then that is a problem. For this reason, an evidentiary hearing is necessary to determine how the House Business Office was able to act in the place of law enforcement and seize computers; which is actually the duty of the Clerk.

But even if the House Business Office took this action, it still had a duty to preserve the evidence because this was a "Public Investigation", not a "private investigation". Let's also not forget a key bit of information: the accusations of misconduct in office were made on August 6, 2015; the accusation was whether or not the two representatives in question had used taxpayer resources either in the furtherance of their affair or in the effort to cover it up. Both of the Representatives in question (Mr. Courser and Ms. Gamrat) immediately brought the issue of the extortion surveillance and illegal access and tampering of their computers and phones and emails to the Chief of Police, Chief Davis starting August 7, 2017. This means that the Capitol Police was involved in this from the start. They were investigating and seizing computers.

The record is clear that the computers and electronic devices were seized on August 6-7, 2015. This was done only with the help of the Capitol Police. The record is also clear that

56

starting very late in the evening on August 6, 2017 between 10:00 p.m. and the early hours of August 7, 2015, there were alterations to these computers. This was after Kevin Cotter instituted the litigation hold.

The prosecution claims the only thing that happened was the doors were locked on August 6-7, 2015 and were reopened on August 10, 2015. First, this is contrary to statements already made by members of the House. Second, this is disingenuous because the House had already altered the said computers and had made backups of the said computers four (4) days prior. Then on August 19, 2015, someone gained access to these machines and conducted a series of steps including making backups of each and "bleaching" the computers. At this point we do not know who gained access on August 6-7, 2017 (other than the user is an "administrator"); but we do know that items and programs were deleted and the computers were bleached. Apparently now the backups are also gone.

We now also have confirmation that surveillance software was added to the computer deemed by the prosecution to be Mr. Courser's laptop (Property item #0003); all of his files have been deleted including documents and emails and even his "log-in" data has been deleted. We also know that someone using the administrative user account installed software that allowed a person to turn Mr. Courser's assigned laptop into a surveillance tool. This software was then removed from this laptop in the early morning of August 7, 2015 by someone using an administrative user account (again, not Mr. Courser or Ms. Gamrat).

The defense demands that this Court require the disclosure of this person so we can call them as a witness to trial; and also issue a subpoena requiring the House of Representatives to turn over all items, including the saved emails and recordings. This unknown person had access and control of the said laptop on December 22, 2014, just prior to it being assigned to Mr.

57

Courser and the same log-in and user account was then used on August 7, 2015 to strip off these pieces of surveillance software and to also search this laptop for all audio files on the hard drive.

**f.    Failure to accept responsibility.**

The government has consistently failed to accept responsibility for any of its failure to disclose evidence. Quite to the contrary, the government has consistently denied its materiality and sought to shift the blame to the defense. The government has taken a firm stand in explaining that it has turned over everything or that it is not responsible for the actions of the House. Shifting the blame to the defense started almost immediately and was a coordinated effort. The government has repeatedly professed surprise and confusion over the relevance of the withheld materials, even though they rebut the very theories the government seeks to advance at trial. While this case relies almost entirely on recordings made by Ben Graham and others, the government's theory is that these recordings are not relevant; going so far to not even seize the actual recordings made, but instead allowing Ben Graham to possess the original evidence; despite the defense argument and evidence that the recordings have been altered. Further, the AG has allowed all other recordings to be deleted from the computers.

The government's behavior shows *at least* recklessness or unwillingness in its ability to recognize quintessential *Brady* material – material that directly contradicts factual allegations in the indictment. As such, the government's inability to discharge its obligations under *Brady* affects cases beyond the one in question and is emblematic of a much larger problem. This is proven by the fact that the MSP prepared two forensic downloads on February 6, 2015; six months before the crime lab even had the computers. This is indicative of larger problems and shows that the government is able to alter the date of forensic downloads in every case.

DEPERNO LAW OFFICE, PLLC • 951 W. MILHAM AVE. • PO BOX 1595 • PORTAGE, MI 49081
(269) 321-5064 (PHONE) • (269) 321-5164 (FAX)

g.    **The government's conduct has prejudiced the defense.**

Absent dismissal, Mr. Courser will suffer "substantial prejudice." The defense has already been forced to show much of its strategy in these constant discovery battles. The prosecution's insistence that the defendants were not entitled to the withheld discovery has required the defendants to repeatedly set forth the legal and factual particulars of their defense. The defendants have revealed certain strategy regarding the prosecution's witnesses. The prosecution could now use of all this information to their advantage which would afford them yet another opportunity to try and correct its "faltering" case. The government has already repeatedly failed to meet it burden of proof against the defendant.

h.    **The facts in this case are egregious.**

The government's actions in this case are flagrant and egregious. The government has had 2 years to meet its discovery obligations. However, there have been early and clear indications that the government has not fully complied with its obligations. The defense has repeatedly raised issues about missing discovery in pre-trial litigation as detailed herein. The discovery issues have continued. The prosecution's argument is that materials have already been provided to the defense, even though those affirmations are demonstrably false.

Aside from a court's authority to dismiss an indictment under its supervisory powers, a court may also dismiss an indictment in the face of outrageous government conduct amounting to a due process violation. *United States v. Barrera–Moreno*, 951 F.2d 1089, 1091 (9th Cir.1991). To constitute sufficiently outrageous conduct, a government must conduct itself in such a way that is "so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Restrepo*, 930 F.2d 705, 712 (9th Cir.1991). Such conduct must be inherently wrong or

DePerno Law Office, PLLC ● 951 W. Milham Ave. ● PO Box 1595 ● Portage, MI 49081
(269) 321-5064 (Phone) ● (269) 321-5164 (Fax)

amount to "the engineering and direction of the criminal enterprise from start to finish." *United States v. Smith*, 924 F.2d 889, 897 (9th Cir. 1991).

Here, the government's repeated, willful refusal to provide exculpatory evidence is sufficiently outrageous to justify dismissal as a due process violation. The government's scant disclosures and destruction of evidence is intrinsically wrong and has defeated the ends of justice.

This Court cannot allow those who brought the accusations and directed the investigation to alter and destroy evidence; or to illegally divert the investigation through their own people (the House Business Office) rather than have it go to the proper office of the Clerk. Allowing this to continue would be substantially unfair and prejudicial to Mr. Courser. At this point the House brought these accusations and had every incentive to destroy the evidence that in anyway impeached their process of removal or impeached themselves as witnesses. The Court should not tolerate this.

## I.   SUMMARY; CONCLUSION; RELIEF REQUESTED

**1.   Summary.**

This case needs to be dismissed. The conduct we have uncovered is outrageous. Here is what we know as fact:

1.   In December 2014, just days before Mr. Courser took office, surveillance software was installed to the laptop that was to be assigned to Mr. Courser (that is Property Item #0003).

2.   Mr. Courser's staff have admitted that "the office was bugged" and that they surreptitiously recorded conversations.

3.   Mr. Courser asked his chief of staff (being Keith Allard) to check with the House Business Office as to whether it was permissible for a staff member to sign Mr. Courser's name to a blue back. That occurred sometime between January 2015 and May 2015. That conversation was verbal (in which case it was recorded) and by way of email (though the House Lync messaging system).

60

4.     Of the 12 known recordings made by Mr. Courser's staff, only 4 recordings have been turned over to the defense.

5.     It took the AG's office over 18 months to produce any of the forensic images for any of the computers.

6.     After they were ordered by a Lapeer District Court judge to turn over the forensic images, it took the AG's office another 6 weeks to produce the images.

7.     When they were produced, Larry Dalman stated that he was unable to verify the authenticity of the images. He also stated that over 37,000 files were not attached to the images.

8.     The House seized all computers on August 6, 2017 and placed the computers in a "litigation hold".

9.     Computers 0005, 0006, 0007, 0008, 0009, 0010, and 0011 were allegedly imaged on September 15, 2015.

10.     Computers 0002 and 0003 were allegedly imaged on October 8, 2015.

11.     However, computers 0002 and 0003 show that they were actually imaged on February 16, 2015, which is 6 months before the House took possession of the computers. This means that the MSP is able to manipulate the date of its forensic images.

12.     The MSP was actively investigating this case in August 2015; but clearly did nothing to secure the evidence seized by the House in August 6, 2015; even though Capitol Police were involved as early as August 7, 2015. Instead, the MSP allowed the House to retain the computers until September 11, 2015 (the defense thinks the date was actually September 1, 2015).

13.     Between August 6, 2015 and September 11, 2015, multiple and very large external hard drives were attached to every computer. The emulator was removed. Files were accessed and deleted (including audio files). Then updates and backups were installed, writing over the deleted sectors. Then a destruction program called Kaspersky (which has now been banned by the US Government) was run on every computer, wiping out the deleted sectors.

14.     Property Item #0003 was imaged again on October 15, 2015. Between September 11, 2015 and September 24, 2015, multiple devices were attached to the computer, files were deleted, updates were installed writing over the deleted sectors, and Kaspersky was run again; "cleaning" this "dirty" computer. Almost a dozen external hard drives were attached to this computer on September 23-24, 2015.

15.     On every computer, there is nothing between March 2015 and May 2015. There are no files, no activity, no internet searches. Everything during that timeframe, which is the timeframe were are discussing that is relevant to this case, EVERYTHING IS GONE!

16.     The Lync message system is deleted on each computer; meaning every email is deleted.

61

17.    We are still in the process of unpacking the actions on these machines by the government employees who attempted to destroy any chance of a defense. This continues daily.

**2.    This case should be dismissed with prejudice.**

The Court can now see the same evidence all the attorneys can see. This isn't made up. This is real. This actually happened. These computers were tampered with while in possession of the MSP. We have actually print-outs of data.

**3.    In the alternative to dismissal, we need an evidentiary hearing.**

What is noticeably absent from any brief filed by the AG in this case is an affidavit. Not one person is willing to be sworn under oath. We need an evidentiary hearing. No doubt at the next hearing, the AGs will only state that nothing happened and they will ultimately refuse to put anyone under oath. They will say what they always say: *Judge, we gave the defense everything, we didn't do anything, nobody at the police did anything, DePerno is just making it up.* We need Colleen Auer, Cathy Hunter, Lisa Curtis, Greg Bensinger, and F/Lt Brody Boucher under oath so we can inquire who bleached these computers, who added files, who deleted file, and why. They are the people whose "fingerprints" are on these computers. The defense cares a great deal about who bleached these computers and who granted them access. This happened while in the possession of the House, then in the possession of the MSP. The Court should care about that. The AG should care about that. We need people under oath. The Court should want people under oath. The AG, Mr. Schuette should want people under oath. The defense certainly wants these people under oath.

Respectfully submitted

DePERNO LAW OFFICE, PLLC

Dated: January 22, 2018

_____

Matthew S. DePerno (P52622)
Attorneys for Defendant Todd Courser

62