CINDY GAMRAT,

       Plaintiff,

v.                                          Case No. 1:16-CV-1094

KEITH ALLARD, et al.,                  HON. GORDON J. QUIST

       Defendants.

_____/

## **OPINION**

      Plaintiff, Cindy Gamrat, a former Michigan legislator, has sued a number of Defendants alleging various claims arising out of her expulsion from the Michigan House of Representatives and events preceding and following her expulsion. Defendants include (among others) the Michigan House of Representatives, Edward McBroom, Tim Bowlin, Kevin Cotter, Brock Swartzle, and Hassan Beydoun (collectively referred to as the "House Defendants"); Norm Saari; and Keith Allard and Benjamin Graham. Gamrat alleges a claim under 42 U.S.C. § 1983 for violation of her right to procedural due process, a claim for violation of the Electronic Communications Privacy Act (federal wiretapping act), 18 U.S.C. §§ 2511 and 2520, and various state law claims. The House Defendants and Saari have moved to dismiss Gamrat's claims pursuant to Fed. R. Civ. P. 12(b)(1) for lack of jurisdiction and pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim. Allard and Graham move to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).

      In the course of the briefing, Gamrat has agreed to dismiss her defamation claim against all Defendants and to dismiss her malicious prosecution/abuse of process claims against Saari,

Allard, and Graham.  Therefore, those claims will be dismissed with prejudice against the appropriate Defendants.

The Court heard oral argument on the motions to dismiss on March 5, 2018.  For the following reasons, the Court will grant Defendants' motions and dismiss all claims, except those against Defendants Joseph Gamrat and David Horr.

## I. BACKGROUND

On November 4, 2014, Gamrat won the general election for State Representative of Michigan's 80th District and Todd Courser won the general election for State Representative of Michigan's 82nd District.  Gamrat and Courser ran as Tea Party candidates on conservative platforms that included "advocating for lower taxes, less spending, and transparency in government." (ECF No. 20 at PageID.115.)

During the period in question, Defendants Cotter and McBroom were State Representatives, and Cotter was also the Speaker of the House.  Defendant Bowlin was the Business Director and Chief Financial Officer for the House.  Defendant Swartzle was General Counsel for the House and Cotter's Chief of Staff.  Defendant Saari was Cotter's Chief of Staff until approximately August 2, 2015.  Defendant Beydoun was the House Majority Legal Counsel. Defendants Allard, Graham, and Cline had served on Gamrat's and Courser's campaigns as volunteers or paid political consultants and, following the election, served as staffers in Gamrat's and Courser's offices.  (*Id.* at PageID.116–17.)  Defendant Joe Gamrat was Gamrat's husband, and Defendants David Horr and Vincent Krell are two individuals whom Gamrat alleges were conducting surveillance on her.[1]

---

[1] Gamrat previously voluntarily dismissed Krell from the case without prejudice.  (ECF No. 42.)

Following the election, Gamrat and Courser agreed to a staff sharing arrangement in which Allard, Graham, and Cline served as staff members in both districts and worked out of both Gamrat's and Courser's separate offices. (*Id.* at PageID.117.) In addition, at some point Gamrat and Courser, both of whom were married, began a sexual affair. On several occasions between January 2, 2015, and July 6, 2015, Allard, Graham, and Cline began reporting perceived misconduct by Gamrat and Courser to members and staff of the House leadership, including Defendants Saari, Swartzle, and Cotter. One such report included an incident in which Courser asked Graham to send a "false flag" email that would serve as a "controlled burn" to "inoculate the herd"—in other words, to serve as cover for the affair. The email that Courser or someone on his behalf had authored contained a number of outlandish, untrue, and salacious allegations about Courser. Courser hoped that the email would create such a stir that any facts that came out about the affair would be ignored as an exaggeration or seen as a smear campaign. Graham refused to send the email, but Courser found someone else to send it.

On July 6, 2015, Gamrat met with Bowlin about issues concerning Allard and Graham (Cline had previously resigned on April 14, 2015). (*Id.* at PageID.121, 123.) Following that meeting, Bowlin terminated Allard's and Graham's employment. (*Id.* at PageID.123.) After the termination, Allard and Graham told Bowlin about their prior reports to Swartzle, Saari, and Cotter. When the House leadership failed or refused to investigate, Allard and Graham provided their information to the *Detroit News*. On August 7, 2015, the *Detroit News* ran a story about the affair and Courser's "false flag" email, and alleged that Gamrat and Courser misused taxpayer money to cover up their affair.

The same day the *Detroit News* article ran, Cotter requested Bowlin to investigate and prepare a report on alleged misconduct by Gamrat and Courser. On August 31, 2015, the House

Business Office (HBO) issued a report concluding that further investigation by the House was warranted.  On August 19, 2015, before Bowlin had completed the HBO report, the House adopted Resolution 129 to form a Select Committee to examine the qualifications of Gamrat and Courser and to determine their fitness to continue holding office.  (ECF No. 24-2 at PageID.305.)  The Select Committee was composed of six members, four from the Republican Caucus and two from the Democratic Caucus.  Defendant McBroom chaired the Select Committee.

On September 8, 2015, the HBO and the Office of the General Counsel issued a "Combined Statement," which set forth the facts uncovered during the investigation.  The Combined Statement concluded with the recommendation that Gamrat not be expelled but censured with severe conditions attached.  (ECF No. 24-4 at PageID.349.)  The following day, McBroom introduced House Resolution 141, which was referred to the Select Committee and reported with recommendation and without amendment.  As originally introduced, HR 141 specified that Gamrat be expelled for misconduct in office and for misuse of state resources, but made no mention of a criminal investigation.  (ECF No. 24-5.)  However, on September 11, 2015, Democratic Representative Andy Schor introduced a resolution to request that the Michigan Attorney General and the Michigan State Police investigate the behavior and conduct of Courser.  (ECF No. 24-6.)  The same day, Democratic Representative Winnie Brinks moved to amend HR 141 to request that the Michigan Attorney General and the Michigan State Police investigate the behavior and actions of Gamrat and that a copy of the unredacted report and the entire evidentiary record be provided to the Michigan Attorney General and the Michigan State Police.  (ECF No. 24-7.)  Upon a vote, ninety-one Representatives voted in favor of the amendment.  The House then passed HR 141, expelling Gamrat, on a 91 to 12 vote.

Gamrat filed her initial complaint in this case pro se, but failed to serve it. Subsequently, certain Defendants moved to dismiss the case for lack of prosecution. Gamrat responded through counsel, requesting additional time to file an amended complaint. The Court granted Gamrat thirty days to file an amended complaint. Gamrat thereafter filed an amended complaint removing certain Defendants and adding others and adding new claims.

## II. MOTION STANDARD

Pursuant to Federal Rule of Civil Procedure 8(a), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Detailed factual allegations are not required, but "a plaintiff's obligation to provide the 'grounds' of h[er] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964–65 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957)). The court must accept all of the plaintiff's factual allegations as true and construe the complaint in the light most favorable to the plaintiff. *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009). The complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009). Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has

not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

Although a court is generally limited to the pleadings in deciding a motion to dismiss under Rule 12(b)(6), *see* Fed. R. Civ. P. 12(d), a court may consider various documents without converting the motion to a motion for summary judgment. "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008) (citation omitted).

### III. DISCUSSION

### A. House Defendants' Motion

#### 1. Eleventh Amendment Immunity

The individual House Defendants argue that they are entitled to sovereign immunity under the Eleventh Amendment. Because the Court concludes that Gamrat's § 1983 claim is barred by absolute legislative immunity and qualified immunity, the Court need not address this argument as it pertains to the individual House Defendants sued in their individual capacities. As for the House, however, Eleventh Amendment immunity applies to all claims. Under the Eleventh Amendment, a state and its agencies generally are immune from private lawsuits in federal court. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568 (1977). "This immunity is far reaching. It bars all suits, whether for injunctive, declaratory or monetary relief, against the state and its departments." *Thiokol Corp. v. Dep't of Treasury*, 987 F.2d 376, 381 (6th

Cir. 1993) (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100–01, 104 S. Ct. 900, 908 (1984)).  Accordingly, Gamrat's claims against the House will be dismissed.[2]

## 2. Due Process Claim

Count I alleges that the House Defendants violated Gamrat's right to procedural due process in connection with the investigation and her expulsion.  Although Gamrat alleges that she had a constitutionally-protected interest in state employment, by her own admission, Gamrat was an elected official, not a state employee, and her claim will be analyzed as such.  The House Defendants argue that they are entitled to both absolute legislative immunity and qualified immunity on Gamrat's § 1983 due process claim.

### *Legislative Immunity*

Pursuant to the Speech or Debate Clause, defendants who engage in legislative activities are absolutely immune from suit in their individual capacities.  The Speech or Debate Clause provides that "for any Speech or Debate in either House, [members of Congress] shall not be questioned in any other place."  The Speech or Debate Clause serves "to prevent intimidation by the executive and accountability before a possibly hostile judiciary."  *United States v. Johnson*, 383 U.S. 169, 181, 86 S. Ct. 749, 755 (1966).  The clause provides protection not "simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative

---

[2] The Court is not persuaded by the individual House Defendants' Eleventh Amendment immunity argument.  The case they cite, *Martin v. Wood*, 772 F.3d 192 (4th Cir. 2014), was a Fair Labor Standards Act case.  *Martin* did not involve a § 1983 claim, and district courts within the Fourth Circuit have declined to extend *Martin* to the § 1983 context.  *See Adams v. NaphCare, Inc.*, 246 F. Supp. 3d 1128, 1138 (E.D. Va. 2017) (stating that "the Fourth Circuit has never extended *Martin* to § 1983 claims, likely because it would 'absolutely immunize state officials from personal liability for acts within their authority and necessary to fulfilling government responsibilities'" (quoting *Patterson v. Lawhorn*, 2016 WL 3922051, at *6 (E.D. Va. 2016)); *Manion v. North Carolina Med. Bd.*, 2016 WL 4523902, at *5 n.3 (E.D.N.C. Aug. 22, 2016) (declining to apply *Martin*'s holding to a suit under § 1983).  And, in the § 1983 context, *Martin* is at odds with *Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358 (1991), in which the Supreme Court rejected the same argument the individual House Defendants raise here—that "officials may not be held liable in their personal capacity for actions they take in their official capacity."  *Id.* at 27, 112 S. Ct. at 363.

process by insuring the independence of individual legislators." *United States v. Brewster*, 408 U.S. 501, 507, 92 S. Ct. 2531, 2535 (1972). Although the federal Speech or Debate Clause does not protect state legislators, Michigan has such a clause in its Constitution, and the Supreme Court has extended legislative immunity to state and local legislative bodies. *Tenney v. Brandhove*, 341 U.S. 367, 376, 71 S. Ct. 783, 788 (1951).

"Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54, 119 S. Ct. 966, 972 (1998) (internal quotation marks omitted). To determine whether an act falls within this sphere, a court must examine "the nature of the act, rather than . . . the motive or intent of the official performing it." *Id.* at 54, 118 S. Ct. at 973. The question is whether the activity is

> 'an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.'

*Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504, 95 S. Ct. 1813, 1821–22 (1975) (quoting *Gravel v. United States*, 408 U.S. 606, 625, 92 S. Ct. 2614, 2627 (1972)).

Apart from words spoken in a debate, the Speech or Debate clause extends to "written reports presented in that body by its committees, to resolutions offered, which, though in writing, must be reproduced in speech, and to the act of voting." *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880). In addition, "committee hearings are protected, even if held outside the Chambers." *Hutchinson v. Proxmire*, 443 U.S. 111, 124, 88 S. Ct. 2675, 2683 (1979); *see Walker v. Jones*, 733 F.2d 923, 929 (D.C. Cir. 1984) (noting that legislative activity includes "participation in committee investigations, proceedings, and reports"). Legislative immunity extends beyond legislators to legislative aides and counsel. *Eastland*, 421 U.S. at 507, 95 S. Ct. at 1823; *see Ellis v. Coffee Cnty. Bd. of Registrars*, 981 F.2d 1185, 1192 (11th Cir. 1993) (noting that "[t]he Supreme Court has

extended this privilege to the chief counsel of a congressional subcommittee; committee staff, consultants, investigators, and congressional aides, insofar as they are engaged in legislative functions").

In engaging in the investigation of Gamrat's and Courser's activities, recommending a particular outcome, and voting on Gamrat's expulsion, the House Defendants all engaged in legislative activity. For example, in *Whitener v. McWatters*, 112 F.3d 740 (4th Cir. 1997), the Fourth Circuit held that disciplinary action taken by a legislative body against one of its own members is a "core legislative act." *Id.* at 741. In *Whitener*, a county board of supervisors voted to censure one of its members. After surveying the development of English Parliamentary law, the court noted that "Americans at the founding and after understood the power to punish members as a legislative power inherent even in the humblest assembly of men." *Id.* at 744 (internal quotation marks omitted). "Absent truly exceptional circumstances," the court observed, "it would be strange to hold that such self-policing is itself actionable in a court." *Id.* In fact, the Michigan Constitution subscribes to this principle: "Each house shall be the sole judge of the qualifications . . . of its members, and may, with the concurrence of two-thirds of all the members elected thereto and serving therein, expel a member." Mich. Const. art. IV, § 16.

Gamrat's reliance on *Haskell v. Washington Township*, 864 F.2d 1266 (6th Cir. 1988), for the proposition that legislative action that singles out specific individuals and affects them differently from others is administrative, not legislative action, fails to consider the specific facts in that case. *Haskell* involved a local body's enactment of zoning legislation, which could be applied generally to all citizens or specifically to an individual. *Id.* at 1278. In the instant case, we are dealing neither with a local legislative body nor a zoning decision, but a state legislative body's discipline of one of its own members.

*Qualified Immunity*

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)). The analysis entails a two-step inquiry. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 815–16 (1982). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232, 129 S. Ct. at 816). A court may address these steps in any order. *Id.* (citing *Pearson*, 555 U.S. at 236, 129 S. Ct. at 818). Thus, an officer is entitled to qualified immunity if either step of the analysis is not satisfied. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016). Gamrat's claim fails at both steps of the analysis.

"To make out a claim for a violation of procedural due process, the plaintiff has the burden of showing that '(1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest.'" *EJS Props., LLC v. City of*

*Toledo*, 698 F.3d 845, 855 (6th Cir. 2012) (quoting *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006)).  Property interests are not created by the Constitution, but instead "'stem from an independent source such as state law.'"  *Thomas v. Cohen*, 304 F.3d 563, 576 (6th Cir. 2002) (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972)).

Michigan law has long held that a public office does not constitute a property interest.  As the Michigan Supreme Court has explained:

> A public office cannot be called "property," within the meaning of these constitutional provisions.  If it could be, it would follow that every public officer, no matter how insignificant the office, would have a vested right to hold his office until the expiration of the term.  Public officers [sic] are created for the purposes of government.  They are delegations of portions of the sovereign power for the welfare of the public.  They are not the subjects of contract, but they are agencies for the state, revocable at pleasure by the authority creating them, unless such authority be limited by the power which conferred it.

*Attorney Gen. v. Jochim*, 99 Mich. 358, 367, 58 N.W. 611, 613 (1894).  The United States Supreme Court and the Sixth Circuit have likewise held that elected office does not constitute a property interest.  As the Court explained in *Taylor v. Beckham*, 178 U.S. 548, 20 S. Ct. 890 (1900): "The decisions are numerous to the effect that public offices are mere agencies or trusts, and not property as such. . . .  In short, generally speaking, the nature of the relation of a public officer to the public is inconsistent with either a property or a contract right."  *Id.* at 577, 20 S. Ct. at 900–01; *see also Burks v. Perk*, 470 F.2d 163, 165 (6th Cir. 1972) (noting that "[p]ublic office is not property within the meaning of the Fourteenth Amendment").

In her amended complaint, Gamrat distinguishes *Burks* from her own situation because she was elected to her position, rather than appointed.  Yet, nothing in *Burks* suggests such a distinction, and Gamrat fails to cite any persuasive authority to establish that she had a property interest in her elected office.

Gamrat also fails to show that the law was clearly established. In order for a right to be clearly established, it must be established "in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665, 132 S. Ct. 2088, 2094 (2012) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)). "[T]he clearly established law must be 'particularized' to the facts of the case," and "in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, -- U.S. --, 137 S. Ct. 548, 552 (2017) (quoting *Anderson*, 483 U.S. at 640, 107 S. Ct. at 3049). In order for a reasonable official to understand that he or she could violate a clearly established right, the courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741, 131 S. Ct. at 2083. Gamrat fails to cite a case from the Supreme Court, the Sixth Circuit, or this Court that clearly establishes that an elected public official expelled from office has a property interest in her office protected by the Due Process Clause. The cases Gamrat cites, *United States v. Brewster*, 408 U.S. 501, 92 S. Ct. 2531 (1972), and *Powell v. McCormack*, 395 U.S. 486, 89 S. Ct. 944 (1969), did not address whether an elected official has a property interest in a public office for purposes of a procedural due process claim.

### 3. Breach of Contract, Promissory Estoppel, and Fraud

Counts II, III, and VII allege claims of breach of contract, promissory estoppel, and fraud. Each claim is based on assurances Gamrat alleges she received from Defendant Beydoun, and possibly other House Defendants, that she would only be censured in exchange for her presentation of a joint statement and her apology to the House.

Gamrat's breach of contract claim fails because Defendants lacked the authority to commit the full House to such an agreement. Article IV, § 16 of the Michigan Constitution vests the full

Michigan House with the authority to determine whether to expel a member. No House Defendant, including Beydoun, could bind the entire House, or even the Republican Caucus, to vote a certain way because they had no authority to enter into the contract Gamrat alleges. *See Sittler v. Bd. of Control of Mich. Coll. of Min. & Tech.*, 333 Mich. 681, 687, 53 NW.2d 681, 684 (1952) ("Public officers have and can exercise only such powers as are conferred on them by law, and a State is not bound by contracts made in its behalf by its officers or agents without previous authority conferred by statute or the Constitution." (internal quotation marks omitted)). In addition, legislative immunity protects Defendants from liability stemming from any alleged breach. The decision to censure or expel Gamrat falls within the legislative sphere because Article IV, § 16 of the Michigan Constitution gives the legislature the exclusive authority to judge the qualifications of its members and to expel them. As the Michigan Supreme Court has observed, a court has no jurisdiction to review the legislature's decision on the qualifications of its members. *Attorney Gen. v. Bd. of Canvassers of Seventh Senatorial Dist.*, 155 Mich. 44, 46, 118 N.W. 584, 585 (1908).

Gamrat says that Beydoun, the House Majority Counsel—a non-Representative, non-elected official—had the authority to enter into a contract binding all Representatives in the Republican Caucus to not exercise their rights to vote to expel Gamrat. She fails to cite any authority supporting her argument. She argues, however, that Beydoun was acting on behalf of Cotter, the Speaker, and Cotter had the ability to control the vote through the so-called "Caucus Pledge," which members of the Republican Caucus were required to sign. (ECF No. 32 at PageID.393–94.) However, the so-called "Caucus Pledge"—a political document—is no more enforceable than the "Contract with America." *See Hurt v. Wicker*, No. 1:06-cv-241-M-D, 2006 WL 2727980, at *1 (N.D. Miss. Sept. 22, 2006) (holding that the plaintiff's promissory estoppel claim based on the defendant's breach of the "Contract with America" was non-justiciable).

Moreover, Defendants have shown that the "Caucus Pledge" did not operate as Gamrat claims. Defendants' evidence of Record Roll Call votes from January 14, 2015, through September 11, 2015, shows that 235 of the 296 votes taken were contested, and of the contested votes, 133 of them, or 56%, involved Caucus members voting differently from the majority of the Caucus. (ECF No. 36-1.) To the same point, one Republican Representative voted against Gamrat's expulsion. In short, Gamrat's breach of contract claim lacks merit.

Gamrat's promissory estoppel claim fails as well. A promissory estoppel claim requires reliance, *see Gason v. Dow Corning Corp.*, 674 F. App'x 551, 558–59 (6th Cir. 2017) (quoting *Leila Hosp. & Health Ctr. v. Xonics Med. Sys., Inc.*, 948 F.2d 271, 275 (6th Cir. 1991)), and such reliance must be reasonable. *Zaremba Equip., Inc. v. Harco Nat'l Ins. Co.*, 280 Mich. App. 16, 39, 761 N.W.2d 151, 165 (2008). Gamrat's claim fails because no reasonable person with even a rudimentary understanding of the political system could believe that one or two individuals—the Speaker and/or the Majority Counsel—could guarantee votes, particularly on an issue as sensitive as censuring or ejecting a member. As the Court indicated at oral argument, such a notion is beyond comprehension. Moreover, Gamrat—a sitting Representative—should have been well aware that the Caucus Pledge does not operate in practice as she claims it does in her amended complaint.

Gamrat's fraud claim fails for similar reasons. This claim is based on four statements by Defendant Beydoun: (1) that the evidence did not support expulsion and the House believed censure was more appropriate; (2) that he could control the Republican votes for censure; (3) that Gamrat's conduct violated House Rule 74 in an attempt to obtain an admission from Gamrat that she misused taxpayer resources; and (4) that Gamrat's signature on the censure agreement would allow her to keep her seat and she could clear up the details after she kept her seat. (ECF No. 20

at PageID.143.)  Gamrat alleges that these representations and assurances were false because Beydoun never intended to take affirmative steps to protect Gamrat's interest and instead took steps to protect the House and its member Defendants.  (*Id.* at PageID.144.)  Gamrat claims that she relied on Beydoun's statements by cooperating with the House in its investigation and by entrusting information to Beydoun that should have been protected by the attorney-client privilege. (*Id.*)

As an initial matter, Beydoun's first and third statements cannot form the basis of a fraud claim because they are statements of opinion and/or legal opinion, not statements of fact.  *See Galeana Telecomms. Invs., Inc. v. Amerifone Corp.*, 202 F. Supp. 3d 711, 730 (E.D. Mich. 2016) ("In general, an honest statement of opinion cannot support a fraud claim because '[e]xpressions of opinion are not false statements of independently verifiable facts.'") (quoting *Johnson v. Botsford Gen. Hosp.*, 278 Mich. App. 146, 153 n.1, 748 N.W.2d 907, 911 n.1 (2008)); *City Nat'l Bank of Detroit v. Rodgers & Morgenstein*, 155 Mich. App. 318, 323–24, 399 N.W.2d 505, 507–08 (1986) (holding that an erroneous legal opinion is not a basis for fraud).  More importantly, as with a claim of promissory estoppel, fraud requires reliance, *Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813, 816 (1976), and a plaintiff's reliance must be reasonable. *See MacDonald v. Thomas M. Cooley Law Sch.*, 724 F.3d 654, 662–63 (6th Cir. 2013). For the reasons set forth above, Gamrat could not have reasonably believed that Beydoun or, for that matter, Cotter, could promise or guarantee any particular outcome to Gamrat.

### 4.  Wiretapping/Eavesdropping, Civil Stalking, and Conspiracy

Count V alleges that all Defendants, except McBroom, violated the federal Wiretap Act, 18 U.S.C. § 2511.  "Section 2511 . . . criminalizes the intentional interception of an electronic communication . . . [and 18 U.S.C. § 2520] provides a private cause of action for persons who are

victimized by such criminal conduct." *Luis v. Zang*, 833 F.3d 619, 626 (6th Cir. 2016). Gamrat alleges that Defendants violated the Wiretap Act when they "intentionally intercepted, endeavored to intercept, or procured other people to intercept or endeavor to intercept, [her] wire, oral, and electronic communications," "intentionally used, endeavored to use, or procured other people to use an electronic, mechanical, or other device to intercept [her] oral communications," and "intentionally used, disclosed or endeavored to disclose to other people the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained . . . in violation of 18 U.S.C. § 2511." (ECF No. 20 at PageID.139.) Count V also alleges that Defendants violated Michigan's eavesdropping statute, M.C.L. § 750.539 *et seq.*, by, among other things, using a device to eavesdrop on Gamrat's private conversations, tapping or accessing without authorization an electronic medium containing Gamrat's communication, and disseminating an illegally-obtained recording of Gamrat's communication to others. (*Id.* at PageID.138–39.)

Count VI alleges that all Defendants, except McBroom, are liable for civil stalking under M.C.L. § 600.2954(1), which provides a civil action to any victim of conduct prohibited under M.C.L. §§ 740.411h and 740.411i. "Stalking" is defined as "a willful course of conduct involving repeated or continuing harassment of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized frightened, intimidated, threatened, harassed, or molested." M.C.L. § 750.411h(1)(d). "Harassment" is "conduct directed toward a victim that includes, but is not limited to, repeated or continuing unconsented contact that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." M.C.L. § 750.411h(1)(c). It "does not include constitutionally protected activity or conduct that serves a

legitimate purpose." *Id.* To support a civil stalking claim, "there must be two or more acts of unconsented contact that actually cause emotional distress to the victim and would also cause a reasonable person such distress." *Nastal v. Henderson & Assocs. Investigations, Inc.*, 471 Mich. 712, 723, 691 N.W.2d 1, 7 (2005) (footnote omitted).

Count X alleges a claim of civil conspiracy against all Defendants. "In Michigan, a claim for civil conspiracy requires a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a lawful purpose by criminal or unlawful means." *Specialized Pharmacy Servs., Inc. v. Magnum Health & Rehab of Adrian, LLC*, No. 12-12784, 2013 WL 1431722, at *4 (E.D. Mich. Apr. 9, 2013) (citation omitted). Conspiracy claims must be pled with some degree of specificity. *Moldowan v. City of Warren*, 578 F.3d 351, 395 (6th Cir. 2009). Thus, vague and conclusory allegations without supporting facts will not do. *Id.*

Nowhere in her amended complaint does Gamrat allege that the House Defendants personally committed any act that violates the federal Wiretap Act or Michigan's eavesdropping statute or gives rise to a claim for civil stalking. Gamrat's claim against the House Defendants under the Wiretap Act, to the extent it is based on procurement, fails from the outset because 18 U.S.C. § 2520 does not impose civil liability for procurement. *See Kirch v. Embarq Mgmt. Co.*, 702 F.3d 1245, 1247 (10th Cir. 2012) (stating that "[a]ny temptation to read the statute as imposing aider-and-abettor liability is overcome by the illuminating statutory history of the civil liability provision," and noting that "almost all courts to address the issue have held that § 2520 does not impose civil liability on aiders or abettors"); *Boseovski v. McCloud Healthcare Clinic, Inc.*, No. 2:16-CV-2491-CMK, 2017 WL 2721997, at *3 (E.D. Cal. June 23, 2017) ("[D]ue to various provisions of the Electronic Privacy Act of 1986, civil liability is not available based on

procurement"). Regardless, Gamrat's wiretapping/eavesdropping and stalking claims against the House Defendants are built solely on conclusory allegations without any factual augmentation. Paragraph 46 is representative of such allegations:

> Upon information and belief, it was around this time that Cotter, Saari, and Swartzle began meeting with Allard, Graham, and Cline in order to direct them to gather information against Gamrat. (See Allegations contained in Complaint and Jury Demand in *Allard and Graham v. Michigan House of Representatives*, case no. 1:15-cv-01259 in the Western District of Michigan, including Paras. 20 and 33, attached as Exhibit 1; Saari MSP Interview at pp. 10, 18, 25; attached as Exhibit 2; April 28, 2015, Text between Allard and Gamrat's son, attached as Exhibit 3.)

(ECF No. 20 at PageID.118–19.)

Gamrat's "upon information and belief" allegation is not *per se* improper under *Twombly*. "The Sixth Circuit has permitted pleading on information and belief in certain circumstances, such as when a plaintiff may lack personal knowledge of a fact, but have 'sufficient data to justify interposing an allegation on the subject' or be required to rely on 'information furnished by others.'" *Apex Tool Grp., LLC v. DMTCO, LLC*, No. 3:13-cv-372, 2014 WL 6748344, at *9 (S.D. Ohio Nov. 26, 2014) (quoting *Starkey v. JPMorgan Chase Bank, NA*, 753 F. App'x 444, 447 (6th Cir. 2014)). However, the exhibits Gamrat cites for her allegation that the House Defendants began meeting with Allard, Graham, and Cline in order to direct them to gather information against Gamrat provide no support for the allegation and, in fact, contradict it. For example, Allard and Graham alleged in their complaint in their previous case against the House that *Allard* initiated the February 2015 meeting with Defendants Saari and Cotter and that "Speaker Cotter appeared genuinely concerned and asked Messrs. Allard, Graham, and Cline to continue to keep Mr. Saari abreast of any additional issues." (*See Allard, et al. v. Michigan House of Representatives*, No. 1:15-CV-259 (W.D. Mich.) (ECF No. 1 at PageID.6–7).) Nothing supports an inference that the House Defendants *directed* Allard, Graham, and Cline to do anything and, more importantly,

Gamrat does not allege that any House Defendant directed, told, or requested Allard, Graham, or Cline to engage in any sort of conduct that conceivably could amount to wiretapping/eavesdropping/stalking. In fact, Allard, Graham, and Cline could have complied with Cotter's request simply by providing him information they obtained from their perfectly legal day-to-day observations of, and interactions with, Gamrat and Courser.

As for the substantive claims, Gamrat relies extensively on what is best characterized as "group pleading"—a practice sometimes permitted in fraud cases but otherwise impermissible. *See State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc.*, No. 14-cv-10266, 2014 WL 5427170, at *3 (E.D. Mich. Oct. 24, 2014) ("Plaintiffs are not permitted, when asserting a fraud claim, to generally assert all claims against all defendants."); *Petrovic v. Princess Cruise Lines, Ltd.*, No. 12-21588-CIV, 2012 WL 3026368, at *3 (S.D. Fla. July 20, 2012) (stating that "a complaint that lumps all the defendants together in each claim and provides no factual basis to distinguish their conduct fails to satisfy Rule 8" (alterations and internal quotation marks omitted)). For example, in paragraph 201, Gamrat alleges that "Defendants further violated 18 U.S.C. § 2511 when they intentionally used, disclosed or endeavored to disclose to other people the contents of the wire, oral, or electronic communications, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communications [sic] in violation of 18 U.S.C. § 2511." Gamrat omits any specifics: what was the information or recording, who obtained it, how was the information used, who disclosed it, and to whom was it disclosed or disseminated? In short, Gamrat's allegations, which do nothing more than parrot the statute, "contribute nothing to the sufficiency of the complaint," and are insufficient to render the wiretapping/eavesdropping and stalking claims plausible. *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013); *see also Alshaibani v. Litton Loan Servicing, LP*,

528 F. App'x 462, 465 (6th Cir. 2013) ("As a practical matter, Plaintiffs' factually unadorned allegation that Litton misapplied their payments does no more to render their claim plausible than would a simple legal conclusion that Litton breached the mortgage.").  Gamrat's civil conspiracy claim fails for the same reasons.

Accordingly, the wiretapping/eavesdropping, stalking, and civil conspiracy claims will be dismissed as to the House Defendants.

### 5. Malicious Prosecution/Abuse of Process

Count IV alleges claims of malicious prosecution and abuse of process against the House Defendants.  To succeed on a malicious prosecution claim, a plaintiff must prove that:

> (1) the defendant has initiated a criminal prosecution against him, (2) the criminal proceedings terminated in his favor, (3) the private person who initiated or maintained the prosecution lacked probable cause for his actions, and (4) the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice.

*Miller v. Sanilac Cnty.*, 606 F.3d 240, 248 (6th Cir. 2010) (quoting *Walsh v. Taylor*, 263 Mich. App. 618, 633–34, 689 N.W.2d 506, 516–17 (2004)).  In Michigan, "[d]ue to the important state policy of encouraging citizens to report possible criminal violations within their knowledge, a defendant cannot be held liable for malicious prosecution unless he took some active role in instigating the prosecution." *Rivers v. Ex-Cell-O Corp.*, 100 Mich. App. 824, 832–33, 300 N.W.2d 420, 424 (1980).  There can be no liability if the defendant "made full and fair disclosure of all of the material facts within his knowledge to the prosecutor, and the prosecuting attorney recommends a warrant." *Id.* at 833, 300 N.W.2d at 424.  In such case, the defendant "has not 'instituted' the charge." *Id.* (quoting *Renda v. Int'l Union, UAW*, 366 Mich. 58, 83–87, 114 N.W. 343, 355–56 (1962)).  Thus, private individuals and police officers can be liable "only if they knowingly furnish false information that the prosecutor relies and acts upon in initiating criminal

proceedings." *Disney v. City of Dearborn*, No. 2:06-CV-12795, 2006 WL 2193029, at *4 (E.D. Mich. Aug. 2, 2006) (citing *Matthews v. Blue Cross & Blue Shield of Mich.*, 456 Mich. 365, 385–90, 572 N.W.2d 603, 613–15 (1998)).

Gamrat's malicious prosecution claim fails for two reasons. First, public records—enacted legislation and legislative history—refute Gamrat's allegation that Defendants "initiated" the criminal prosecution. As noted above, the matter was referred to the Michigan State Police and the Michigan Attorney General for investigation based on amendments to HR 141 introduced by two Democrat Representatives who are not Defendants in this case, and the amendments were approved by the House. Thus, contrary to Gamrat's allegations, the House Defendants did not initiate the criminal prosecution. Second, Gamrat fails to allege any fact rebutting the presumption that the prosecutor initiated the prosecution. In fact, Gamrat admits in her amended complaint that Defendants Cotter and Bowlin told the Michigan State Police that they did not have direct evidence of anything illegal before conducting the investigation and did not see anything criminal in the investigation. (ECF No. 20 at PageID.137.)

Gamrat's primary argument is that it is "disingenuous" for the House Defendants to argue that their actions did not "initiate" the prosecution because the creation of the HBO Report led directly to the Michigan State Police's investigation and criminal charges. But Gamrat cites no case to support her argument, and Michigan courts have rejected Gamrat's causation theory. *Renda*, 366 Mich. at 91, 114 N.W.2d at 359 (rejecting the notion that "any party who is a proximate cause of a prosecution is himself the prosecutor and may be held liable if the prosecution thereafter ensuing proves to have been commenced without probable cause"). Moreover, Michigan courts have held that there is no liability when, similar to the situation here, a private citizen conducts its own investigation and provides the information to the police, who then conduct their own

investigation. *Wilson v. Sparrow Health Sys.*, 290 Mich. App. 149, 153, 799 N.W.2d 224, 226 (2010). In short, there is no basis for a malicious prosecution claim.

Gamrat's abuse of process claim fails as well. Under Michigan law, an abuse of process claim requires a plaintiff to show: "(1) an ulterior purpose and (2) an act in the use of process which is improper in the regular prosecution of the proceeding." *Friedman v. Dozorc*, 412 Mich. 1, 30, 312 N.W.2d 585, 594 (1981). It is clear under Michigan law that there is no abuse of process claim for causing process to issue. *Id.* n.18 (citing Restatement (Second) of Torts). Rather, an abuse of process claim "lies for the improper use of process after it has been issued, not for maliciously causing it to issue." *Spear v. Pendill*, 164 Mich. 620, 623, 130 N.W. 343, 344 (1911) (internal quotation marks omitted); *see also Garcia v. Thorne*, 520 F. App'x 304, 311 (6th Cir. 2013) ("Garcia's abuse-of-process claim against Thorne fails because Thorne's behavior has to do with the initiation of criminal proceedings, not the misuse of process."). Gamrat concedes that she lacks direct evidence of the House Defendants' malicious use of process, but she states that it is "plausible" that the House Defendants participated more fully in her prosecution by the Attorney General. This speculation does not suffice to save Gamrat's claim from dismissal.

### 6. Indemnification

Count IX alleges a claim for indemnification against Cotter and the House under M.C.L. § 691.1408(1) and (2). Gamrat seeks indemnification for legal fees she incurred in defending a state-court suit by Allard and Graham and for her defense costs in the criminal proceeding. As mentioned above, the Eleventh Amendment bars this claim against the House.

The statute, which Gamrat quotes in full in her amended complaint, states that when a civil action or a criminal action is commenced against an employee of a government agency, "the governmental agency may pay for, engage, or furnish the services of an attorney to advise the

officer . . . as to the claim and to appear for and represent the officer . . . in the action."  Noting that Gamrat concedes in her amended complaint that the statute is discretionary, the House Defendants argue that Gamrat cannot seek relief from this Court.  Indeed, the Michigan Supreme Court has held that the "full discretion" granted by the statute precludes judicial second-guessing about whether the governmental agency made a wise decision in deciding whether to pay an officer's attorney's fees.  *Warda v. City Council of the City of Flushing*, 472 Mich. 326, 332, 696 N.W.2d 671, 676 (2005) ("Whether the council acted wisely or unwisely, prudently or imprudently, is not for the consideration or determination of this Court.").

Gamrat cites *Warda* for the proposition that a governmental agency's discretionary action must still comport with the United States and Michigan constitutions.  She argues that because she has alleged a due process violation she can argue that Defendants acted improperly.  However, as Defendants note, the concern with constitutionality arises in the area of equal protection—whether the statute was applied in a discriminatory manner based on membership in a protected class.  Gamrat makes no such claim.  Moreover, as noted above, Gamrat's due process claim is without merit.  Therefore, Gamrat's claim for indemnification will be dismissed.

**B.**     **Defendant Saari's Motion**

Gamrat's claims against Defendant Saari include the due process, wiretapping/eavesdropping, civil stalking, and civil conspiracy claims.  The analysis for each of these claims is the same as set forth for the House Defendants above, as Gamrat essentially lumps Saari into her allegations with the House Defendants.  Therefore, for these reasons, Saari is entitled to dismissal of all four claims.

## C.    Defendants Allard's and Graham's Motion

Gamrat's remaining claims against Allard and Graham include wiretapping/eavesdropping, civil stalking, and civil conspiracy.

### 1.    Wiretapping/Eavesdropping

Allard and Graham argue that Gamrat's wiretapping/eavesdropping claim fails as to them because the amended complaint contains insufficient factual detail to render her claim plausible.[3] *See Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) ("The factual allegations in the complaint need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible.") (citing *Iqbal*, 556 U.S. at 578, 129 S. Ct. at 1949–50).  Gamrat responds that her allegations in her amended complaint and the documents attached thereto provide a sufficient factual basis to survive a motion to dismiss.

As set forth above, the Court has already determined that Gamrat's allegations regarding the House Defendants "direct[ing]" Allard, Graham, and Cline to gather information against Gamrat by engaging in wiretapping/eavesdropping or stalking activities lack sufficient factual support to survive dismissal.  Gamrat's allegations concerning Allard's and Graham's individual conduct similarly lack factual support.  For example, in paragraph 57, Gamrat alleges, "At the same time, Allard, Graham, and Cline were also obtaining information through wiretapping and eavesdropping devices, as described in Count V."  (ECF No. 20 at PageID.120.)  However, Count V does not provide the promised detail, particularly with regard to Allard and Graham.  In a similar

---

[3] The Court rejects Allard's and Graham's initial argument regarding Gamrat's failure to cite a statute that provides a civil action under either state or federal law.  Although Gamrat did not specifically cite the statutes that provide private causes of action, 18 U.S.C. § 2520 provides for recovery of civil damages for violations of the Wiretap Act, and M.C.L. § 750.539h provides a civil cause of action for eavesdropping under Michigan law.   The Court finds it unnecessary to address Allard and Graham's argument that there is no civil liability for violation of M.C.L. § 750.540.

manner, paragraphs 65 and 66 allege that "Graham and Allard were illegally and secretly recording conversations involving Gamrat . . . [and] [i]n some cases, Graham and Allard were admittedly not part of the recorded conversation." (*Id.* at PageID.121.) Again, Gamrat's allegations are conclusions without factual detail. Gamrat fails to identify who (Allard or Graham) recorded the conversation, the participants, where it occurred, or when it happened. It appears that Gamrat is referring to Graham's recording of his own May 19, 2015, conversation with Courser, during which Gamrat was apparently also on the phone with Courser. If so, Graham violated neither federal nor state law because there is no violation when the individual recording the conversation is also a participant. 18 U.S.C. § 2511(2)(d); *Sullivan v. Gray*, 117 Mich. App. 476, 481, 324 N.W.2d 58, 60 (1982); *Ferrara v. Detroit Free Press*, 52 F. App'x 229, 231–32 (2002) (also permitting third-party disclosure absent a statutory violation). Thus, Gamrat's allegation that Allard "directed" Graham to record his conversations with Gamrat and Courser (as opposed to merely "encouraging" Graham to do so, as Gamrat appears to concede in her response (ECF No. 50 at PageID.701)), is irrelevant because Graham's conduct would have been legal in any event.

Furthermore, Gamrat's other allegations, and the documents she cites in her amended complaint and response, provide no factual basis for her claim. For example, Anne Hill's comment that she "wondered" if Allard and Graham planted surveillance items in Gamrat's office is not evidence of anything illegal, as "wondering" about something is not evidence. Similarly, Allard's alleged statement that Gamrat's office was "bugged" is not factual support for a claim that Allard or Graham engaged in illegal wiretapping or eavesdropping because, even if true, the statement does not show that Allard or Graham had anything to do with planting surveillance items. (ECF No. 20 at PageID.122.) Gamrat's citation to a text exchange between Allard and Joe Gamrat regarding a picture of Gamrat's car—a matter not found in the amended complaint—does not

support Gamrat's claim, as taking a picture of a car does not constitute wiretapping or eavesdropping. Finally, Gamrat's allegation that Allard, Graham, and Cline exchanged texts with Joe Gamrat does not show, or even suggest, that Allard and Graham were intercepting, or attempting to intercept, Gamrat's communications. The lone text message from the Michigan State Police report that Gamrat cites is from Joe Gamrat to Allard concerning Gamrat's whereabouts. Nothing in the text suggests that Allard, or, for that matter, Joe Gamrat, was engaged in conduct that violated wiretapping or eavesdropping laws.[4]

Accordingly, Gamrat fails to state a plausible wiretapping/eavesdropping claim against Allard and Graham.[5] Thus, that claim will be dismissed as to Allard and Graham.

### 2. Civil Stalking

Allard and Graham contend that Gamrat's stalking claim is subject to dismissal on two grounds. First, citing *Nastal v. Henderson & Associates Investigations*, 471 Mich. 712, 691 N.W.2d 1 (2005), they argue that their conduct does not constitute stalking because it falls within the safe harbor of M.C.L. § 750.411h for conduct that is constitutionally protected or serves a legitimate purpose. Second, they contend that, regardless of whether their conduct falls within the safe harbor, Gamrat's allegations are insufficient to state a plausible civil stalking claim.

The Court need not address Allard and Graham's safe harbor argument because it concludes that Gamrat's allegations fall short of stating a plausible claim. As stated above, to support a civil stalking claim, "there must be two or more acts of unconsented contact that actually

---

[4] The Michigan State Police Report of Extortion can be found at http://media.mlive.com/lansing-news/other/Police-Report-on-Extortion-Texts-in-Courser-Gamrat-Scandal_Redacted.pdf. The text appears at 295–96 of the report.

[5] In Gamrat's response and at oral argument, Gamrat's counsel intermingled the stalking allegations with the wiretapping/eavesdropping allegations. For example, in discussing the wiretapping/eavesdropping claim, Gamrat's counsel referred to Allard taking a picture of Gamrat's vehicle and to the "extortion texts" Joe Gamrat and Defendant Horr allegedly sent to Gamrat and Courser. However, neither taking a picture, nor sending a text, is conduct that would violate the wiretapping/eavesdropping statutes.

cause emotional distress to the victim and would also cause a reasonable person such distress." *Nastal*, 471 Mich. at 723, 691 N.W.2d at 7 (footnote omitted). The Court has scoured the amended complaint in vain for an allegation that either Allard or Graham had even one unconsented contact with Gamrat that actually caused her emotional distress. Allard's and Graham's communications and contacts with Joe Gamrat, with or without Gamrat's permission, provide no basis for a stalking claim. And, because Allard and Graham were employees in Gamrat's office, any contact they had with her on a regular basis was, obviously, with her implied consent. As for the so-called "extortion texts," they appear to satisfy the elements for a stalking claim. The problem for Gamrat, however, is that she admits in her amended complaint that the Michigan State Police report concluded that Joe Gamrat and/or Defendant Horr, not Allard or Graham, sent those texts. Gamrat's allegation that Allard and Graham were communicating with Joe Gamrat before, during, and after the time the "extortion texts" were sent does not create a plausible inference that they had anything to do with those texts.

Accordingly, the Court will dismiss Gamrat's stalking claim as to Allard and Graham.

**3.      Civil Conspiracy**

Gamrat's conspiracy claim as to Allard and Graham is subject to dismissal for the reasons given above as to the House Defendants. In short, the claim is wholly unsupported by factual content supporting the existence of an agreement to accomplish an unlawful purpose or to accomplish a lawful purpose through unlawful means.

## IV. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motions as to all claims against them.[6]

An Order consistent with this Opinion will be entered.

Dated: March 15, 2018                 /s/ Gordon J. Quist
                                             GORDON J. QUIST
                            UNITED STATES DISTRICT JUDGE

---

[6] A few days before oral argument, the Court granted Gamrat's motion to file a supplemental brief regarding alleged spoliation of evidence, in which Gamrat claims that the House Defendants or someone on their behalf had tampered with Gamrat's computer and electronic devices after they were seized by the House in connection with the HBO investigation. (ECF No. 64.) The House Defendants had no opportunity to respond prior to oral argument. Nonetheless, Gamrat's supplemental brief cannot save her claims from dismissal. Claims that are factually deficient on their face cannot benefit from speculation about what might have been removed from a computer. *Cf. Brown v. Matauszak*, 415 F. App'x 608, 613 (6th Cir. 2011) ("Although Rule 8 does not constitute a 'hyper-technical, code-pleading regime,' it 'does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.'") (quoting *Iqbal*, 556 U.S. 678–79, 129 S. Ct. at 1950).