```
 1                 UNITED STATES DISTRICT COURT
                   WESTERN DISTRICT OF MICHIGAN
 2                       SOUTHERN DIVISION


 3   _____

 4   CINDY GAMRAT,

 5                        Plaintiff,
                                       DOCKET NO. 1:16-cv-1094
 6   vs.

 7

     KEITH ALLARD, in his official
 8   capacity; BENJAMIN GRAHAM, in his
     individual capacity;
 9   JOSHUA CLINE, in his individual
     capacity; JOSEPH GAMRAT; MICHIGAN
10   HOUSE OF REPRESENTATIVES;
     KEVIN G. COTTER, in his
11   individual capacity;
     TIM L. BOWLIN, in his individual
12   capacity; BROCK SWARTZLE, in his
     individual capacity; NORM SAARI,
13   in his individual capacity;
     EDWARD McBROOM, in his individual
14   capacity; HASSAN BEYDOUN, in his
     individual capacity; DAVID HORR;
15   and VINCENT KRELL,

16                        Defendants.

17   _____/

18              TRANSCRIPT OF MOTIONS TO DISMISS

19          BEFORE THE HONORABLE GORDON J. QUIST

20                GRAND RAPIDS, MICHIGAN

21                    March 5, 2018

22

23   Court Reporter:          Glenda Trexler
                              Official Court Reporter
24                            United States District Court
                              685 Federal Building
25                            110 Michigan Street, N.W.
                              Grand Rapids, Michigan 49503
```

1    Proceedings reported by stenotype, transcript produced by

2    computer-aided transcription.

3    A P P E A R A N C E S:

4    FOR THE PLAINTIFF:

5         MR. TYLER ERNEST OSBURN
          SCHENK, BONCHER & RYPMA
6         601 Three Mile Road, N.W.
          Grand Rapids, Michigan 49544
7         Phone:  (616) 647-8277
          Email: tosburn@schenkboncher.com
8
     FOR THE DEFENDANTS ALLARD AND GRAHAM:
9
          MS. SARAH RILEY HOWARD
10        PINSKY, SMITH, FAYETTE & KENNEDY, LLP
          146 Monroe Center Street, N.W., Suite 805
11        Grand Rapids, Michigan 49503-2824
          Phone:  (616) 451-8496
12        Email:  sarahrileyhoward@hotmail.com

13        MR. H. RHETT PINSKY
          PINSKY, SMITH, FAYETTE & KENNEDY, LLP
14        146 Monroe Center Street, N.W., Suite 805
          Grand Rapids, Michigan 49503
15        Phone:  (616) 451-8496
          Email:  hrpinsky@sbcglobal.net
16
     FOR THE DEFENDANTS MICHIGAN HOUSE OF REPRESENTATIVES, MCBROOM,
17   BOWLIN, COTTER, SWARTZLE, AND BEYDOUN:

18        MR. GARY P. GORDON
          DYKEMA GOSSETT, PLLC
19        Capitol View Building
          201 Townsend Street, Suite 900
20        Lansing, Michigan 48933
          Phone:  (517) 374-9133
21        Email: ggordon@dykema.com

22        MR. KYLE MICHAEL ASHER
          DYKEMA GOSSETT, PLLC
23        201 Townsend Street, Suite 900
          Lansing, Michigan 48933
24        Phone:  (517) 374-9100
          Email:  kasher@dykema.com

25

```
 1   FOR THE DEFENDANT NORM SAARI:

 2        MR. CAMERON JEZEWSKI EVANS
          EVANS LAW GROUP, PC
 3        950 West University Drive, Suite 102
          Rochester, Michigan 48307
 4        Phone:  (248) 468-1485
          Email: cevans@evanslawgrp.com
 5

 6                         *   *   *   *   *

 7                                 Grand Rapids, Michigan

 8                                 March 5, 2018

 9                                 2:03 p.m.

10                    P R O C E E D I N G S

11        THE COURT:  Okay.  This is the case of Cindy Gamrat

12   against Keith Allard and others, docket number 1:16-cv-1094,

13   the time set for oral argument on the motions to dismiss.

14        Can I have the appearance of counsel, please.

15        MR. OSBURN:  Tyler Osburn on behalf of plaintiff

16   Cindy Gamrat.

17        MR. GORDON:  Gary Gordon and Kyle Asher on behalf of

18   the Michigan House of Representatives,

19   Representative Edward McBroom, Speaker of the House

20   Kevin Connor, House Business Office Director --

21        THE COURT:  You guys can remain seated.  And speak

22   into the microphone because it does help me.

23        MR. GORDON:  -- Tim Bowlin; general counsel and chief

24   of staff now Court of Appeals Judge Brock Swartzle; and house

25   majority counsel Hassan Beydoun.
```

1          *THE COURT:*  All right.

2          *MR. EVANS:*  May it please the Court, Cameron Evans on

3     behalf of Defendant Norm Saari.

4          *MS. HOWARD:*  Sarah Howard and Rhett Pinsky on behalf

5     of defendants Keith Allard and Benjamin Graham.

6          *THE COURT:*  Thank you.

7          Okay.  Counsel, I think I've read everything

8     submitted to me.  My clerks, of course, have read into it as

9     well.  And I think we're prepared to go.

10          I have some preliminary conclusions, and I'll hear

11     from -- I was going to hear from the plaintiff first, but let

12     me hear from counsel for the House of Representatives employees

13     first.

14          *MR. GORDON:*  Thank you, Your Honor.  This is

15     our -- well, there are multiple motions to dismiss.

16          *THE COURT:*  Yes.

17          *MR. GORDON:*  Our first count for dismissal is based

18     upon 12(b)(1), which is lack of jurisdiction based on the

19     court -- because of Eleventh and Tenth Amendment sovereign

20     immunity.  The basis of that claim as to the House is evident.

21     As to the --

22          *THE COURT:*  I have real trouble with that argument

23     that you have.  I think your better arguments -- and I'm not

24     here to help you, I'm doing it so that we can keep moving --

25     would be lack of any property interest that's being affected,

1    number 1.  And -- well, we'll go with number 1 first.  What's

2    your argument on that?  I think I understand it, and I think

3    it's a pretty good argument that there's no property interest

4    that was affected by -- that the plaintiff had that was

5    injured.

6         *MR. GORDON:*  Thank you.  Yeah, there's a lack of a

7    constitutional right to hold office, lack of a property

8    interest.  Arguments based upon the due process and a number of

9    the other claims are based upon two factual allegations which

10   are simply one.  One, that she's an employee.  And two, that

11   because she's an employee of the House she has a property

12   interest and, therefore, she has a property interest, then any

13   removal from office, any of the other actions alleged to have

14   been taken against her violate the various sections in the

15   Constitution.  Her due process of law argument is based solely

16   on those two standards.  There's no Michigan law, case law, or

17   Sixth Circuit case law to support that position.  In fact, we

18   have cited cases in our brief that indicate that holding a

19   public office is not a public right.  A person holding a public

20   office is not considered an employee.  She was a public

21   officer, not an employee.  Therefore, she had no

22   constitutional -- and on top of that, Your Honor, Article IV,

23   Section 16 of Michigan's Constitution gives the House the sole

24   right to determine the qualifications of its members and to

25   remove its members if they believe it's warranted.

1  Additionally, she's also --

2          *THE COURT:*  But then you get into the great

3  argument -- and I went back and read the Adam Clayton Powell

4  case, sort of from my era, long before you guys apparently --

5  where even -- the federal Constitution even has a stricter

6  standard, but the state Constitution says each house shall be

7  the sole judge of the qualifications, the elections, and

8  returns of its members and may with the concurrence of

9  two-thirds of all the members selected therefor and serving

10  therein expel a member.  And then the argument comes, well,

11  they have certain qualifications within the same Section 16,

12  and maybe it's just limited to that.  That was the case that

13  the Powell -- what's your distinction of the Powell case?

14          *MR. GORDON:*  Well, Your Honor, here we have a

15  specific provision in Michigan's Constitution that doesn't set

16  forth grounds for removal.  It says that each house shall be

17  the sole judge of the qualifications of its members.  In fact,

18  the Michigan courts have held that their decision on that basis

19  is not reviewable.  I think that's separate, and we have our

20  own standard, our own state law dealing with removal of

21  individuals.

22          Then -- so, Your Honor, before you even get to that

23  provision point, though, she still has to establish the fact

24  that she is an employee and has a property right to hold that

25  office.  And that's not what the case law says in this circuit

1    or in Michigan.  The courts have held that individuals holding

2    public office or public offices are not employees, they are

3    office holders, therefore, the same protections, removal with

4    due process of law, don't apply.  And that's clear.  And that's

5    based upon her own pleading.  She has the two bases and the two

6    bases alone for that -- for the removal -- or in violation of

7    due process of law.

8            The -- I know Your Honor had indicated that the

9    sovereign immunity argument I shouldn't spend a lot of time on.

10           *THE COURT:*  Yeah, don't spend a lot of time on it,

11   but you can go to legislative immunity, which is different.

12           *MR. GORDON:*  Legislative immunity.  Thank you,

13   Your Honor.  That's based on the speech and debate clause.  The

14   speech and debate clause of the United States Constitution has

15   been interpreted, Michigan courts have adopted that

16   construction because the clauses are very similar.  The speech

17   and debate clause holds that anything within the legislative

18   sphere is immune from suit, immune from damages.  The

19   legislative sphere doesn't only include debate on the floor of

20   Congress or debate on the floor of the House, but it involves

21   all other aspects of the legislature and operation of the

22   legislature.

23           The -- here what could be more germane, more closely

24   related to the operations of the legislature than the

25   legislature exercising its specific authority granted under

1    Article IV, Section 16?  The entire process involved in that

2    encompassed the investigation by the House Business Office,

3    advice to the committees and to the House, interaction between

4    members of the House, and ultimately culminated in 91 members

5    of the House, two-thirds majority, voting that she should be

6    removed.  And an aside is that that was confirmed by her

7    constituents in a subsequent run for office.

8              THE COURT:  That's really irrelevant at this stage, I

9    think.  That's an aside.

10             MR. GORDON:  The actions under the speech or debate

11   clause talk about whether the actions are inextricably

12   intertwined with the operations of the House.

13             Let me, if I may quote, Your Honor, from Gravel

14   versus United States, which is the pretty much preeminent case

15   interpreting the speech or debate clause.  States that the

16   action has to be an integral part of the deliberative and

17   communicative processes by which members participate in

18   committee and House proceedings with respect to the

19   consideration or reject of proposed legislation or with respect

20   to other matters which the Constitution places within the

21   jurisdiction of either House.

22             Clearly the Michigan Constitution has placed within

23   the House's jurisdiction the qualifications of its members.

24   Everything derives from that, and all actions taken by all of

25   the defendants here, all the House defendants that I'm

1    representing, were derivative of that constitutional provision

2    and part of the legislative process.  So under the Gravel case,

3    all of these actions are clearly immune from damages and immune

4    from suit.

5            THE COURT:  Okay.  And go on to qualified immunity.

6    And then we'll hear from -- I'm going to do it by sections --

7    from Mr. Osburn, and then anyone else that wants to pipe up

8    will be able to do so.

9            MR. GORDON:  Thank you, Your Honor.

10            Qualified immunity, of course, addresses an action --

11            THE COURT:  Number 1 rule -- and Mr. Pinsky should

12    have told you, or Ms. Riley -- don't put it there.  My first

13    day as a judge a lawyer put it there and it went --

14            MR. GORDON:  Oh, there?  Thank you, Your Honor.  I'll

15    move it back.  I apologize.  I get dry.

16            THE COURT:  No problem.  No problem.  Go ahead.  It's

17    fun for me to say things like that.

18            MR. GORDON:  Thanks, Mr. Pinsky.

19            There has to be a clearly established statutory

20    constitutional right in order to overcome qualified immunity.

21    So the statutory or constitutional right that is apparently

22    being propounded here by the plaintiff is her right to hold

23    office and not be removed from office without due process of

24    law because she's an employee and because she's an employee she

25    has a property right and, therefore, that establishes a

1    well-known, well-established statutory or constitutional right.

2    But it's just not so.  Because number 1, as we've argued

3    extensively, there's no property right to hold office in the

4    state of Michigan as a member of the legislature.  Number 2,

5    even if there was, the well-established constitutional or

6    statutory right usually goes to rights that are well -- against

7    self-incrimination, well-established property rights.  None of

8    that has even been alleged here I don't think.  So under the

9    qualified immunity standard --

10            *THE COURT:*  Are you aware of any case under the

11   Fourteenth Amendment where a legislator has sued the

12   legislative body under the Fourteenth Amendment?

13            *MR. GORDON:*  I am not, Your Honor.

14            *THE COURT:*  I'm going to ask that question.  You

15   might have an answer.  And successfully I should have said.

16   Successfully sued.

17            *MR. GORDON:*  No, I'm not, Your Honor.

18            *THE COURT:*  Okay.

19            *MR. GORDON:*  So the right is established, clearly

20   established for purposes of the qualified immunity standard

21   when it is sufficiently clear that every reasonable official

22   would have understood what he is doing violates that right.

23   And this is United States Supreme Court Reichle versus Howards,

24   which we've cited in our brief.

25            Here we don't approach that standard.  We don't reach

```
 1    that standard.  It's not applicable because of the fact that
 2    the legislator relies upon her property right as an underlying
 3    basis for every subsequent action and most of the causes of
 4    action in her Complaint.
 5              THE COURT:  All right.  Thank you.
 6              MR. GORDON:  Thank you, Your Honor.
 7              THE COURT:  Mr. Osburn.
 8              MR. OSBURN:  Thank you, Your Honor.  May it please
 9    the Court.
10              THE COURT:  Oh, Mr. Osburn -- and let me tell all
11    counsel this -- it's very helpful when you file your briefs to
12    have an index and then a table of citations, because when I
13    read his brief or your brief and then I want to see what the
14    other side says about it, there are so many of them I've got to
15    flip through there, and it takes me forever to find what we're
16    talking about.  In other words, you say, "Well, that's not true
17    what he says."  Well, I want to make sure I understand what he
18    says and then read.  So no criticism, once again, but if we
19    could remember that, it would be very helpful from now on.
20              MR. OSBURN:  I will do that, Your Honor.  Thank you.
21              THE COURT:  Okay.
22              MR. OSBURN:  Your Honor just asked if there was any
23    case out there where -- forgive me if I misinterpreted what you
24    asked -- but where there was an expelled legislator who has
25    successfully sued on the basis of their expulsion.  Actually
```

```
 1   just this morning --
 2             THE COURT:  No, under the due process clause.
 3             MR. OSBURN:  Solely under the due process clause?
 4             THE COURT:  Under the due process clause.
 5             MR. OSBURN:  Okay.  Then the case that I found does
 6   not indicate that -- does not implicate the
 7   Fourteenth Amendment.
 8             THE COURT:  What does it implicate, then?
 9             MR. OSBURN:  Well, in this case an expelled member of
10   the state legislature -- this is a district court case out of
11   Alabama -- but he successfully sued, and they essentially held
12   he didn't have -- he was not even accorded the barest rudiments
13   of due process.  So they mentioned due process.  I don't
14   believe they explicitly cite the Fourteenth Amendment in here,
15   but they do mention his right to have due process and notice of
16   the charges and fair opportunity.
17             THE COURT:  Well, the general rule regarding -- the
18   Supreme Court really tightened up in that area recently.  And
19   it used to be that you could sort of reason your way into a
20   violation, but now they say that it has to be clear to a
21   person, you know, a typical police officer.  And unless you
22   have a case, as I read it, pretty much on point, you don't have
23   a claim for a violation of the Fourteenth Amendment
24   due process.
25             I got -- I had a case myself that I was affirmed on,
```

```
1    I found that there was a violation.  And then, of course, it's
2    appealed because you get an interim appeal in those cases.  I
3    was affirmed by the Sixth Circuit.  It goes up to the
4    Supreme Court.  Some new cases came out, they reversed the
5    Sixth Circuit, reversed me, because the wrong standard.  That
6    was a standard that was applicable maybe four years ago, but
7    now the standard is really tough.  You've got to pretty well
8    find a case directly on point.  So what is your best case?
9            MR. OSBURN:  Forgive me, Your Honor, are you speaking
10   with regard to qualified immunity or --
11           THE COURT:  No -- yes, with qualified immunity.  I
12   guess I jumped -- jumped over a little bit.  Yeah.  Qualified
13   immunity.
14           MR. OSBURN:  Well, I think it's important for
15   qualified immunity -- the best case that -- I've cited the
16   seminal case Harlow versus Fitzgerald and then Mullins versus
17   Cyranek which was a Sixth Circuit case.  And that says whether
18   the facts -- Your Honor knows what that says -- whether the
19   right violated was clearly established.  But the right violated
20   here is not just the constitutional right to procedural
21   due process.  We've pled conspiracy.  We've pled --
22           THE COURT:  Well, I'm talking just about Count 1
23   right now.
24           MR. OSBURN:  As far as the procedural due process?
25           THE COURT:  Yeah.
```

1          *MR. OSBURN:*  Those are the cases -- I couldn't find a

2     Sixth Circuit case on point, Your Honor.  This is a unique

3     case, and I think that that -- in the history of the Michigan

4     legislature, there have been four members that have actually

5     been expelled.  So this is not a case that -- where it comes up

6     a lot in any circuit, let alone the Sixth Circuit.  So, no, I

7     did not find a case directly on point as to that point,

8     Your Honor.

9          *THE COURT:*  Okay.

10         *MR. OSBURN:*  But as far as -- as far as the rest of

11    the counts with qualified immunity, I mean, it's clear that my

12    client had a right not to be stalked, not to be wiretapped, not

13    to be extorted.  I don't think that they can argue with a

14    straight face that she did not have those rights and that they

15    didn't know she had those rights.

16         *THE COURT:*  All right.  Thank you.

17         *MR. OSBURN:*  Now, with regard to the procedural due

18    process rights, again, because of the uniqueness of this case

19    and the fact that it just doesn't happen when you expel a

20    member of the legislature, the cases -- the seminal

21    Sixth Circuit case, Burks versus Perk, involved a committee

22    that served and they could be removed for cause by the mayor.

23    They were not duly elected members of Congress.

24         My client at all times during this whole -- during

25    the whole nine months of her time in office met all of the

1    qualifications to be a House of Representatives member.  And,

2    yes, the House has the sole right to judge the qualifications

3    of its members, and she met those qualifications.

4              THE COURT:  You're saying the qualifications then are

5    limited, like Adam Clayton Powell said many years ago, to the

6    age, citizenship, and residence?

7              MR. OSBURN:  Well, yeah, in the Michigan Constitution

8    it's at least 21 years of age, an elector of the district you

9    represent, a citizen, and have not been convicted of subversion

10   or a felony involving a breach of the public trust.

11             At all times she met the qualifications.  And even in

12   the Powell case, which does involve an exclusion as opposed to

13   an expulsion -- so I know there is that distinction out there

14   that has to be addressed -- but with regard to expulsion the

15   court did state that a member whose expulsion is contemplated

16   may as a matter of right address the House and participate

17   fully in debate.  And that just didn't happen in this case.

18   That didn't happen in this case.  And I think that's important

19   because what defendants, I think, would like this Court to do

20   is to put all of the other claims of stalking and wiretapping

21   and conspiracy, put all of those claims in one bucket and then

22   put the procedural due process violation in another bucket.

23   And I don't think you can do that in this case.  Because what

24   we've shown, what the evidence has shown, is that during this

25   period of time the House defendants had meetings, had a lot of

1    meetings with the staff defendants, Allard, Graham, and Cline.

2    And during this time the staff defendants -- Allard, Graham,

3    and Cline -- had over 200 communications with Defendant Gamrat

4    and Defendant Horr who were the extortionists in this case as

5    per the Michigan State Police report.

6              You have staff defendants representing that they work

7    for the speaker, that they know the office is bugged.  The

8    extortionist representing that he had a meeting with the

9    speaker.  We have attached evidence to show this nexus between

10   the defendants.  And now this formed the foundation, formed the

11   basis of her ultimate expulsion.  So I don't see how you can

12   separate it the way the defendants want to separate it.

13   Because the only reason that she was expelled is because of all

14   these activities that were going on.  All these illegal and

15   tortious activities that were going on throughout the time --

16   throughout her time as a state representative.  And I think

17   that's what distinguishes this case, is that you just can't

18   make that distinction, because that, again, formed the

19   foundation.

20             And then any evidence that we might have of

21   communications, as per my supplemental brief or my motion for

22   leave and supplemental brief attached, a lot of it has been

23   destroyed.  Now, there are two computers that were seized by

24   the House that we might still be able to get information off

25   of, but part of the information destroyed was a messaging

system between legislators and their staff.  So we don't know any of the content of those messages.  But the evidence destroyed went directly to the content of the meetings between the staff defendants and the House defendants.

The only thing we have to show at this point to survive a (b)(6) motion is that our claims are plausible.  And the evidence that we've submitted to show the nexus between the defendants and as it relates to her ultimate expulsion clearly nudges those claims to plausible.

Now, as far as legislative immunity goes, I know Your Honor brought that up, the purpose of legislative immunity is to preserve the integrity of the legislative process and independence of legislators.

Now, to extend the legislative sphere -- and this is why I think it's important that you can't separate this into two buckets like defendants have tried to do -- the scope of the legislative sphere to encompass now the activities that happened that led up and directly caused my client's ultimate expulsion, those being the tortious activities described in the Amended Complaint, I don't see how you can make an argument that they should be afforded legislative immunity for those actions taken.  And, again, those actions directly led to her expulsion.  I think to extend the legislative sphere that far is simply not warranted.

And then in the case of Haskell versus

1    Washington Township, which is a Sixth Circuit case, it

2    specified that a legislative action that singles out

3    specifiable individuals and affects them differently should be

4    considered administrative rather than legislative anyway.  But,

5    again, even if it is a legislative action, to extend that

6    sphere to include the totality of what happened in this case is

7    way too broad.  And the courts have recognized that that sphere

8    is not unlimited.

9             THE COURT:  Well, the question is, I think -- this is

10   a quote from Eastland -- "An integral part of the deliberative

11   and communicative processes by which members participate in

12   Committee and House proceedings with respect to the

13   consideration and passage of or rejection of proposed

14   legislation or with respect to other matters which the

15   Constitution places within the jurisdiction of either house."

16   That's the kind of activity that is covered by the legislative

17   immunity.

18             In other words, it's more than just getting on the

19   floor and arguing.  It's discussions regarding other proposed

20   legislation.  And the other thing is the actions of the House

21   itself.

22             One of the problems I have -- and it's not briefed or

23   anything -- but that I have, and it's mentioned in the Powell

24   case, and that is how much should courts get involved in

25   telling state legislatures or the United States Congress how to

1    run their business?  It's a very difficult thing.  And, you

2    know, the court keeps creeping into what you might call

3    legislative matters, and the legislature tries to creep

4    sometimes into what the court does.  So I'm a hesitant judge

5    here, I think.  But anyway.  That's me.

6        *MR. OSBURN:*  Sure.  I appreciate that, Your Honor.

7    But the case law does say that that absolute immunity does not

8    extend even to traditionally legislative actions taken in bad

9    faith because of corruption or primarily in furtherance of

10   personal interest.

11       We've pled the bad faith and the corruption as it

12   pertains to this whole legislative process that they are trying

13   to be -- that they are trying to have covered by this

14   legislative immunity.

15       *THE COURT:*  All right.  Okay.  I think you've

16   addressed qualified immunity and legislative immunity.

17       *MR. OSBURN:*  Yes, Your Honor.  And I have addressed

18   procedural due process as well.  There is a -- yes, they

19   have -- the House has the sole -- the sole authority to judge

20   the qualifications of its members, but it has to do so in a

21   fair and just manner, and that's in the Constitution as well.

22       *THE COURT:*  Okay.

23       *MR. OSBURN:*  And that's part of what we've pled in

24   our Amended Complaint is that they have not comported with that

25   responsibility or their responsibility under the

1    Fourteenth Amendment.

2              *THE COURT:*  All right.  Thank you.

3              *MR. OSBURN:*  Thank you, Your Honor.

4              *THE COURT:*  Yep.  Anybody else want to jump in on

5    this?

6              *MS. HOWARD:*  We'd like to address the arguments in

7    our motion.

8              *THE COURT:*  Just those issues, legislative immunity?

9              *MS. HOWARD:*  No, nothing on that issue.

10             *THE COURT:*  All right.  Anything more from one of the

11   defendants?

12             *MR. EVANS:*  Not on behalf of Defendant Saari.

13             *MR. GORDON:*  If I may, Your Honor, one small point.

14   Again, going back to the employee issue, is that she claims

15   that -- the plaintiff claims that her removal by the House was

16   in violation of her due process rights because she's an

17   employee.  Employees' due process rights under the Loudermill

18   case -- and I don't have the full cite -- are simply that the

19   employee is offered an opportunity to be advised of the charges

20   and to respond if necessary.  It's not a hearing right.  It's

21   not a grievance or an arbitration.  It's here is a charge.  Did

22   you do it or not?

23             She was fully aware of the charges brought against

24   her.  She had an opportunity to address those before the

25   committee.  And I don't know if she attempted to do so before

```
1    the House, but there certainly are procedural rules of the

2    House that allow members to speak.  So even if she were an

3    employee, there's no due process right because she was afforded

4    due process rights that are given to employees.

5            THE COURT:  All right.  Don't go anywhere.  Jump to

6    the communications act, the federal Telecommunications Act and

7    the state Communications Act, and the eavesdropping statute.

8            MR. GORDON:  Thank you, Your Honor.  As to those

9    acts, there's really nothing implicating any of my clients

10   other than speculation.  And gross speculation that perhaps

11   there were wiretaps.  And -- but -- I'm sorry -- but none of my

12   clients participated in any wiretapping -- that's admitted in

13   the Complaint -- under either the Michigan or the federal act.

14   None of my clients ordered anybody to engage in any

15   wiretapping.  There is speculation and conjecture in the

16   Complaint that is "on information and belief I think that maybe

17   some of the House defendants ordered the other defendants to

18   engage in wiretapping."  But there's no concrete allegation to

19   that effect.

20           THE COURT:  Well --

21           MR. GORDON:  I'm sorry, Your Honor.

22           THE COURT:  Wiretapping, of course, is secretive by

23   nature, and the argument probably would be that, you know,

24   "Well, give us a little chance here, give us a little time, let

25   us take a few depositions to find out."  It's like conspiracy
```

```
 1   law.  There's a conspiracy which is by definition almost, you
 2   know, secret.
 3          MR. GORDON:  Your Honor, you hit the nail on the
 4   head, if I may.
 5          THE COURT:  Okay.
 6          MR. GORDON:  This is akin to a conspiracy allegation.
 7   And the Sixth Circuit has recognized that with regard to
 8   allegations of conspiracy, and I quote, "It is well settled
 9   that conspiracy claims must be pled with some degree of
10   specificity and that vague and conclusory allegations
11   unsupported by material facts will not be sufficient to state
12   such a claim under federal law."  That's the Spadafore versus
13   Gardner case that we cited in our brief.
14          Here this falls on all fours with that quote.  There
15   are no specific facts.  There is nothing to tie any of my
16   clients with the alleged wiretapping.  In fact, they
17   specifically and vehemently deny there was any involvement
18   there.  But without regard to the existence or nonexistence of
19   wiretapping by other people, the plaintiff has not met the
20   standard of pleading that's necessary to state a cause of
21   action.  It's all based on speculation and information and
22   belief.  Every single count or paragraph that references any of
23   my clients makes that statement.
24          THE COURT:  Okay.
25          MR. GORDON:  So he's guessing, and he says, "Yeah,
```

1      well, you know, give me a chance to do discovery and maybe I'll

2      be able to come up with pleadings adequate to support a cause

3      of action."  That's not what the federal rules require.  That's

4      not what the Sixth Circuit requires.  And he hasn't met that

5      standard.

6                     THE COURT:  Okay.  Thank you.

7                     Mr. Osborn.  Osburn, I mean.  I'm sorry, sir.

8                     MR. OSBURN:  I'm sorry, Your Honor, I didn't catch

9      the last thing you said.

10                    THE COURT:  I said "Osborn" and I meant to say

11     "Osburn."  Sorry.

12                    MR. OSBURN:  No, that's all right.  You know, we've

13     pled with regard to the conspiracy, with regard to the

14     wiretapping these meetings that were occurring.  And they were

15     occurring.  The defendants have admitted they were occurring

16     between the staff defendants and the House defendants.

17                    Now, the content of those meetings, we would love to

18     conduct discovery on those.  Frankly, because of the

19     information that we've uncovered since we've filed the Amended

20     Complaint, that might not even get us to where we need to go

21     because that information has been destroyed by House defendants

22     in either a grossly negligent or an intentional manner,

23     according to our expert.

24                    So, yes -- and, Your Honor, it is secretive by

25     nature, and that's why we pled it upon information and belief.

1    But we pled that the times of these specific meetings with --

2    between House defendants and staff defendants.  Again, there

3    are those extensive communications documented in the State

4    Police report between staff defendants Defendant Joe Gamrat and

5    Defendant Horr.  And, again, all the representations about "I

6    work for the speaker, I work for the speaker."  We have this

7    nexus here.  And, again, that's what we've plead.  These aren't

8    vague and conclusory allegations.

9          Now, again, the content of those meetings, yeah, we

10   don't know what was said, and we won't know until we take a

11   deposition or two or until we're able to look at these other

12   two computers that have been locked by House defendants.

13         *THE COURT:*  So one of the reasons, though, for

14   qualified immunity is so that defendants don't have to go

15   through this kind of discovery before, you know, you get a

16   decision.

17         *MR. OSBURN:*  I understand that, Your Honor.  But,

18   again, they knew when they were taking these actions -- I mean,

19   even if you just look at the destruction of evidence.  They

20   know that it's wrong to tamper with evidence.  I mean, if

21   that's -- if that's the standard here where they can just

22   destroy evidence as to these meetings that occurred or as to

23   anything in particular, yeah, any time you bring a claim

24   against a governmental actor or a governmental agency you're

25   not going to get very far.

1          So I would argue that their argument in that regard

2     that we have not met the standard of the pleading fails because

3     we have pled these meetings, we've pled the communications,

4     we've shown whatever communications we've been privy to at this

5     time.  We know there are more communications because of the

6     State Police interviews with House defendants, with staff

7     defendants that we have not been privy to, that we have not

8     been able to uncover.  So that's what we're -- you know, that's

9     what we're really talking about here.  But, yes, it is by

10    nature secretive, but that's why we're trying to get to the

11    bottom of it.

12          *THE COURT:*  Yeah.  But there are countervailing

13    arguments as well, I think, that were articulated.

14          Okay.  Thank you, sir.

15          Do you want to finish up?  Then I'll give you a

16    chance.

17          *MR. GORDON:*  Yeah.  A couple things, Your Honor.  I

18    object to the continuing reference to destroyed evidence.  You

19    have granted the motion to file a supplemental brief.  The

20    supplemental brief has not been filed.  There has not been an

21    opportunity to respond.  And that contains some wild

22    allegations of destruction of evidence which has not been

23    proved.

24          You have a couple of affidavits attached to that of

25    so-called computer experts, but other computer experts will say

```
 1    that some of the so-called hits or information contained in

 2    their affidavits is caused by an investigator booting up the

 3    computer to download evidence and information.  So that's

 4    offensive.  It's not in the record.  And I think it's

 5    inappropriate to speak to destroyed evidence.  That slanders my

 6    clients.

 7         Now back to the issue you addressed.  There's one

 8    other case cite I'd like to bring to your attention, and that's

 9    on page 34 of our main brief, and it specifically dealt with a

10    Third Circuit dismissal of a wiretapping complaint.  And I

11    quote -- the case is In re: Nickelodeon Consumer Privacy

12    Litigation, and I quote --

13         THE COURT:  What's the cite?  What's the cite on it?

14    Never mind, I've got it here.

15         MR. GORDON:  Thank you, Your Honor.

16         It says, "The plaintiff's allegations of procurement

17    in this case are entirely conclusory and, therefore, fail to

18    comport with the Supreme Court's teaching that all aspects of a

19    Complaint must rest on well-pleaded factual allegations and not

20    merely conclusory statements."  As to my clients all we have

21    are conclusory statements.  "On information and belief" is how

22    every single paragraph starts.  But if you read the paragraph,

23    there's no information, all there is is belief and conclusory

24    statements.  Thank you, Your Honor.

25         THE COURT:  Thank you.
```

1          Is it Mr. Evans?

2          *MR. EVANS:*  Thank you, Your Honor.  On behalf of

3   Defendant Norm Saari, I just have a few points I want to raise.

4   And I think it's important to remember that as chief of staff

5   for then Speaker of the House Cotter, Mr. Saari exited stage

6   right as of August 2nd when he was appointed to the Public

7   Service Commission.

8          With that said, the U.S. Supreme Court in Iqbal says

9   "Plausibility asks for more than a sheer possibility that a

10  defendant acted unlawfully."  And what we have here is a

11  situation of a sheer possibility, which is insufficient to

12  plead a claim under 12(b)(6).

13         There's been some mention about the secretive nature

14  of a conspiracy.  But we have a different procedural posture in

15  this case where there was a curtain dropped to keep people out

16  from seeing what was going on.  The curtain has been lifted to

17  a certain extent already.

18         You have an extensive House Business Office

19  investigation.  You have over an 800-page report from the House

20  Business Office that is public attached to plaintiff's

21  Complaint.  At least portions of it.  You had open hearings in

22  the Michigan House over the charges and the debate and the

23  ultimate votes.  We have police reports from the

24  Michigan State Police that have been made public.  We've had

25  people put under oath in open court in connection with criminal

1   charges that have been brought.

2          And so this thing of let's take a few depositions,

3   plaintiff has far more information than a typical plaintiff may

4   have to understand what is going on.  And what we're left with

5   as it relates to Defendant Saari is paragraph 46 in the

6   First Amended Complaint.  It says, "Upon information and belief

7   it was around this time that Cotter, Saari, and Swartzle began

8   meeting with Allard, Graham, and Cline in order to direct them

9   to gather information against Gamrat."  Gather information

10  about Gamrat.  There's no allegation here that they told them

11  to go and illegally wiretap.  There's no allegation they told

12  them -- that Mr. Saari told them to do anything illegal.  And

13  the simple allegation in connection with people who are

14  employees of the House complaining to a supervisor of improper

15  work conduct cannot be lost in this day and age of harassment

16  complaints that workforces and employers face.

17         Mr. Saari, as the chief of staff, if this were a

18  harassment complaint, what, now he is prohibited from having an

19  investigation done?  Because if you do an investigation you're

20  going to be sued for civil conspiracy, stalking, wiretapping,

21  eavesdropping?  If you don't do an investigation, you're

22  dropping the ball on your responsibilities of being management

23  and an employer for looking into serious legitimate concerns.

24         I think Exhibit -- paragraph 46 and also

25  paragraph 190, 1-9-0 in the First Amended Complaint, again it's

1    upon information and belief to conduct surveillance or to

2    gather information.  There's nothing in those allegations that

3    are sufficient to say that it's anything more than a sheer

4    possibility that Mr. Saari directed them to do anything

5    illegal.

6               And if you look at the House business report,

7    Mr. Saari is interviewed and he does not have any, any

8    information that was allegedly obtained by wrongful wiretaps or

9    eavesdrops -- or eavesdropping from Allard, Graham, and Cline.

10   So as it relates to Defendant Saari, there's some additional

11   reasons that we believe that that claim should be dismissed as

12   to him on a 12(b)(6) motion.

13              *THE COURT:*  Okay.  Thank you, sir.

14              Mrs. Howard.

15              *MS. HOWARD:*  Yes, Your Honor.

16              *THE COURT:*  Formerly known as Ms. Riley, I believe.

17              *MS. HOWARD:*  Your Honor, I represent Keith Allard and

18   Ben Graham who are before this Court in a separate case

19   involving these events, as Your Honor is aware.

20              *THE COURT:*  Well, before the Court, that gives it a

21   whole new meaning.  I don't think they were ever here.

22              *MS. HOWARD:*  That's true, Your Honor.  Before the

23   Court in the legal sense, I guess.

24              *THE COURT:*  Yes.

25              *MS. HOWARD:*  To simply address the wiretapping and

1    the eavesdropping count, which is Count 5, with respect to my

2    clients Allard and Graham.   There is nothing in the Complaint

3    which supports such a claim on -- as to my clients.

4          I would address -- I'm going to start backwards, I

5    think, because it makes the most sense.   With respect to the

6    issue raised by plaintiff in the supplemental brief about the

7    alleged spoliation of evidence.   I have no idea whether or not

8    that allegation is true or not, but it has nothing to do with

9    my clients who were terminated from the House, not in a

10   position to effect anything related to spoliation of evidence.

11   The plaintiff has not alleged that they were.   There would be

12   no way to allege that they were.   And so to the extent that any

13   spoliation took place or did not take place, that issue has

14   zero relevance to my clients and whether or not they are

15   entitled to dismissal with prejudice of the claims today or

16   not.   They had no control over it.   They can't possibly be held

17   responsible for it.   And nobody has alleged that they had any

18   control over it, Your Honor.   Now, with respect to -- and that

19   would apply to all the claims.

20         With respect to the wiretapping and eavesdropping

21   claims, the Complaint -- to the extent that there are specific

22   allegations and not mere conclusory allegations, the Complaint

23   references outside sources.   The response brief talks about

24   various allegations and things that are in those reports.   But

25   even if the Court were to permit amendment of the Complaint,

1    that would be futile because there's nothing that's cited that

2    provides direct evidence which would support this claim.

3            The plaintiff talks about the text messages with

4    Joe Gamrat, but there's no indication there that -- to support

5    a claim that either of my clients violated federal

6    wiretapping/eavesdropping statutes or state statutes.

7            The references -- another one of the references to

8    the State Police report talks about text messages, but it

9    contains only records of text messages being sent, not what was

10   in them.  So there's nothing there to support that there was

11   illegal wiretapping, eavesdropping going on.

12           There was a reference to the House Business Office

13   report where staffer Ann Hill says she wonders if my client is

14   engaged in surveillance.  That's not enough under the Iqbal

15   standard to constitute a sufficient allegation to support the

16   claim.

17           There is a reference on page 10 of plaintiff's

18   response brief at page ID 703 where the plaintiff talks about

19   potentially Ben Graham wiretapping a phone call between Courser

20   and Gamrat.  The only thing I can think of that she's talking

21   about there is when my client lawfully recorded the

22   conversation he had with Todd Courser the night in May when

23   Mr. Courser asked Mr. Graham to send the infamous controlled

24   burn email.  And Mr. Courser called Cindy Gamrat on the phone

25   and talked to her while he was talking to Ben Graham and the

1   recording picks up some parts of that conversation from the
2   side that Mr. Graham can hear.  But there's nothing illegal
3   about that because he was a party to the conversation with
4   Mr. Courser.  And I'm not even sure that's the telephone call
5   that they are talking about, but that's the only one I can
6   think of.  And, again, that's only mentioned in the response
7   brief.  I can't find anywhere where that's alleged in the
8   Complaint.  So, again, not enough to support an illegal
9   wiretapping or eavesdropping claim.
10         And then it's simply not plausible, the conclusion,
11   such that it is alleged, that is being asked to be drawn in the
12   Complaint.  Which was that Allard and Graham were working with
13   the House defendants.  Everything -- a lot which is cited is
14   cited directly back to my client's separate Complaint alleging
15   they were fired in violation of the First Amendment, alleging
16   they were retaliated against, alleging they were fired in
17   violation of the Whistleblower's Protection Act.  So to infer
18   and cite that Complaint and say they were obviously working
19   together simply doesn't make logical sense since that Complaint
20   alleged the very opposite of they were working together.
21         But as Mr. Evans points out, they certainly were
22   allowed to meet, which they did, to go and report to House
23   leadership that they felt there were untoward, illegal,
24   unethical things going on in the office, which is what
25   happened.  All they have alleged is that there were meetings

```
1    taking place, which no one disputes there were meetings taking

2    place.  But it's a big jump to say what they must have been

3    discussing was illegal surveillance, that they had done illegal

4    surveillance, that they had done illegal wiretapping, and

5    there's simply nothing to provide factual basis in the

6    allegations in the Complaint or otherwise, frankly, to support

7    that conclusion.

8              It is a long way to say that they were meeting than

9    to argue that the House leadership directed them and that they

10   directed them to do something illegal.  There's just simply no

11   factual support in this Complaint or in any other document

12   we've been pointed to to go chase after these allegations to

13   support that.  And as a result, Your Honor, the Count V must be

14   dismissed with prejudice against my clients.

15             THE COURT:  Thank you.

16             MS. HOWARD:  Thank you.

17             THE COURT:  Anybody else?  Mr. Osburn, do you want to

18   say anything in reply, rebuttal?

19             MR. OSBURN:  If I just may, a couple things,

20   Your Honor.  As to Defendant Saari, we're absolutely not saying

21   that an investigation can't be done.  We are saying that it has

22   to comport with the law.  And that's the issue in this case.

23   And to the extent that he relies upon the HBO report and even

24   his client's statements in the HBO report, that report was

25   based on the unsworn testimony, unsworn statements.  There was
```

1   no testimony in that -- in the HBO report.  My client was not

2   allowed to call witnesses.  My client was not informed of the

3   charges against her.  My client was not allowed to test any of

4   the claims that were being levied against her.  And if she had

5   been, as we later found out, because charges were brought

6   against my client, my client was brought up on charges related

7   directly to the contents of that HBO report.  And as soon as

8   she had a chance, through her counsel at the time, to conduct

9   an evidentiary hearing, to confront the witnesses against her,

10  to take a look at some of the evidence, it was thrown out --

11  the charges were thrown out.  The charge of misconduct in

12  office were thrown out at the probable cause hearing.  So

13  whatever reliance they may have on this HBO report as it

14  pertains to misconduct of my client is misplaced because it has

15  no credibility in that regard.

16          As to Defendants Allard and Graham stating that the

17  contents of our supplemental brief and the information

18  regarding the spoliation doesn't affect her clients I think is

19  a little bit too broad because it does affect the

20  communications that her clients may have had with House

21  defendants.  We're not claiming that they spoliated the

22  evidence, but I think it does affect our claims as they pertain

23  to her clients.

24          And not only that, in the state police interviews

25  Defendant Beydoun referenced multiple recordings made by

1   Ben Graham.  We have not been privy to any of those recordings.

2   And we've presented the evidence that during this time -- well,

3   my client is -- this isn't in dispute, my client was being

4   extorted during this time.  We have extensive communications

5   between Defendants Allard and Graham and the extortionist

6   defendants.  And not only that, Defendant Allard and Graham

7   both --

8            THE COURT:  What -- define for me better the

9   extortion, if you would, please.  The word "extortion."

10           MR. OSBURN:  Sure.  During this time my client

11  started receiving -- her and Representative Courser started

12  receiving text messages from an unknown person essentially

13  trying to blackmail her into -- and Representative Courser into

14  quitting and to informing their spouses about the affair,

15  threatening to reveal compromising recordings and information

16  regarding the affair.  And eventually it came out that that

17  person was believed to either be Representative Gamrat's

18  husband, ex-husband, and Defendant Horr.  And, again, between

19  those two people and staff defendants Allard and Graham and

20  Cline we have over 200 communications during this time.  Of

21  which we don't have all of them, but we know they exist because

22  they are referenced in the State Police report, so . . .

23           THE COURT:  Then how do you link that to particular

24  defendants in this case?

25           MR. OSBURN:  Because at that point -- what do you

1    mean particular defendants, Your Honor?  Which defendants?

2            THE COURT:  Any of them.

3            MR. OSBURN:  Because at that point these

4    extortionists referenced these recordings that they had,

5    these -- everything that they had pertaining to my client's --

6    the affair that my client was engaged in at the time.

7            Again, during that time my --

8            THE COURT:  Based on --

9            MR. OSBURN:  Yes.

10           THE COURT:  -- what you have said and what

11   Mrs. Howard has said, you're saying that someone was trying to

12   extort your client with disclosing information about her

13   apparently and, therefore, I get to sue these defendants?

14           MR. OSBURN:  Because during that time my client's --

15   or I'm sorry -- the extortionist defendants were in constant

16   communication with staff defendants.  And we have information

17   that staff defendants were even sending pictures of my client's

18   vehicle at various locations to these extortionist defendants.

19   That's the basis of the claim, Your Honor.  So I think that's

20   important to remember.

21           THE COURT:  Okay.  Thank you.

22           MR. OSBURN:  Thank you.

23           THE COURT:  Well, as I -- let me refer to my notes

24   here.  We've hit on the two federal claims, and now we're

25   starting, I think, talking about state law:  Breach of

1   contract, promissory estoppel, malicious prosecution, abuse of

2   process, civil stalking, civil conspiracy, defamation.  I think

3   that's going to be dismissed, correct, Mr. Osburn?

4           MR. OSBURN:  Correct, Your Honor.

5           THE COURT:  And I'll pick up the other dismissals

6   later.  And then fraud.  So we've hit A, B, F.

7           All right.  Let's hear from the House of

8   Representatives, then, on the breach of contract, promissory

9   estoppel.  Unless you want someone else to go forward.

10          MR. GORDON:  I can go forward first, Your Honor.  I

11  never turn down a chance to speak.

12          THE COURT:  All right.

13          MR. GORDON:  For the breach of contract, promissory

14  estoppel charges, it's important to remember that at all times

15  encompassed by the allegations in the Complaint addressing

16  these two issues, which are pretty much intertwined, the

17  plaintiff was represented by outside counsel.  She was not

18  there alone and being taken advantage of by anybody.

19          Now, the breach of contract claim appears to be based

20  on an agreement to issue a joint statement to the

21  House Committee with regard to her actions and so on.  And

22  that's the contract I believe they are alleging is in existence

23  and was breached by she claims --

24          THE COURT:  Tell me that again because I didn't

25  understand.

1          Did you hear him, Mr. Osburn?

2          MR. OSBURN:  Yes.

3          THE COURT:  All right.  Is what he is saying correct

4    as to the contract you're talking about?

5          MR. OSBURN:  Essentially, Your Honor.  There's also

6    the oral representations made by --

7          THE COURT:  That's what I was focusing in on when he

8    was saying that.  Okay.

9          MR. GORDON:  So as far as a written document, it was

10   never signed by both parties.  And it ended up being in essence

11   a plea by the plaintiff for mercy for censure instead of

12   expulsion.  So the requirements for there to be a contract are

13   not met.

14         Now, she claims that there was some oral statement

15   that the House defendants could guarantee a vote in support of

16   censure.  Now, the House defendants that she's speaking to here

17   are the Cotter, Bowlin, Swartzle, McBroom, and Beydoun.  Now,

18   they are all named, but there aren't any real allegations as to

19   Mr. Bowlin.  And Mr. -- Representative McBroom was head of the

20   Senate subcommittee.

21         Now, they are claiming that, "Well, this was a

22   promise, and it was a promise upon which we could rely because,

23   for example, Mr. Beydoun was house majority counsel, and house

24   majority counsel is the counsel for all the Republicans.  And

25   all the Republicans meet in caucus.  And all the Republicans in

1    the caucus signed some kind of agreement that they would all

2    vote together on substantive issues."  But as we've delineated

3    in our reply brief, that doesn't happen.  One member of the

4    staff -- or the underlying assumption that anybody can

5    guarantee that individual members of a deliberative body are

6    going to collectively vote in one way or another is simply

7    nonsense.  Nobody can reasonably rely on that.

8         The case law in Michigan is that -- and I quote --

9    "Public officers have and can exercise only such powers as are

10   conferred on them by law, and that all persons dealing with

11   such officers are charged with knowledge of the extent of their

12   authority or power to bind the state and are bound at their

13   peril to ascertain whether the contemplated contract is within

14   the power conferred."  That's the Sittler versus Board of

15   Control of Michigan College of Mining and Technology which is

16   cited in our brief.

17        How one could assume that any one of these

18   individuals had the authority, had the power to bind the House,

19   especially when the person making that assumption is a member

20   of the House who has demonstrated a fiercely independent voting

21   track contrary many times to that of the caucus, to rely on

22   that is not reasonable.  There has to be reasonable reliance

23   upon the oral statements.  And the person who is relying on

24   those statements is charged with the responsibility of

25   determining whether such reliance is reasonable.  She cannot

```
 1    make that statement here.
 2              THE COURT:  Okay.  Thank you.
 3              MR. GORDON:  Thank you, Your Honor.
 4              THE COURT:  Mr. Osburn.  I think you've got a real
 5    problem on this, Mr. Osburn.  Her expulsion required the vote
 6    of the entire House, and to say that anyone had any authority
 7    to make any promises to her is beyond comprehension in my mind.
 8              MR. OSBURN:  Well, Your Honor, what was not
 9    mentioned, or maybe it was briefly mentioned, is the caucus
10    pledge that my client signed.  Now, it is true that --
11              THE COURT:  I don't care about that.  These people
12    that go in there, they vote on -- they might have rules that
13    they want to abide by or someone wants to get them to abide by,
14    apparently some of these people are leaders in the house and
15    they want to get everybody to agree on that, and maybe they do,
16    but when it comes to a legislative body, these people go all
17    over the place, in a situation especially like this I would
18    think.  And to say that -- you've got to look at it just beyond
19    your case.  To say that, well, the chief counsel or the speaker
20    or the chief guy in charge of the staff or this state of
21    Michigan has promised me this and then you start investing in
22    it, for example, or any other promise that he might make,
23    everybody knows that it has to be decided by the legislature.
24    That guy can't promise anything.  Anything.  And you're saying,
25    well, he was -- he had so much power that he could tell these
```

```
 1    people how to vote and they would have to do it.  That it's
 2    legally binding.  I've never heard such an argument.
 3              MR. OSBURN:  Well, first of all, for promissory
 4    estoppel the agreement doesn't have to be legally binding.
 5    It's an alternative count to the breach of contract.  But what
 6    you have is in this caucus pledge you have this agreement that
 7    they will vote with the caucus on all procedural votes.  Now,
 8    Mr. Gordon already referenced that this was a procedural vote.
 9    And my client had been forcibly removed from the caucus for
10    allegedly violating the caucus pledge in the past.  So what you
11    have is a promise that the promissor in this case reasonably
12    expected to induce reliance by saying, "Hey, if you sign this
13    censure agreement, you're only going to get censured.  We'll
14    worry about the details later."  And it actually did produce
15    reasonable reliance because she had been forcibly removed from
16    caucus in the past.
17              THE COURT:  It still took the House to do it.
18              MR. OSBURN:  It took two-thirds of the House.
19              THE COURT:  Two-thirds, right.  Under the rules,
20    right.
21              MR. OSBURN:  And Republicans had a majority at that
22    time.  I don't know the exact percentage.  But, again, you have
23    this pledge that my client has already seen enforced.  And I
24    think that's the difference here.  I understand what Your Honor
25    is saying and I don't disagree with you, but in this case my
```

1    client felt firsthand the wrath of Defendant Cotter in being

2    removed from the caucus.  So I think that's what moves this to

3    reasonable in this case.

4         *THE COURT:*  When you sit down just take that

5    rationale and apply it to other people that want tax breaks,

6    build a building and they want state help, all of that stuff.

7         *MR. OSBURN:*  I don't -- I don't disagree with you,

8    Your Honor.  But, again, in this case with that procedural

9    language in there, and it's already been referenced as a

10   procedural vote, my client already having seen the power in

11   this, I think it was reasonable, and that's what we pled.

12        *THE COURT:*  Okay.  Thank you.

13        *MR. GORDON:*  If I may, Your Honor, if I said it was a

14   procedural vote, I was wrong.  It's not a procedural vote.

15   It's a substantive vote.  To expel somebody from the

16   legislature is certainly a substantive vote.  What I was

17   referencing were the nonprocedural votes that we've listed in

18   our response brief which shows that the caucus votes all over

19   the place.  They don't go in lockstep.  Never have.  Never

20   will.  They are all individuals.  So to think that these

21   people, staffers, can bind the legislature is not reasonable.

22        That goes to the promissory estoppel argument also,

23   Your Honor, that the Michigan Supreme Court, one of the

24   elements to demonstrate the existence of a promissory estoppel

25   claim is reliance on the statement made by the other party.

1    The Supreme Court in Michigan has emphasized that the reliance
2    interest protected by promissory estoppel is reasonable
3    reliance.  And that's not here.  And if that's not here, then
4    there's no cause of action.  Thank you.
5              *THE COURT:*  All right.  Thank you.
6              Anybody else?
7              *MS. HOWARD:*  No, Your Honor.  No.
8              *MR. EVANS:*  No, Your Honor.
9              *MR. ASHER:*  No, Your Honor.
10             *THE COURT:*  Okay.  Malicious prosecution, abuse of
11   process.
12             Okay.  Mr. Osburn, let me hear from you first on
13   that, sir.
14             *MR. OSBURN:*  Thank you, Your Honor.  The statute at
15   issue in this case, MCL 600.2907, states that there's civil and
16   criminal liability for every person who for vexation, trouble,
17   or with malice, which we've pled, causes another to be
18   arrested, attached, or in any way proceeded against.
19             The thing that distinguishes this case is that
20   everybody involved, from the House of Representatives to the
21   Attorney General, to the State Police, they are all state
22   actors in this case.  And, again, we've touched on -- or I've
23   touched on the point that the HBO report really has no
24   credibility and had no credibility with regard to the
25   misconduct of my client.  All the House defendants testified to

1   the State Police that they didn't think there was any

2   illegality here and yet they still submitted a resolution to

3   have an investigation done by the Attorney General and by the

4   State Police which caused -- which caused charges to be levied

5   against my client.  That's the basis for our malicious

6   prosecution claim.

7           I mean, this isn't just an independent citizen

8   walking into a police station or a prosecutor's office and

9   handing over some evidence.  And, again, you can't separate --

10  this goes back to my argument -- you can't separate bucket A

11  from bucket B in this case.  The totality of the circumstances

12  in this case certainly indicates that there was malice, that

13  there was -- these were imposed for vexation of my client, and

14  certainly based on an HBO report that was incomplete and not

15  based on any sworn statements.

16          *THE COURT:*  Okay.  As I understand the law, the

17  defendant in order to -- you know, the plaintiff has to show

18  that the defendant instigated the prosecution as distinguished

19  from just reporting something that may have been illegal,

20  otherwise people would never -- I mean, it would be too big a

21  risk to bring something to the attention of the police.

22          *MR. GORDON:*  That's my understanding.

23          *THE COURT:*  Am I correct on that?

24          *MR. GORDON:*  You are correct, Your Honor.

25          *THE COURT:*  Then what does the word "instigating"

1   mean?

2          MR. GORDON:  Here the prosecution -- I think we have

3   to look at intervening steps.  There was the report of the

4   House Business Office that was prepared in the course of

5   legislative responsibility, so we would argue all the

6   immunities apply to that.

7          But secondly, none of these defendants pursued the

8   prosecution.  The House resolution to forward the results to

9   the Attorney General was made by two Democrats.  They were the

10  sponsors.  None of these defendants were.

11         THE COURT:  Well, you can't sue a representative for

12  voting one way or the other.

13         MR. GORDON:  That seems to be where we are.

14         THE COURT:  Unless it's a bribe.

15         MR. GORDON:  That's the action that is being

16  complained of is the referral of this report to the

17  Attorney General.  But once a report was referred to the

18  Attorney General, he enlisted the State Police who conducted

19  their own investigation.  And based upon that, the

20  Attorney General, as the prosecutor, and no one else, made the

21  decision to prosecute plaintiff and the other representative.

22         So by preparing the House report didn't instigate the

23  prosecution.  There was a House resolution that said the matter

24  should be referred to the Attorney General.  Maybe that's what

25  they are talking about.  But you certainly can't prosecute the

1    House members for voting and for passing this on.  There's no

2    nexus there.  The bottom line is that the decision is that of

3    the prosecutor, it's not of the House defendants or any of my

4    defendants here.

5         The quote from our brief, it's a Court of Appeals

6    case from 2015, states "When a citizen places information or a

7    complaint in the hands of the police, even if the information

8    is flawed" -- parenthetically we don't believe ours was -- "and

9    then the police conduct their own investigation and with the

10   prosecutor determine that there was probable cause to pursue

11   the matter, that decision is entirely outside the authority or

12   control of the private citizen."  That quote is on all fours

13   with our situation.  There was no malice.  There was no intent.

14   The legislature was merely following through based upon a

15   resolution request by two Democrats, and they are immune, so

16   there's no case here.

17              *THE COURT:*  All right.  Thank you.

18         *MR. GORDON:*  Shall I address abuse of process?

19              *THE COURT:*  Sure.  Go ahead.

20         *MR. GORDON:*  Well, abuse of process is just wrong.

21   Abuse of process, according to the case law, addresses process

22   that is -- that takes place after a Complaint is filed.  There

23   aren't any allegations that even come close to the requirements

24   of establishing the case of abuse of process against any of

25   these people.  None of them caused process to be served.  There

1    wasn't a Complaint filed that any of them were engaged.  Once

2    the criminal Complaint was filed by the Attorney General, that

3    was all the Attorney General, and the House -- none of the

4    other House defendants had anything to do with that.  So I'm

5    not even sure what the Complaint is attempting to say with

6    regard to abuse of process, but it certainly doesn't meet the

7    statutory or case law standards.  Thank you.

8              THE COURT:  All right.  Thank you.

9              Anybody else want to --

10             MR. EVANS:  Your Honor, just for the record, in

11   plaintiff's response to Defendant Saari's --

12             THE COURT:  You can stand up over here.

13             MR. EVANS:  Plaintiff in her response brief to

14   Defendant Saari's motion, it's page ID 682, she agreed to

15   dismiss her claims for malicious prosecution and abuse of

16   process against Defendant Saari.  I'll just make sure that's

17   noted on the record.

18             THE COURT:  All right.  Thank you.

19             MS. HOWARD:  Your Honor, the same is true with

20   respect to my clients.  The plaintiff has agreed to drop that

21   charge with respect to Defendants Allard and Graham.

22             THE COURT:  All right.

23             MS. HOWARD:  Thank you, Your Honor.

24             THE COURT:  Okay.  Civil stalking, civil conspiracy.

25   Do you want to go for the defendants first on this one?

1          *MR. GORDON:*  Thank you, Your Honor.  Civil stalking

2     is based on an alleged violation of a Michigan statute.  There

3     aren't any allegations that any of the House defendants engaged

4     in any stalking whatsoever.  There is an allegation that they

5     may have directed the alleged activity.  But as with the other

6     complaints, this is akin to conspiracy.  There aren't any

7     facts.  There aren't any concrete -- there's no concrete

8     evidence whatsoever.  It's based upon information and belief.

9     The activities that are complained of, the actual stalking,

10    were not taking place by -- or were not engaged in by any of

11    the House defendants.  So the only claim is that maybe, I'm

12    guessing, they directed stalking of the plaintiff.  But

13    that's -- that's ridiculous, over the top.  And there's no

14    concrete fact.  It's speculation, it's conjecture, and that

15    doesn't meet the federal standards of pleading.

16          Similar -- similarly to the civil conspiracy.  Again,

17    this is from Fieger versus Cox, a Sixth Circuit case, and I

18    quote, "It is well settled that conspiracy claims must be pled

19    with some degree of specificity and that vague and conclusory

20    allegations unsupported by material facts will not be

21    sufficient to state such a claim.  Accordingly, pleading

22    requirements governing civil conspiracy are relatively strict."

23          In Michigan he's required -- the plaintiff is

24    required to prove a concerted action by a combination of two or

25    more people to accomplish an unlawful purpose or a lawful

1    purpose by unlawful means.  Here, again, all we have are

2    conclusory statements as to my clients based upon information

3    and belief.  There's no concrete evidence.  And in order for a

4    civil conspiracy charge to even be made, there have to be valid

5    underlying tort claims.  And we believe that none of the tort

6    claims here are valid and they should all be dismissed.  If

7    they are all, then it stands to reason, as required by law, no

8    civil conspiracy claim can be maintained.  But even if --

9             THE COURT:  Go ahead.

10            MR. GORDON:  -- one or more of the tort claims

11   survive, there aren't any concrete allegations.  It's just

12   guess and speculation.

13            THE COURT:  Is stalking defined as a willful course

14   of conduct involving repeated or continuing harassment of

15   another individual that would cause a reasonable person to feel

16   terrorized, frightened, intimidated, threatened, harassed, or

17   molested and that actually causes the victim to feel

18   terrorized, frightened, intimidated, threatened, harassed, or

19   molested?  Is that the definition?

20            MR. GORDON:  I believe so, Your Honor.  But there

21   aren't any allegations that any of my clients engaged in that

22   kind of behavior.

23            THE COURT:  All right.

24            MR. GORDON:  Thank you.

25            THE COURT:  Anything?

1        *MR. EVANS:*  Two points.  There are no allegations in

2   the First Amended Complaint that Mr. Saari had any contact with

3   the plaintiff that she believes was in violation of the

4   Michigan stalking statute, much less two or more of these

5   unconsented contacts that you reference.

6        And the statute itself, unlike the Michigan

7   eavesdropping statute, does not prohibit or address someone

8   directing someone else to quote-unquote stalk them.  Those

9   would be two additional reasons.

10        *THE COURT:*  All right.  Thank you.

11        *MS. HOWARD:*  Thank you, Your Honor.  With respect to

12   the stalking claim, you are correct, you read the definition of

13   the prohibited conduct or the actionable conduct correctly.

14        So we have a couple of problems with respect to

15   Allard and Graham.  First of all, there's no allegation in the

16   Complaint of contact directly with Cindy Gamrat that would fall

17   under the statute.  You have to have at least two or more

18   incidents of unconsented contact.  But all of the incidents she

19   complains about aren't contact with her, they are contact with

20   her husband, providing information to her husband about her

21   whereabouts.

22        There's a complaint that they forwarded a photo of

23   her vehicle in a public place to her husband.  That wouldn't

24   qualify as stalking.  And, again, to the extent she complains

25   that my clients were somehow indirectly used by Mr. Gamrat or

1    Mr. Horr in the so-called extortion texts, the State Police

2    concluded there was no evidence to suggest that my clients were

3    involved, and so any reference to the State Police report

4    doesn't really help her cause on that claim.

5            In addition, the extortion texts were all sent to

6    Mr. Courser, so whoever was sending those had contact with

7    Mr. Courser, not Ms. Gamrat.  That wouldn't support a stalking

8    claim.

9            There is also -- if you get past all of those things,

10   which you, of course, can't, there's the safe harbor provision

11   that says First Amendment-protected communication or activity

12   would also be excluded from being actionable under the stalking

13   statute, which, of course, we assert strongly that anything my

14   clients said was protected by the First Amendment.  So for all

15   of those reasons, Your Honor, there's no stalking claim against

16   Allard and Graham.

17           There's similarly no civil conspiracy claim.  Both

18   because -- as other defendants' counsel pointed out -- there's

19   no underlying actionable tort.  There's also not sufficient

20   pleading with specificity here that there was a concerted

21   action by two or more persons to either accomplish an unlawful

22   purpose or to accomplish a lawful purpose with unlawful means.

23           For the reasons I talked about earlier, there's no

24   specific allegations that suggest that these defendants were

25   working together.  In fact, all of the evidence to which the

1    Complaint points the reader, like my client's Complaint,

2    suggests to the contrary, that they were not working together.

3    So there's simply nothing here to support civil conspiracy

4    against Allard and Graham either, Your Honor.

5              *THE COURT:*  All right.  Thank you.

6              *MS. HOWARD:*  Thank you, Your Honor.

7              *THE COURT:*  Mr. Osburn.

8              *MR. OSBURN:*  I know we discussed this -- sorry,

9    Your Honor -- I know we discussed this earlier, but again I

10   would just point to the nexus that we have established in our

11   Complaint between House defendants and staff defendants, staff

12   defendants and the extortionists, and everybody referencing

13   that they work for the speaker, all while my client is being

14   harassed.  As early as February of 2015 she's being harassed.

15   She knows that her information is being divulged to somebody.

16   She's receiving --

17             *THE COURT:*  How is she being harassed?  I mean, the

18   standard is pretty high.  Terrorized?

19             *MR. OSBURN:*  Sure.

20             *THE COURT:*  How was she terrorized?

21             *MR. OSBURN:*  Her location was being divulged.  She

22   knew there were recordings, secret recordings of her being

23   taken at that time.

24             *THE COURT:*  All right.

25             *MR. OSBURN:*  My client was receiving extortion texts,

1    so I'm not sure what counsel was referring to that they only

2    went to Mr. Courser.  They went to my client as well about

3    divulging this information.  And this is all during the period

4    of time where defendants are in communication with the

5    extortionists.  So, again, we would point to the nexus between

6    the defendants, which we've pled extensively.

7              Now, as far as the safe harbor provision goes, the

8    case that -- excuse me, Your Honor -- the case that Ms. Howard

9    stated or relied upon is the Nastal versus Henderson &

10   Associates Investigations.  That case explicitly referred to

11   the Private Detective License Act in Michigan and explicitly

12   referred to the fact that the individual in that case who was

13   doing the surveillance was a licensed private investigator, was

14   doing it pursuant to litigation.  That is simply not the case

15   here, and we would argue that that exception does not apply.

16             And not only that, Defendants Allard and Graham were

17   following my client across the state to take pictures and send

18   them to her ex-husband on state time.  And that's -- that's in

19   the Complaint and in the attachments as well.  They would have

20   had to leave on state time to send these pictures of my client.

21             THE COURT:  Okay.  Thank you.

22             MR. OSBURN:  Thank you.

23             THE COURT:  Defamation is gone.

24             Fraud.  You're talking about Evans' statements.  And

25   that's a question of, once again, reliance.

```
 1              Have we handled that one from your perspective,
 2    Mr. Osburn?
 3              MR. OSBURN:  With regard to the fraud claim,
 4    Your Honor.
 5              THE COURT:  Yes.
 6              MR. OSBURN:  I believe we have.
 7              THE COURT:  Okay.  The indemnification, have we
 8    handled that one?
 9              MR. OSBURN:  I don't believe we've touched on the
10    indemnification.  If I may, Your Honor.
11              THE COURT:  Go ahead.
12              MR. OSBURN:  It's just important to understand what
13    we're claiming in the indemnification claim.  And that is we're
14    looking for an order enjoining defendants from refusing to
15    indemnify my client for an unconstitutional reason.  Now, we've
16    pled a violation of her due process rights.  We acknowledge
17    that the indemnification statute is discretionary.  We can't
18    dispute that.  But we also allege that the reasons that they
19    have refused to indemnify her implicate the due process clause.
20    So that's why we're seeking an order enjoining them --
21    enjoining the House specifically from refusing to indemnify my
22    client for an unconstitutional reason.  That's why this falls
23    outside of any of the immunities as well.  We're not seeking
24    money damages, but we are seeking that order here.
25              THE COURT:  Okay.  Thank you, sir.
```

1          *MR. GORDON:*  Just simply on indemnification.  It

2     states it may occur.  The Supreme Court in Michigan has ruled

3     may means may.  It's discretionary.  The relief they are

4     seeking is apparently to have you order an appropriation from

5     the legislature.  I think that's inappropriate here.  And where

6     the statute is discretionary, it's discretionary.  And I don't

7     know any other arguments to make with regard to that.

8          There's one immunity argument that we did not discuss

9     that I just would like to mention.

10          *THE COURT:*  Why don't you go for it, and then I'll

11     give Mr. Osburn a chance to come back.  Go for it right now.

12          *MR. GORDON:*  Is the governmental immunity statute --

13          *THE COURT:*  Okay.

14          *MR. GORDON:*  -- which precludes tort damages against

15     the legislature for public officials acting in their official

16     capacity.  And we've briefed that extensively.

17          *THE COURT:*  That comes up every once in a while.

18     What do you do with a lot of federal acts that say that state,

19     you know, actors may be liable?  But anyway.

20          *MR. GORDON:*  Where the state actors may be liable for

21     an underlying tort?

22          *THE COURT:*  Violating someone's constitutional

23     rights.

24          *MR. GORDON:*  Right.

25          *THE COURT:*  Yeah.

1          *MR. GORDON:*  And I don't think that's been

2   established here or even properly plead.

3          *THE COURT:*  All right.  I think we talked about it

4   earlier anyway.

5          *MR. GORDON:*  Pardon me, Your Honor?

6          *THE COURT:*  I say I think we talked about it earlier

7   anyway.

8          *MR. GORDON:*  Yes, we did.  Thank you, Your Honor.

9          *THE COURT:*  Anything further?

10          *MR. OSBURN:*  I have nothing further, Your Honor.

11          *THE COURT:*  Anything further on anything, Mr. Osburn?

12          *MR. OSBURN:*  No, Your Honor.

13          *THE COURT:*  Anybody want to talk?

14          *MR. GORDON:*  Nothing from the state defendants,

15   Your Honor.

16          *MR. EVANS:*  Nothing, Your Honor, on behalf of

17   Defendant Saari.

18          *MS. HOWARD:*  Nothing else, Your Honor.

19          *THE COURT:*  All right.  I'll take it under

20   advisement.  I was hoping to be able to do something today.

21   I've got other things to think about, and I don't have a

22   secretary, so it's going to take me -- we won't be able to get

23   something out this week, but it will certainly be next week.

24   Okay.

25          *MR. GORDON:*  Thank you, Your Honor.

1          *THE COURT:*  I want to thank everybody for the fine

2   presentations that you had here and your ability to work very

3   professionally together.  We're adjourned.  Thank you.

4          *MR. OSBURN:*  Thank you, Your Honor.

5          *THE COURT:*  But keep in mind index going forward.

6          *MR. OSBURN:*  Yes, I will do that, Your Honor.

7          *THE COURT:*  All right.  You're free to go.

8          *THE CLERK:*  Court is adjourned.

9      *(Proceeding concluded at 3:28 p.m.)*

10                      *   *   *   *   *

11          I certify that the foregoing is a correct transcript

12   from the record of proceedings in the above-entitled matter.

13          I further certify that the transcript fees and format

14   comply with those prescribed by the court and the Judicial

15   Conference of the United States.

16

17   Date:  June 21, 2018

18

19                         **/s/ Glenda Trexler**
                           _____
20                         Glenda Trexler, CSR-1436, RPR, CRR

21

22

23

24

25